# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

D.R., as a minor through parent and next friend Dawn Richardson, A.K., as a minor through parent and next friend, Angy Keelin, C.D.M., as a minor through parent and next friend Crystal McCadden, C.M., as a minor through parent and next friend Crystal McCadden, J.T., as a minor through parent and next friend Nakiya Wakes, N.S, as a minor through parent and next friend Nakiya Wakes, J.W., as a minor through parent and next friend Kathy Wright, C.D., as a minor through parent and next friend Twanda Davis, D.K. as a minor through parent and next friend Rachel Kirksey, M.K. as a minor through parent and next friend Rachel Kirksey, O.N., as a minor through parent and next friend Manita Davis, D.T. as a minor through parent and next friend Manita Davis, D.D. as a minor through parent and next friend Willie Daniels, C.W. as a minor through parent and next friend Chandrika Walker, J.B. as a minor through parent and next friend Jeree Brown, individually and on behalf of all similarly situated persons,

     Plaintiffs,

v.

Michigan Department of Education, Genesee Intermediate School District, Flint Community Schools,

     Defendants.

_____/

**CLASS ACTION COMPLAINT**

Kary L. Moss (P49759)
Kristin L. Totten (P72942)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
ACLU Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201

Gregory G. Little
Lindsay M. Heck
Walter A. Ciacci
Dominique N. Forrest
Laura A. Grai
White & Case LLP
1155 Avenue of the Americas

(313) 578-6800
kmoss@aclumich.org
ktotten@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

David G. Sciarra,
Jessica Levin
Education Law Center
60 Park Place, Suite 300
Newark, NJ  07102
(973) 624-1815
dsciarra@edlawcenter.org
jlevin@edlawcenter.org

Counsel for Plaintiffs

New York, NY 10036-2787
(212) 819-8200
gregory.little@whitecase.com
lindsay.heck@whitecase.com
walter.ciacci@whitecase.com
dominique.forrest@whitecase.com
laura.grai@whitecase.com

_____/

## COMPLAINT

### INTRODUCTION

1.     The state-created public health crisis in Flint, Michigan, whereby an entire population was poisoned with lead-contaminated water, is now well known. Since the full magnitude of this crisis became public in 2015, there have been federal and state inquiries, investigations, task forces, declarations, and appropriations.  Yet there has been no effective response to address the needs of the thousands of children who attend Flint's public schools.  This class action civil rights lawsuit is brought to remedy that failure.

2.     Flint is a community in sustained economic decline,[1] with deterioration of essential infrastructure and public services, including education and public health services.[2] Forty percent of Flint's residents live in poverty, one of the highest rates in the nation for a city of its size.[3] The childhood poverty rate is equally staggering: 42% in Flint as compared to 14.8% in the United States.[4] The majority of Flint's residents are African American.[5]

---

[1] Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 284 (2016) (citing A.J. Jacobs, *The impacts of variations in development context on employment growth: a comparison of central cities in Michigan and Ontario*, 23 ECON. DEV. QUARTERLY 351 (2009) (noting that Flint is a postindustrial region "struggling from years of disinvestment by the automobile industry and associated manufacturing activities: the region has lost 77% of its manufacturing employment and 41% of employment overall since 1980.")

[2] Josh Sanburn, *Why Flint's Life Expectancy Is Below the National Average*, TIME (April 11, 2016), *available at* http://time.com/4290027/flint-genesee-county-life-expectancy-study/.

[3] Abby Goodnough, *Flint Weighs Scope of Harm to Children Caused by Lead in Water*, N.Y. TIMES (Jan. 29, 2016), *available at* http://www.nytimes.com/2016/01/30/us/flint-weighs-scope-of-harm-to-children-caused-by-lead-in-water.html?_r=0.

[4] Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 284 (2016).

[5] Approximately 57% of Flint's 99,000 residents are African American. Abby Goodnough, *Flint Weighs Scope of Harm to Children Caused by Lead in Water*, N.Y. TIMES (Jan. 29, 2016), *available at*

3.     Even before the lead crisis, the Flint public education system was failing its students and the community.   Student enrollment in Flint Community Schools has declined rapidly, graduation rates are low, and drop-out rates high. The district, facing a crippling deficit, has drastically reduced staff, programs and services in recent years, leaving school children in under-resourced, overcrowded classrooms.

4.     Given that lead is known to be a neurotoxin that causes cognitive, developmental and behavioral impairment in children, it is imperative that Flint's public schools be prepared and equipped to provide critical services to students with disabilities.  Yet, as detailed throughout this complaint, in nearly every area of preschool to grade 12 education, the State of Michigan has failed to provide the resources and support essential to enable the Flint public education system to meet the needs of this vulnerable population.  In the wake of the Flint lead crisis, Flint children face an unprecedented educational and civil rights disaster.

5.     As Flint pediatrician Dr. Mona Hanna-Attisha has explained, "If you were going to put something in a population to keep them down for generations to

---

http://www.nytimes.com/2016/01/30/us/flint-weighs-scope-of-harm-to-children-caused-by-lead-in-water.html?_r=0.

4

come, it would be lead." [6]  Lead, without an aggressive, comprehensive and proactive response, will, when combined with poverty, shackle thousands of Flint children to the circumstances into which they were born, narrowing their prospects for a healthy and productive life.

6.      For the children of Flint, education is the antidote to the public health crisis they have endured.  Well-resourced, high functioning schools are tools for self-empowerment, upward mobility, and ascendancy from poverty.  For the thousands of Flint children exposed to lead, their schools must afford them the opportunity to become productive citizens and contributing members of the community, an opportunity they deserve and are entitled to.

7.      Recent congressional testimony of the Superintendent of Flint Community Schools, Bilal Tawwab, highlighted the central role of special education to mitigate the educational emergency confronting Flint's children.  He testified that Flint schools will need "expanded special education services," which must include lead-free facilities, comprehensive screening and evaluation services, early intervention programs, year-round schooling, and the resources to attract and

_____

[6] Abby Goodnough, *Flint Weighs Scope of Harm to Children Caused by Lead in Water*, N.Y. TIMES (Jan. 29, 2016), *available at* http://www.nytimes.com/2016/01/30/us/flint-weighs-scope-of-harm-to-children-caused-by-lead-in-water.html?_r=0.

retain highly skilled special education teachers and support staff.[7]  He accurately described his school district as experiencing an "educational emergency" in desperate and urgent "need [of] support now and into the future."[8]

8.    If the children of Flint are denied meaningful access to essential education teachers, staff, programs and services, their opportunities to contribute to society through productive civic engagement, and to thrive on a personal level, will be permanently foreclosed.  These essential resources must include appropriate services to identify, evaluate and address disabilities in their formative years. Approximately 30,000 school-age children [9] currently reside in Flint.  It is impossible to overstate the resounding effects of the failure to provide meaningful education opportunities, and to provide them now.

9.    Flint is a symbol in the national consciousness of gross governmental malfeasance and a profound inability of government to promptly respond to the vulnerable population who unknowingly are the victims of that malfeasance and

--------

[7] Testimony of Superintendent Bilal Kareem Tawwab, *"The Flint Water Crisis: Lessons for Protecting America's Children,*" House Democratic Steering and Policy Committee (Feb. 10, 2016).

[8] *Id.*

[9] There were 29,711 children between the ages of 0 and 19 residing in Flint during the 2015-16 school year.  Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

inaction.  Children are the most vulnerable victims of the Flint crisis.  Aggressive measures must be taken immediately to redress the failures of the Flint public education system.  If not, Flint will also become a national symbol of the irreversible consequences when government at all levels abandons its children.

## SUMMARY OF LEGAL CLAIMS

10.    This is a class action civil rights lawsuit for declaratory and injunctive relief, brought pursuant to federal and state law, to vindicate the rights of approximately 30,000 school-age children[10] residing in Flint who currently have, or who have placed been at risk of developing, a disability due to elevated levels of lead in the drinking water over an extended time period of at least eighteen months. As a result of this prolonged exposure, these children require community-wide early screening; timely referral for, and performance of, evaluations to determine whether they have a qualifying disability which makes them eligible for special education and related services; provision of special education and related services in the least restrictive environment; and procedural safeguards to ensure that they are not subject to disciplinary measures for disability-related behaviors, in compliance with the mandates of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S. § 1400 *et seq*.; § 504 of the

---

[10] *Id.*

Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12131 *et seq.*; and Michigan law.

11.    The approximately 30,000 school-age children in Flint between the ages of 0 and 19 were exposed to lead-contaminated water over a period of at least eighteen months beginning in April 2014.[11]  This exposure put all children in Flint at risk of a disability.[12]

———————————————

[11] Dominic Adams, *Closing the valve on history: Flint cuts water flow from Detroit after nearly 50 years*, MLIVE (April 25, 2014), *available at* http://www.mlive.com/news/flint/index.ssf/2014/04/closing_the_valve_on_history_f.html

[12] The IDEA defines a "child with a disability" as a child with intellectual disabilities, having mental retardation, a hearing impairment (including deafness), a speech or language impairment, visual impairment (including blindness), a serious emotional disturbance, an orthopedic impairment, autism, traumatic brain injury, any other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.  20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(a)(1).

Lead poisoning is a chronic health problem that may lead to the qualifying disability of "Other Health Impairment" under the IDEA.  An "other health impairment" is defined as "limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that – (i) [i]s due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, *lead poisoning*, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and (ii) [a]dversely affects a child's educational performance."  34 C.F.R. § 300.8(c)(9)(i-ii) (emphasis added).

12.     This population includes approximately 8,000 children[13] under the age of five.  All of these children are at risk of developing a disability, or already have a disability.   Despite this community-wide condition,   Defendants Michigan Department of Education ("MDE"), Genesee Intermediate School District ("GISD"), and Flint Community Schools ("FCS") do not provide early screening, timely referrals for evaluations for Flint three-and four-year olds to identify the existence of a qualifying disability and eligibility for special education and related services, or appropriate early intervention services, including universal, high-quality preschool education.

13.     Similarly, all 5,426[14] of the children attending FCS schools in grades K-12 are at risk of developing a disability due to their prolonged exposure to lead. Despite that risk, FCS has a pattern and practice of systemically failing to provide ongoing screening and timely referrals for evaluations to identify qualifying disabilities which make students eligible for special education services pursuant to IDEA's child find mandate.

_____

[13] There were 7,841 children under the age of 5 residing in Flint during the 2015-16 school year.  Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

[14] There were 5,426 students attending FCS schools in grades K-12 during the 2015-16 school year.  Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

14.    Of the 5,426 students attending FCS schools, 907, or 16.7%,[15] are classified with qualifying disabilities and are consequently eligible for special education and related services.  However, FCS has an ongoing pattern and practice of systemically failing to provide special education and related services compliant with students' individualized education programs in the least restrictive environment, as required by IDEA.

15.    FCS also has an ongoing pattern and practice of systemically failing to provide students with disabilities with procedural safeguards as required by IDEA in the administration of disciplinary practices, as well as a pattern and practice of using unduly harsh disciplinary measures with students with disabilities, including physical restraints and seclusion techniques, contrary to IDEA.

16.    MDE, the State agency charged with conducting oversight and ensuring FCS's and GISD's compliance with IDEA in the provision of special education services, has engaged in an ongoing pattern and practice of systemically failing to provide FCS and GISD with sufficient funding and support to enable

---

[15] There were 907 special education students attending FCS schools in grades K-12 during the 2015-16 school year.  Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

FCS and GISD to provide: early screening and intervention services for children aged 3-4; evaluations for all children at risk of a disability in fulfillment of the child find mandate; special education services compliant with students' individualized education programs in the least restrictive environment; and procedural safeguards to prevent the use of unduly harsh disciplinary measures for disability-related behaviors, as required by IDEA.

17.    The named plaintiffs bring this action on behalf of their own children and all similarly situated children in Flint who have a disability or who are at risk of developing a disability due to prolonged exposure to elevated lead levels in the drinking water.  Plaintiffs seek to remedy the ongoing violations of IDEA, Section 504, Title II, and Michigan law by seeking the provision of early screening and intervention services for children in Flint aged 3-4; identification and evaluation of all children with, or at risk of, disabilities who are attending, or who may attend, FCS schools; special education services compliant with students' individualized education programs in the least restrictive environment in FCS schools; and procedural safeguards when administering discipline to students for disability-related behaviors in FCS schools, including through the elimination of physical restraints and seclusion techniques.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, given the federal questions raised, and 28 U.S.C. § 1343(a), given the civil rights claims raised.  This Court also has jurisdiction over the claims raised herein under 20 U.S.C. § 1415(i)(3)(A) and 29 U.S.C. § 794, which provide the district courts of the United States with jurisdiction over any action pursuant to those sections regardless of the amount in controversy.  This Court has supplemental jurisdiction over the state-law claim pursuant to 28 U.S.C. § 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted occurred within Genesee County, which is located in the Eastern District of Michigan.

## PARTIES

**Representative Plaintiffs**

20.     Plaintiff D.R. is a twelve-year-old who resides in Flint, Genesee County and who is a student in the seventh grade at the International Academy of Flint, a charter school.  He previously attended Holmes 3-6 STEM Academy, an FCS school, through the 2015-16 academic year.  Plaintiff D.R. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case through his parent and next friend, Dawn Richardson.

12

21.    Plaintiff A.K. is a six-year-old who resides in Flint, Genesee County and who attends Jack P. Haas Elementary School, a GISD-run school, where he is completing Kindergarten for a second time.   He formerly attended a preschool program at Durant-Tuuri-Mott Elementary School, an FCS school.   Plaintiff A.K. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.   He brings this case through his parent and next friend, Angy Keelin.

22.    Plaintiff C.D.M. is an eight-year-old who resides in Flint, Genesee County and who attends Pierce Elementary School, an FCS school.   Prior to the 2016-17 school year, he attended Brownell K-2 STEM Academy, another FCS school.    Plaintiff C.D.M. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.   He brings this case through his parent and next friend, Crystal McCadden.

23.    Plaintiff C.M. is a twelve-year-old who resides in Flint, Genesee County and who was a seventh-grade student at the charter school New Standard Academy during the 2015-16 school year.  She is now enrolled in Hamady Middle School, which is part of the Westwood Heights School District, located in Northern Flint.  Plaintiff C.M. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.   She brings this case through her mother and next friend, Crystal McCadden.

13

24.     Plaintiff J.T. is a seven-year-old student in the second grade at Brownell K-2 STEM Academy, an FCS school.  Previously, he was a student at the International Academy of Flint, a charter school, through the 2015-16 school year. Plaintiff J.T. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case through his parent and next friend, Nakiya Wakes.

25.     Plaintiff N.S. is a seventeen-year-old who resided in Flint, Genesee County, and who attended Flint Northwestern High School, an FCS school, through the 2015-16 academic year.  Plaintiff N.S. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  She brings this case through her parent and next friend, Nakiya Wakes.

26.     Plaintiff J.W. is a fourteen-year-old who was repeating the sixth grade for the third time at Holmes 3-6 STEM Academy, an FCS school, when he was expelled from all FCS schools during the 2015-16 school year.  He is now in a juvenile detention facility in Flint.   Plaintiff J.W. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case through is parent and next friend, Kathy Wright.

27.     Plaintiff C.D. is a sixteen-year-old resident of Flint, Genesee County who was a tenth grade student at Northwestern High School, an FCS school, until he was expelled from school in February 2016.  Plaintiff C.D. has been exposed to

14

lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case though his parent and next friend, Twanda Davis.

28.    Plaintiff D.K. is a seven-year-old African-American student in the first grade at Eisenhower Elementary School, an FCS school, who resides in Flint, Genesee County. Plaintiff D.K. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case through his parent and next friend, Rachel Kirksey.

29.    Plaintiff M.K. is a three-year-old who resides in Flint, Genesee County.  Plaintiff M.K. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  She brings this case through her parent and next friend, Rachel Kirksey.

30.    Plaintiff O.N. is an eight-year-old in the third grade at Doyle/Ryder Elementary School, an FCS school, who resides in Flint, Genesee County. Plaintiff O.N. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case through his grandmother and next friend, Manita Davis.

31.    Plaintiff D.T. is a thirteen-year-old who resides in Flint, Genesee County and who is a seventh grade student at Flint Southwestern Academy, an FCS school.  Previously, she attended Doyle/Ryder Elementary School, another FCS school.  Plaintiff D.T. has been exposed to lead-contaminated water for a

prolonged period of at least eighteen months.  She brings this case through her grandmother and next friend, Manita Davis.

32.    Plaintiff D.D. is a twelve-year-old seventh grade student who resides in Flint, Genesee County and who currently attends school in the Carman-Ainsworth Community Schools district.  He previously attended Holmes 3-6 STEM Academy, an FCS school.  Plaintiff D.D. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case through his parent and next friend, Willie Daniels.

33.    Plaintiff C.W. is a four-year-old resident of Flint, Genesee County who attends the daycare and Head Start preschool programs offered on site through the GISD at St. Luke's in Flint.  In June and July of 2015, C.W. attended the daycare program at Uniquely Created Children's Center, which is housed in New Standard Academy, a charter school in Flint.  Plaintiff C.W. has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  He brings this case through his parent and next friend, Chandrika Walker.

34.    Plaintiff J.B. is a five-year-old African-American student in Kindergarten at Eisenhower Elementary School, an FCS school, who resides in Flint, Genesee County.  He has been exposed to lead-contaminated water for a prolonged period of at least eighteen months.  Plaintiff J.B. brings this case through his mother and next friend, Jeree Brown.

16

**Defendants**

35.    Defendant MICHIGAN DEPARTMENT OF EDUCATION ("MDE")
is the department of the State of Michigan government responsible for
administering and enforcing laws related to public education.  Mich. Comp. Laws
§§ 16.400-16.402.  As Michigan's state educational agency ("SEA"), MDE bears
the ultimate responsibility for ensuring that all public schools in Michigan—
including public school academies or charter schools—comply with the Individuals
with Disabilities Education Act ("IDEA").  20 U.S.C. § 1412(a)(11)(A).  MDE is
also a "program or activity" covered by Section 504, 20 U.S.C. § 794(b), and a
"public entity" under Title II, 42 U.S.C. § 12131(1)(A).

36.    Defendant GENESEE INTERMEDIATE SCHOOL DISTRICT
("GISD") is the intermediate school district ("ISD") responsible for overseeing
special education services for students who attend public schools in Flint.  As such,
GISD provides federal, state and local funds to FCS and public school academies
for special education; (2) coordinates the delivery of special education services;
and (3) investigates special education programs and services it or a local district
has been contracted to provide.  Mich. Comp. Laws § 380.1711(1)(h).

37.    Defendant FLINT COMMUNITY SCHOOLS ("FCS") is a public
school district in Flint, Michigan required under Michigan law to provide "special
education programs and services designed to develop the maximum potential of

17

each student with a disability in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the intermediate school district special education plan."   Mich. Comp. Laws §380.1751(1).   FCS is a local educational agency ("LEA") under IDEA, responsible for ensuring that its special education policies, procedures, and programs are consistent with those of the SEA under IDEA.   20 U.S.C. §1414(a)(1).   FCS is also a "program or activity" covered by Section 504, 20 U.S.C. §794(b), and a "public entity" under Title II, 42 U.S.C. §12131(1)(A).

## DESCRIPTION OF PLAINTIFF CLASS

38.   Plaintiffs bring this suit as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all present and future children, ages 3 through age 26,  and the parents of such children, residing within Flint, Michigan, who 1) have been exposed to lead and 2) are or may be eligible for special education and related services pursuant to the IDEA and its federal implementing regulations, Section 504, and Title II, but who have not been timely identified, located, referred, evaluated, or provided with special education and related services.

39.   The Class consists of four subgroups as follows:  1) children aged 3-4 who have been deprived of, and lack access to, early screening and intervention services; 2) children who attend or may attend FCS schools and whose disabilities

18

have not been timely identified and evaluated to determine their eligibility for special education and related services and who do not have completed individualized education programs in accordance with IDEA; 3) students with disabilities in FCS who have not been provided special education and related services in accordance with their individualized education programs in the least restrictive environment; and 4) students with disabilities who are not afforded the procedural and substantive safeguards in IDEA.

40.   The class consists of hundreds of current children, as well as numerous future unknown children, so numerous as to make joinder of all members impractical.

41.   Material questions of fact and law are common to the class, including:

> a. Whether Defendants violated Plaintiffs' rights under the IDEA, Section 504, Title II, and Michigan law by: i) failing timely to identify and evaluate all children with disabilities aged 3-4 or who attend or who may attend FCS schools who require or who may require special education services; ii) failing to provide timely and adequate special education and related services to children determined eligible; and iii) failing to provide compensatory education to all children determined eligible for special education who were not

19

timely identified, evaluated, or provided with legally-mandated special education and related services;

b. Whether Defendants MDE and GISD additionally violated Plaintiffs' rights under the IDEA, Section 504, and Title II by failing appropriately to monitor and enforce Defendant FCS's timely identification of, evaluation of, and provision of, legally mandated special education and related services to, children with known or suspected disabilities who require or may require such services.

42.    The claims of the representative Plaintiffs are typical of the claims of the class.   The representative Plaintiffs, like all class members, claim that Defendants have violated their rights under the IDEA, its federal implementing regulations, Section 504, Title II, and Michigan law, to be identified, evaluated, and, if eligible, provided with special education and related services.   The representative Plaintiffs, like all class members, also assert that Defendants MDE and GISD have failed appropriately to monitor the provision of special education and related services by FCS.

43.    The representative Plaintiffs will fairly and adequately protect the interests of the class as they have no interests antagonistic to those of the class.

20

44.     The representative Plaintiffs' counsel, attorneys from the American Civil Liberties Union Fund of Michigan, Education Law Center, and White & Case LLP, are experienced in civil rights litigation, disability law, education law, and class actions.  The representative Plaintiffs' attorneys will vigorously prosecute this action on behalf of the entire class.

45.     Defendants are acting or refusing to act on grounds generally applicable to the Plaintiff class, making appropriate injunctive relief and declaratory relief with respect to the Plaintiff class as a whole.  The Plaintiff class seeks to enjoin Defendants from continuing to violate their federal and state rights to receive a free and appropriate public education free of discrimination based on their disabilities.

## LEGAL STANDARDS

**IDEA REQUIREMENTS**

46.     The Individuals with Disabilities Education Improvement Act of 2004 ("IDEA") requires that eligible children with disabilities, including children with disabilities who have been suspended or expelled from school, receive a "free appropriate public education."  20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). The IDEA establishes a system of procedural and substantive requirements to

which the Defendants must adhere to ensure that each child with a disability receives a free appropriate public education.  20 U.S.C. § 1401 *et seq.*

47.    A "free appropriate public education" is defined as special education and related services that (a) are provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the state educational agency ("SEA"); (c) include an appropriate preschool, elementary school, or secondary school education; and (d) conform with the student's individualized education program ("IEP").  20 U.S.C. § 1401(9); 34 C.F.R. §300.17.

48.    Local educational agencies ("LEAs"), such as Defendants FCS and GISD, must have in effect policies, procedures, and programs that are consistent with the State policies and procedures established under the IDEA in providing for the education of children with disabilities within their respective jurisdictions.  20 U.S.C. § 1413(a)(1); 34 C.F.R. § 300.201.  The State of Michigan has set forth the policies and procedures as required by the IDEA in Mich. Admin. Code R. 340.1701 *et seq.*

49.    The state educational agency ("SEA") bears the ultimate responsibility for ensuring that all public schools in the state of Michigan comply with the IDEA.  20 U.S.C. § 1412(a)(11)(A).  Accordingly, Defendant MDE is responsible for ensuring that the LEAs – Defendants FCS and GISD – are

monitored for implementation of, and compliance with, the IDEA.   34 C.F.R. §

300.600(a)(1).   If the state determines that the LEA is not in compliance, the state

must take necessary action to enforce compliance.   34 C.F.R. §§ 300.600(a)(3),

300.608(a), 300.222(a).   An assurance of compliance with this law is required by

Mich. Admin. Code R. 340.1701a.

50.    In addition to its general supervisory responsibilities, Defendant MDE

has responsibility to ensure that all LEAs in Michigan, including Defendants FCS

and GISD, implement and comply with the following specific provisions of the

IDEA.

51.    The IDEA mandates that Defendants must have in effect policies and

procedures to ensure that all children with disabilities who are in need of special

education and related services, including those attending private schools, are

identified, located, and evaluated.   20 U.S.C. §§ 1412(a)(3), (a)(7), 1414(a)-(c); 34

C.F.R. §§ 300.111, 300.301, 300.304-300.306.   With respect to children aged 3-4,

the child find mandate, requiring proactive identification, location, and evaluation

of children with disabilities, is not likely to be discharged unless children in this

age range are provided early intervention services, or enrolled in universal

preschool, which would allow suspected disabilities among this population to be

observed and assessed.   The initial evaluation of the child must be conducted

within sixty days of receiving parental consent for the evaluation or within the

timeframe that is established by the State.   20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1).   Under Michigan law, the time from receipt of parental consent for an evaluation to the notice of an offer of a free appropriate public education or the determination of ineligibility shall not be more than 30 school days.  Mich. Admin. Code R. 340.1721b(1).

52.     Defendants must also ensure that an individualized education program ("IEP") is developed, reviewed, and revised for each child with a disability to enable the child to receive a free appropriate public education.   20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-300.324.   The IEP is defined as a written statement which must include, *inter alia*, a statement of the student's present levels of academic achievement and functional performance, measurable annual goals, and the special education and related services that will be provided. 20 U.S.C. §1414(d)(1)(A)(i); 34 C.F.R. § 300.320(a).   A meeting to develop an IEP must be conducted within 30 days of a determination that the child needs special education and related services.  34 C.F.R. § 300.323(c)(1).  The IEP Team consists of a) the parents of the child; b) the child, where appropriate; c) at least one regular education teacher; d) at least one special education teacher, or if appropriate, at least one special education provider; e) a representative of the LEA who is qualified to provide or supervise the provision of specially designed instruction for children with disabilities and is knowledgeable about the general

24

curriculum and the availability of LEA resources; f) an individual who can interpret the instructional implications of evaluation results, who may already be a member of the team; and g) at the discretion of the parent or agency, other individuals with knowledge or special expertise regarding the child, including related services personnel.  20 U.S.C. §1414(d)(1)(B); 34 C.F.R. §300.321(a).  As soon as possible following the development of the IEP, the SEA and LEAs must ensure that special education and related services are made available to the child in accordance with the IEP.  34 C.F.R. § 300.323(c)(2).  Under Michigan law, within seven school days from the date of the IEP team meeting, the public agency shall provide the parent with the notice of the offer of a free appropriate public education, and shall initiate the IEP as soon as possible and not more than 15 school days after the parent's receipt of the written notice.  Mich. Admin. Code R. 340.1721b(3).

53.    Defendants must ensure that children with disabilities are afforded the procedural safeguards required by the IDEA when disciplinary action is contemplated.   20 U.S.C. §§ 1412(a)(6)(A), 1415(k); 34 C.F.R. §§ 300.150, 300.500, 300.530-300.536.  Pursuant to the IDEA, the SEA must examine data to determine if significant discrepancies exist in the rates of long-term suspensions and expulsions of children with disabilities, either between different LEAs or between disabled and nondisabled students within the same LEA.   20 U.S.C.

§1412(a)(22)(A); 34 C.F.R. § 300.170(a).  If such discrepancies exist, the SEA must review and, if appropriate, revise (or require the affected LEA to revise) its policies, procedures and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure compliance with the IDEA.  20 U.S.C. § 1412(a)(22)(B); 34 C.F.R. § 300.170(b).

54.    Defendant MDE must ensure that each LEA in Michigan, including Defendants FCS and GISD, takes steps to ensure that children with disabilities within its jurisdiction have available to them the variety of educational programs and services available to nondisabled children, including art, music, industrial arts, consumer and homemaking education, and vocational education.   20 U.S.C. §§1412(a)(2), 1413(a)(1); 34 C.F.R. § 300.110.

**SECTION 504 AND TITLE II REQUIREMENTS**

55.    Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act prohibit public entities such as SEAs and LEAs from discriminating against individuals with disabilities.  Pursuant to Section 504 and Title II, public schools are prohibited from excluding students with disabilities from participating in or receiving the benefits of a school's services, programs, or activities, and such exclusion constitutes disability discrimination.  29 U.S.C. § 794(a); 42 U.S.C. § 12132.  Accordingly, each student with a disability must be

26

provided access to all programs provided to non-disabled students.  29 U.S.C. §

794; 42 U.S.C. § 12132; 34 C.F.R. § 104.21.  Furthermore, Section 504 and Title II

require that each disabled student be provided reasonable accommodations and

modifications designed to provide meaningful access to educational benefits, or as

necessary to avoid discrimination on the basis of disability.  34 C.F.R. § 104.12; 34

C.F.R. § 104.44; 28 C.F.R. § 35.130(b)(7).

56.     The nearly identical anti-discrimination mandates in Section 504 and

Title II apply to qualified individuals with disabilities.  29 U.S.C. § 794(a); 42

U.S.C. § 12132.  In the preschool, elementary and secondary education context, the

term "qualified individual" refers to

> a handicapped person (i) of an age during which nonhandicapped
> persons are provided [public preschool, elementary, or secondary
> educational] services
> (ii) of any age during which it is mandatory under state law to provide
> such services to handicapped  persons, or (iii) to whom a state is
> required to provide a free appropriate public education under [the
> IDEA].

34 C.F.R. § 104.3(*l*)(2).

57.     Section 504 and Title II define "disability" as "a physical or mental

impairment that substantially limits one or more major life activities."  42 U.S.C. §

12102(1)(A); 29 U.S.C. § 705(9)(A).  Qualified students with disabilities can

demonstrate that their SEA discriminated against them pursuant to the following

analysis:

27

1. The plaintiff-student is disabled, according to the common definition;

2. The plaintiff-student is otherwise qualified to participate in school activities;

3. The SEA receives federal financial assistance; and

4. The plaintiff-student was excluded from participation in, denied the benefits of, or subject to discrimination at the school.

58.     Section 504 also mandates that each child with a disability in Flint receive a free appropriate public education including the provision of regular or special education and related aides and services to meet the needs of the student. 29 U.S.C. § 794; 34 C.F.R. § 104.33.

**MICHIGAN LAW**

59.     Under Michigan law, each child with a disability shall be provided with programs and services designed to develop his or her maximum potential. Mich. Comp. Laws § 380.1711(1)(a).

## STATEMENT OF FACTS

60.     There are approximately 30,000 children[16] aged nineteen or under residing in Flint, 5,426[17] of whom are students attending FCS schools in grades K-

---

[16] There were 29,711 children between the ages of 0 and 19 residing in Flint during the 2015-16 school year. Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/ (last visited October 17, 2016).

12.  All of these children have been exposed to elevated lead levels in the drinking water for a period of at least eighteen months beginning in April 2014,[18] when Flint's water source was changed from Detroit-supplied Lake Huron water to the Flint River as a temporary cost-saving measure, awaiting a new pipeline to Lake Huron in 2016.[19]

61.    A study conducted in February 2016 by Hurley Medical Center found that the incidence of elevated blood lead levels in Flint doubled, increasing from 2.4% to 4.9%, after the water source change, and that the neighborhoods with the highest water lead levels experienced a 6.6% increase.[20]

---

[17] There were 5,426 students attending FCS schools in grades K-12 during the 2015-16 school year.  Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

[18] Dominic Adams, *Closing the valve on history: Flint cuts water flow from Detroit after nearly 50 years*, MLIVE (April 25, 2014), *available at* http://www.mlive.com/news/flint/index.ssf/2014/04/closing_the_valve_on_history_f.html

[19] Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 283 (2016).

[20] *Id.*  This retrospective study includes all children younger than five years who had a Blood Lead Level test processed through the Hurley Medical Center's laboratory, which runs Blood Lead Level tests for most Genesee County children. The pre time period (before the water source change) was January 1, 2013 to September 15, 2013, and the post time period (after the water source change) was January 1, 2015 to September 15, 2015.  *Id.* at 284.

62.     Lead is a confirmed potent neurotoxin,[21] and childhood lead poisoning has an impact on many developmental and biological processes, most notably intelligence, behavior, and overall life achievement.[22]  Numerous studies have shown the biological and neurological damage linked to cognitive and behavioral impairment, even at low blood lead levels.[23]

63.     Reviews suggest that no level of lead exposure is safe or free from deleterious and irreversible health outcomes.[24]  They show that even very low levels of exposure in children are associated with learning and behavioral

---

[21] Bruce Lanphear et al., *Low-Level Environmental Lead Exposure and Children's Intellectual Function: An International Pooled Analysis*, 113 ENVIRON. HEALTH PERSPECTIVES 894, 894 (2005); Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 283 (2016).

[22] Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 283 (2016).

[23] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence from Detroit Public Schools, 2008-2010*, 103 AM. J. PUB. HEALTH e72, e72 (2013).

[24] *Id.*; Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 288 (2016).

deficits.[25]  Indeed, low levels of lead exposure have been found to have negatively affected children's intelligence and academic performance.[26]

64.    For example, early childhood exposure to lead levels below five microliters of lead per deciliter of blood[27] is still adversely associated with academic achievement.[28] The preponderance of data also indicates that there are persistent and deleterious effects of blood lead levels of less than 10 microgram of lead per deciliter of blood on brain function, including lowered intelligence, behavioral problems, and diminished school performance.[29]  One study suggests

---

[25] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence from Detroit Public Schools, 2008-2010*,  103 AM. J. PUB. HEALTH e72, e72 (2013).

[26] *Id.*

[27] This is the CDC's current blood lead level of concern (also known as a reference level).  However, the CDC recognizes that there is no known identified safe blood lead level.  Exposure to lead can seriously harm a child's health.  *CDC'S Childhood Lead Poisoning Data, Statistics, and Surveillance*, *available at* https://www.cdc.gov/nceh/lead/data/.

[28] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence from Detroit Public Schools, 2008-2010*,  103 AM. J. PUB. HEALTH e72, e76 (2013).

[29] Bruce Lanphear et al., *Low-Level Environmental Lead Exposure and Children's Intellectual Function: An International Pooled Analysis*, 113 ENVIRON. HEALTH PERSPECTIVES 894, 894 (2005).

that the higher a student's BLL in early childhood was, the more likely that the student would perform worse [on standardized] tests.[30]

65.   Elevated blood lead concentration is associated not only with lower IQ scores, but students with elevated blood lead concentrations also are more inattentive, hyperactive, disorganized, aggressive, and more likely to be delinquent.[31]

66.   The CDC states that "[e]xposure to lead can seriously harm a child's health . . . increasing their risks for damage to the brain and nervous system, slowed growth and development, learning and behavior problems (e.g., reduced IQ, ADHD, juvenile delinquency, and criminal behavior), and hearing and speech problems."[32]

---

[30] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence from Detroit Public Schools, 2008-2010*, 103 AM. J. PUB. HEALTH e72, e76 (2013).

[31] *Id.* at e72.

[32] *CDC'S Childhood Lead Poisoning Data, Statistics, and Surveillance*, *available at* https://www.cdc.gov/nceh/lead/data/

67.     Lead in drinking water disproportionately affects developmentally vulnerable children.  Children can absorb 40% to 50% of an oral dose of water-soluble lead compared with 3% to 10% for adults.[33]

68.     Flint children already suffer from risk factors that innately increase their lead exposure: poor nutrition, concentrated poverty, and older housing stock. With scarce resources for water alternatives, lead in water further exacerbates preexisting risk factors.[34]

69.     Increased lead-poisoning rates therefore have profound implications for the life course potential of an entire cohort of Flint children already suffering from other known toxic stress contributors (e.g., poverty, violence, unemployment, food insecurity).[35]

70.     The Flint Task Force Final Report recognized that the Flint lead crisis is "a chronic toxic exposure of an entire population in a sharply demarcated

---

[33] Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 284 (2016).

[34] Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 286 (2016).

[35] *Id.*

geographic area. Several key aspects point to the long-term health and social consequences:

    a. The manifestations of this toxic exposure depend on where along the life course a person may be.  At different ages, critical structures and functions are injured or altered to different degrees. These changes may not manifest in functional derangements for months or years after exposure. The science of epigenetics addresses the interaction between genes and the environment, suggesting that some of these changes can be passed on from one generation to the next.

    b. Blood lead levels do not indicate peak lead exposures beyond a 30- to 35-day window. The damage from lead toxicity may be done months before the first blood lead level is taken or after the last is drawn, especially for newborns and children younger than 6 years of age. This suggests that the findings related to elevated lead levels measured in Flint children are merely the tip of the iceberg of actual exposure across children living in Flint.

    c. Documented risks of learning, behavioral, and cognitive problems are present for all potentially exposed children in Flint. Aggressive and impulsive behaviors that can emerge in adolescence related to lead exposure put children in the crosshairs of the criminal justice system, unemployment and underachievement. . . .

**For those serving in Flint's already distressed schools and mental health agencies**, new and unprecedented challenges derive from balancing the need to track children and adults in a toxic exposure registry for preventative and supportive services, while being mindful of the stigma of low expectations for those listed in the registry."[36]

---

[36] *Flint Task Force – Final Report,* March 21, 2016, at 55 (emphasis in original).

71.    Every FCS school – not just the Elementary schools – had water samples that tested positive for lead.[37]

72.    On February 10, 2016, FCS Superintendent Bilal Tawwab testified before a committee of legislators on the impact of the lead crisis on special education services and programs, stating that:

> While the effects of lead poisoning on our children cannot be fully reversed, there are things we can do to assist our children and provide them full wraparound services.
>
> The Flint Community Schools will need additional support in the form of expanded special education resources.  We need lead-free facilities for all students so time can be spent on what matters most – teaching and learning.  We need resources to measure the intellectual and emotional damage done to each, and possibly every child. This will require complete testing – both medical and intellectual assessment – to understand the magnitude of our issues. We need early intervention programs to provide the educational support so that each student will have the opportunity to lead a productive life, and year-round schooling to deliver these services.  We need the resources to attract and retain talented specialists who are trained in

---

[37] Department of Environmental Quality, Fixture Sampling & Plumbing Assessment Results, October 2015-December 2015; Department of Environmental Quality, Outlet Sampling and Plumbing Assessment Recommendations, October 2015-December 2015.

special learning needs.  These needs are crucial at [a] time when the district has a looming deficit [of] over ten million dollars.[38]

73.    In January 2016, Superintendent Tawwab explained that special education is "the piece that keeps [him] up at night."  He added that "[i]t costs almost double to educate a student with special needs."[39]  In an interview with another media outlet, he elaborated that FCS schools "will need more special education teachers, more nurses, and more early childhood programs."[40]

74.    The population of three- and four-year-old children in Flint has been exposed to elevated lead levels in the drinking water, which has put them at risk of developing a disability.  They require early screening, timely referrals for evaluations to identify the existence of a qualifying disability and eligibility for special education and related services, and early intervention services, including universal, high-quality preschool education.

---

[38] Testimony of Superintendent Bilal Kareem Tawwab, *"The Flint Water Crisis: Lessons for Protecting America's Children,"* House Democratic Steering and Policy Committee (Feb. 10, 2016).

[39] Abby Goodnough, *Flint Weighs Scope of Harm to Children Caused by Lead in Water*, N.Y. TIMES (Jan. 29, 2016), *available at* http://www.nytimes.com/2016/01/30/us/flint-weighs-scope-of-harm-to-children-caused-by-lead-in-water.html?_r=0.

[40] Lizziz O'Leary and Raghu Manavalan, *Flint schools face a long-term lead problem*, MARKETPLACE (Jan. 28, 2016), available at http://www.marketplace.org/2016/01/28/world/flint-schools-face-long-term-lead-probem.

75.    The 5,426[41] children attending FCS schools in grades K-12 are likewise at risk of developing a disability due to their prolonged exposure to lead.

76.    Of the 5,426 students attending FCS schools, 907, or 16.7%,[42] are classified with qualifying disabilities and are consequently eligible for special education and related services.  Of these 907 special education students, 57 (or 6.3%) have been identified as having Autism Spectrum Disorder ("ASD"), 181 (or 20%) have been identified as having a Cognitive Impairment, 42% (or 4.6%) have been identified as having an Early Childhood Developmental Delay, 48 (or 5.3%) have been identified as having an Emotional Impairment, 15 (or 1.7%) have been identified as having a Hearing Impairment, 14 (or 1.5%) have been identified as having a Physical Impairment, 136 (or 15%) have been identified as having a Specific Learning Disability, 238 (or 26.2%) have been identified as having a Speech and Language Impairment,  162 (or 17.9%) have been identified as having an Other Health Impairment, less than 10 have been identified as having a Visual

---

[41] There were 5,426 students attending FCS schools in grades K-12 during the 2015-16 school year.  Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

[42] There were 907 special education students attending FCS schools in grades K-12 during the 2015-16 school year.  Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

Impairment, fewer than 10 have been identified as having a Traumatic Brain Injury, and fewer than 10 have been identified as having a Severe Multiple Impairment.[43]

77.    These 907 students are not being provided with special education and related services in compliance with their IEPs in the least restrictive environment as required by IDEA.

78.    The percentage of students in FCS schools with an IEP aged 6-21 who receive their education inside a regular education classroom for less than 40% of the day has been nearly double the statewide percentage for the last three years for which data is available.  In 2014-15, 29.25% of such special education students in FCS were placed in the regular education environment less than 40% of the day as compared to 11.08% statewide.  In 2012-13, 28.21% of special education students in FCS received their education in a regular classroom setting less than 40% of the day, contrasted with 11.22% statewide.  Finally, in the 2012-13 school year,

---

[43] This data is from the 2015-16 school year.  *See* Special Education Data Portraits: Disability Snapshot for School District of the City of Flint, *available at* https://www.mischooldata.org/SpecialEducationEarlyOn/DataPortraits/DataPortraitsDisability.aspx.

25.92% of special education students in FCS were in the general education environment less than 40% of the day, as compared to 11.38% statewide.[44]

79.    Moreover, special education students with qualifying disabilities are subject to unduly harsh disciplinary procedures, which are administered without the procedural safeguards required by IDEA and Michigan law.

80.    In 2014-15, 13.59% of special education students in FCS were suspended or expelled for more than ten days – more than five times the statewide suspension/expulsion rate of 2.48%.[45]   In addition, FCS had a "significant discrepancy" by race or ethnicity in the rate of suspensions and expulsions of greater than ten cumulative days in a school year for children with an IEP.[46]

81.    FCS's failure to provide necessary special education and related services in compliance with students' IEPs in the least restrictive environment, coupled with the disciplinary measures that are administered without procedural safeguards, has resulted in exceedingly poor outcomes for special education students.

---

[44] Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

[45] Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

[46] Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

82.     The percentage of special education students with IEPs who graduated from high school with a regular diploma was 56.67% in 2014-15.  Even before the lead crisis, which began in April 2014, the graduation rates for special education were 46.38% in 2013-14 and a staggering 28.40% in 2012-2013.[47]

83.     The dropout rates for special education students in FCS in 2014-15 was 13.11%,  as compared to 7.86% statewide.  Both prior to, and following, the lead crisis, dropout rates in FCS were nearly double the statewide dropout rates.  In the 2013-14 school year, 15.52% of special education students dropped out of high school, as compared to 8.63% statewide.  During the previous school year, from 2012-2013, 16.10% of FCS special education students dropped out, whereas only 9.40% dropped out statewide.[48]

84.     The FCS budget is inadequate to provide special education and related services for students with disabilities even at current classification levels.  FCS

---

[47] Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

[48] Michigan Department of Education, Michigan School Data, available at https://www.mischooldata.org/.

currently has a $10 million deficit, and is one of only two school districts with a deficit in Genesee County.[49]

85.     As a result of this deficit, FCS cut 229.95 full-time equivalent staff members from the 2012-13 school year to the 2013-14 school year, including 14.5 special education teachers, 52.2 general education teachers, and 162.95 other staff.[50]

86.     As of January 2016, FCS only had district nurse for the approximately 5,500 students who attend FCS schools.[51] The American Academy of Pediatrics ("AAP") recommends at least one full-time registered nurse in every school.[52]

---

[49] FCS Budget and Transparency Reporting, *available at* http://www.flintschools.org/?DivisionID=11970&ToggleSideNav=ShowAll; *see also* Lizzie O'Leary and Raghu Manavalan, *Flint schools face a long-term lead problem*, MARKETPLACE (Jan. 28, 2016), available at http://www.marketplace.org/2016/01/28/world/flint-schools-face-long-term-lead-probem.

[50] Genesee Document Center, *available at* http://www.geneseeisd.org/DocumentCenter/View/3994. The 2013-14 academic year is the last year for which data is available.

[51] Lizzie O'Leary and Raghu Manavalan, *Flint schools face a long-term lead problem*, MARKETPLACE (Jan. 28, 2016), available at http://www.marketplace.org/2016/01/28/world/flint-schools-face-long-term-lead-probem.

[52] American Academy of Pediatrics Policy Statement, Press Room (May 23, 2016), *available at at* https://www.aap.org/en-us/about-the-aap/aap-press-

Recent State appropriations have enabled the district to hire nine nurses, but concerns exist that the ratio will skyrocket again once the appropriation and political will runs out.

87.     When Michigan school districts do not have sufficient funding to cover special education expenditures, they are required to divert general funds to cover special education expenditures, a transfer called "cross-subsidization." With higher percentages of students with disabilities, and with more severe disabilities, low-wealth school districts such as FCS must "cross-subsidize."[53] In 2014, $8,517,844 was diverted from FCS's general education fund to pay for special education.[54]

88.     These factors create a disincentive for FCS to identify, locate and evaluate all children with known or suspected disabilities and to provide the special education and related services they need, as required by law.

---

room/pages/AAP-Policy-Statement-Recommends-Full-Time-Nurse-in-Every-School.aspx.

[53] Michael Conlin & Meg Jalilevand, *Equity and Unrestricted Funds in Special Education*, EDUCATION FINANCE & POLICY (April 2016), working paper available at https://msu.edu/~conlinmi/aefpresubmissionApril2016final.

[54] *Id.*

89.    The injuries of the named Plaintiffs are representative of the class of all individuals who are similarly situated.

## NAMED PLAINTIFFS' INJURIES

90.    Summarized below are the violations of federal and state law suffered by the named Plaintiffs as a result of the Defendants' failure to comply with their legally mandated responsibilities under the IDEA, Section 504, Title II, and Michigan law.   These violations illustrate the specific harm suffered by the Plaintiff class as a result of the Defendants' failure to comply with federal and state law.

### Plaintiff D.R.

91.    Plaintiff D.R. is a twelve-year-old who is a resident of Flint, Genesee County and who is a student in the seventh grade at International Academy of Flint, a charter school.  He previously attended Holmes 3-6 STEM Academy, an FCS school, through the 2015-16 academic year.  He brings this case through his parent and next friend, Dawn Richardson.

92.    D.R. was diagnosed by a private practitioner with ADHD and, in 2012, with ASD in the form of Asperger Syndrome.  He has been prescribed Vyvanse for his ADHD and Trazodone for his ASD.  D.R. also has asthma and allergies.

43

93.    D.R. has had an IEP in place since the 2011-12 school year when he was in second grade.  His IEP at that time was for the qualifying disability of a Speech and Language Impairment.

94.    During the 2012-13 school year, when D.R. was in the third grade, his mother disclosed his ASD diagnosis to Holmes 3-6 STEM Academy.  At that time, she also advocated that his needs went beyond mere speech and language issues and requested that he be reevaluated for the qualifying disability of autism. Notwithstanding this disclosure and request, the school's IEP Team found that D.R. was eligible for special education and related services only for the qualifying disability of a Speech and Language Impairment on both March 1, 2013 and February 3, 2014, when the team convened to review and redesign D.R.'s IEP on the basis of an updated reevaluation.  D.R.'s known ASD diagnosis was not considered during the reevaluation and IEP review process.

95.    In addition to failing to identify and evaluate all of D.R.'s special education and related needs, Holmes 3-6 STEM Academy also failed to properly implement D.R.'s IEPs during this period.  For example, his February 3, 2014 IEP provided for speech and language services 1-2 times per month for 20-30 minutes per session.  D.R. was provided with five sessions of speech and language services during the eleven-month period between September 23, 2014 and October 26, 2015.  Therefore, he did not receive the speech and language services to which he

44

was entitled.  D.R.'s mother received a letter, dated June 17, 2016, from the FCS Director of Student Services and Learning Support Services inquiring about the speech and language services that the school failed to provide over the course of the 2015-16 school year.

96.    During this period, D.R. failed to progress academically.  He scored in the not proficient range on the MEAP standardized assessments in Language Arts, math, and social studies during the 2014-15 school year when he was in the fifth grade.  In the same year, D.R. received all Cs and a D in math.  He has specifically identified math as an area of weakness.  His IEPs during this period did not delineate goals for reading, mathematics, or writing.  They also did not provide for interventions, such as Occupational Therapy, to assist him in these areas.

97.    On January 22, 2016, D.R.'s IEP Team was convened again to review and redesign his IEP.  At this time, his IEP Team determined that he no longer had the qualifying disability of a Speech and Language Impairment.  They instead found him eligible for special education and related services for the qualifying disability of an Other Health Impairment.

98.    D.R.'s IEP Team decided to discontinue his eligibility status under the qualifying disability of a Speech and Language Impairment based on reevaluation data that was three years out of date (and on the basis of which they had previously reached the diametrically opposite conclusion that D.R. had a Speech and

Language Impairment).   D.R.'s speech and language services were suspended because according to the speech and language therapist at Holmes 3-6 STEM Academy, nothing could be done to improve upon his articulation needs.

99.   D.R.'s IEP Team did not consider his known ASD diagnosis, and how it can impact his ability to communicate effectively with others, in the design of his January 22, 2016 IEP.

100.   At D.R.'s January 2016 IEP meeting, D.R.'s mother expressed concern that his IEP did not provide services tailored to address his ASD-related needs.  His teacher also relayed her belief that D.R. was "on the spectrum" at this meeting.  She elaborated that he had sensory issues and that his social interactions were problematic because he could not communicate effectively with his peers and had a hard time reading the facial expressions of others.  His teacher also added that D.R. is very rigid and repetitive in his thinking and perseverates on what is said to him by the other students.  However, the school's psychologist responded by stating that "the school was not equipped to deal with autism" and that he did not want "to put that label" on D.R.  There was no mention of bringing in an ASD consultant to assist with a reevaluation or in designing D.R.'s IEP.

101.   At D.R.'s January 2016 IEP meeting, the IEP Team agreed that D.R. performs better at school when he receives one-on-one support.  D.R.'s mother consequently requested that one-on-one paraprofessional support be provided to

enable D.R. to progress academically.   However, this request was summarily denied.  The school's psychologist and social worker stated that D.R. would not have one-on-one support in "real life" and therefore should not receive such support in the school setting.

102.   Without ASD-related supports, D.R. had difficulty navigating social interactions and was consequently subjected to severe bullying and harassment at Holmes 3-6 STEM Academy.  D.R. reports being threatened at school and hit frequently.   His teachers indicated that he was often bullied because he did not understand social cues.  According to one teacher, D.R. was targeted on a daily – almost hourly – basis because he found social interactions challenging and repeatedly misinterpreted what his peers said to him.  When D.R. attended the resource room program every day, the other children in that placement would sometimes take their anger out on him.

103.   On four or five occasions, D.R. was bullied in the bathroom at Holmes 3-6 STEM Academy by a large group of 10-12 male students.  On these occasions, he was held against the wall, hit, kicked, pushed to the ground, and stomped on.  His head was also violently smashed against the hard tile in the bathroom.  The behavioral specialist at Holmes 3-6 STEM Academy dismissed these incidents as "horseplay."

104.   D.R. subsequently tried to avoid using the restroom because he was afraid that he might encounter bullying there.  He attempted to "hold it" at school.  This culminated in adverse physical issues.  D.R. said that "it is scary to go to the bathroom because kids will jump you if you tell they are smoking weed in the bathroom."

105.   When teachers witnessed students bullying D.R., they did not intervene.  D.R. sometimes documented the bullying, writing about the incidents that he experienced in their immediate aftermath.  When he provided such documentation to his teachers at Holmes 3-6 STEM Academy, they failed to take any action in response.  On one occasion, D.R. was reprimanded for documenting the bullying to which he was subjected.

106.   Although D.R. sought the protection and assistance of adults, one of his teachers appeared to suggest that any intervention would be futile, stating "It [– the bullying –] happens all day long."

107.   D.R. did not feel safe at Holmes 3-6 STEM Academy as a result.  He stated that it was not "safe at school.  You have to be a bully to survive and it's not comfortable."  D.R. contemplated joining a gang for protection since the adults at school were unresponsive to his needs.

108.   D.R. was often disciplined, secluded from the general education environment, or suspended when he became enmeshed in fights and tried to protect

48

himself.  Holmes 3-6 STEM Academy frequently placed D.R. in a segregated classroom with a behavioral specialist.  The behavioral specialist did not help to protect D.R. from the bullies who preyed upon him because the behavioral specialist's nephew was one of the assailants who targeted D.R. on a daily basis.  The behavioral specialist voiced the opinion that D.R. should not graduate from the sixth grade at the end of the 2015-16 school year because he had been segregated and placed in the behavioral specialist's classroom more than he had been in his general education classroom.

109.   Most of D.R.'s referrals to the behavioral specialist's classroom were undocumented.  His mother reports that D.R.'s records indicate that he was only sent to the behavioral specialist's classroom on one occasion.

110.   D.R. was also suspended or sent home from school more than 30 times during the 2015-16 school year.  On these occasions, D.R.'s mother was called to pick him up from school so that he could "calm down."  When she picked up D.R. from school, she was not asked to sign him out.  As a result, most of his removals and suspensions have not been documented.  His school records state that he had only 10 absences and four suspensions during the period from September 9, 2015 through May 17, 2016.  His exclusions and suspensions were therefore vastly underreported.

111.   As a result of this underreporting, D.R. did not receive a MDR to determine whether his behaviors were disability-related.

112.   When D.R. is sent home from school, he is not provided with take-home resources which would allow him to continue to make academic progress and to advance towards achieving his IEP goals.

113.   D.R.'s mother requested a behavioral intervention plan ("BIP") at his January 2016 IEP Meeting.  When this request was ignored, she followed up again on May 10, 2016, asking for D.R. to receive a functional behavioral assessment ("FBA") and BIP.  At this time, the school psychologist stated, "can we just put the ASD issue to rest?"  FCS's Director of Student Services and of Learning Support Services added that labeling D.R. as ASD may preclude him from a future career in the military.

114.   Holmes 3-6 STEM Academy completed a FBA and BIP for D.R. on June 9, 2016 at the conclusion of the school year.  However, it did not provide him with Positive Behavioral Intervention Supports.  An IEP Amendment, dated May 16, 2016, also noted that D.R. was "disruptive, moving, acts out in anger, seeks attention, easily distracted, easily frustrated."  However, it did not provide for supports or services to help him with these behaviors.

115.   Over a period of at least eighteen months from 2014-15, D.R. was exposed to lead-contaminated water both at school and at home.  Holmes 3-6

50

STEM Academy has tested positive for elevated levels of lead in the water.  Water fountains at Holmes were not continuously taped off or decommissioned over the period from April 2014 to October 2015 and bottled water was not made readily available to the students.  D.R. also lives in a residential area which is being monitored for high lead levels.

116.   D.R.'s disability-related behaviors escalated over this eighteen-month period.   Despite his known and prolonged exposure to lead, D.R. was not reevaluated to assess the potentially adverse impact of lead on his academic, behavioral, psychological, and physical needs.  Lead was not mentioned at D.R.'s January 2016 IEP meeting even though he had significant learning and behavioral issues at this time and was failing to make academic progress.  D.R. also was not provided with routine vision and hearing screenings, even though he was noted to frequently ask for directions and questions to be repeated, which suggests that he might have issues with hearing.

117.   D.R. is currently attending International Academy of Flint, a charter school.  He has been suspended twice during the current academic year, but his mother has not received any documentation of these suspensions.  A police officer was present at the school when D.R.'s mother went to pick him up the second time that he was suspended.

**Plaintiff A.K.**

118.   Plaintiff A.K. is a six-year-old who resides in Flint, Genesee County. He currently attends Jack P. Haas Elementary, a GISD-run school, where he is completing Kindergarten for the second time.  He formerly attended Durant-Tuuri-Mott Elementary School, an FCS school.  He brings this case through his parent and next friend, Angy Keelin.

119.   A.K. has a visual impairment stemming from Persistent Fetal Vasculature and, as a result, requires the use of a cane and instruction in Braille. He also has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") by an outside provider, Dr. Chheda, a neurologist.  His neurologist has additionally classified A.K. as having Autism Spectrum Disorder ("ASD").

120.   He was identified by *Early On* Michigan as being in need of special education and related services for an Early Childhood Developmental Disability. He thereafter received an IEP.

121.   A.K.'s parent enrolled him in a full-time preschool program at Durant-Tuuri-Mott for the 2014-15 school year.  During that year, A.K. initially thrived under the attentive care of a mobility and orientation specialist.

122.   At Durant-Tuuri-Mott, A.K. was placed in a classroom for students with Early Childhood Developmental Disabilities.  The program was offered for five full days per week.  At this program, A.K. worked on verbal skills and

52

mobility and orientation skills.  He also was provided Occupational Therapy and Physical Therapy to address his developmental needs.

123.   In December 2014, Durant-Tuuri-Mott notified parents that the program was being reduced to 4 half-days per week.  This reduction in instruction and services was effected without reconvening A.K.'s IEP team.  A.K.'s mother was troubled because due to this reduction, A.K. received less service.  She felt that he needed more assistance than was provided, such as what was delineated in his IEP for him to obtain a FAPE during this critical stage of his development.

124.   In the 2015-16 school year, GISD took over Durant-Tuuri-Mott's visual impairment program from FCS.  Durant-Tuuri-Mott was consequently left without any certified teacher for students with visual impairments.

125.   Instead of losing the foundation allowance to the GISD so that A.K. could continue in the visual impairment program that was now provided under GISD's auspices, Durant-Tuuri-Mott approached A.K.'s parent with an offer to place A.K. in a classroom for the cognitively impaired, notwithstanding the fact that A.K. had never been diagnosed with a cognitive impairment.  A.K. would have been the only kindergartener in this classroom.  A.K.'s mother declined this placement because A.K. is not cognitively impaired and because A.K. would not have had access to a certified teacher for the visually impaired.  Moreover, A.K.'s mother wanted her son to be placed in a classroom environment that would foster

53

interaction with non-disabled children his own age, doing typical Kindergarten activities.

126.   In light of the deficiencies in essential special education and related services available at Durant-Tuuri-Mott, A.K. was forced to leave the school and to enroll at a GISD-run school that was ten miles away from his home, Jack P. Haas Elementary, which had a program for the Visually Impaired.  It took one month for FCS to release A.K. to receive services at GISD.  During this one month period, A.K. was not receiving necessary services.  He was at home with his mom.  A.K.'s mother felt that there was no other option for her son because his community school, Durant-Tuuri-Mott, did not have a teacher certified to teach students with visual impairments, and he would be in a cognitively impaired classroom although he is not cognitively impaired.

127.   The transition to Jack P. Haas Elementary was incredibly difficult for A.K.   He lost the mobility and orientation specialist to whom he had become attached at Durant-Tuuri-Mott.  He also had behavioral outbursts for the first three months that he was enrolled at Jack P. Haas.

128.   A.K.'s IEP provided for a one-on-one paraprofessional to monitor and assist him during the day.  The IEP team at Jack P. Haas Elementary unilaterally reduced A.K.'s paraprofessional support without the input or consent of A.K.'s mother.  There is a two-student-to-one-paraprofessional ratio now.

129.   A.K.'s mother worries that his sensory and behavioral needs, which stem from his ASD, are not being addressed by the GISD.  He has a hard time sitting still, rocks while standing at times, flaps his hands, and can wander.  Due to his sensory needs, he cannot always handle commotion, noise, vibrations, or other stimuli.  When he experiences sensory overload, he has meltdowns and outbursts. He also sometimes flops on the floor.

130.   A.K.'s mother was not contemporaneously apprised of all of A.K.'s behavioral issues and the behavioral referrals that he received.  She reports being told that his team at the GISD-run school considered using a "basket hold" technique to control him, which entailed wrapping their arms around him to hold him still.   A.K.'s mother never signed off on the use of such restraint or the behavior plan that was put in place for her son.  The MDE's December 2006 manual on Standards for the Emergency Use of Seclusion and Restraint states that "[p]hysical restraint involves direct physical contact that prevents or significantly restricts a student's movement.   Restraint is a last resort emergency safety intervention."[55]  The manual further states that "[i]mplementation of a school-wide

---

[55] Michigan Department of Education, *Supporting Student Behavior: Standards for the Emergency Use of Seclusion and Restraint* (2006) at 13.

systematic approach will ensure that seclusion and restraint are used only as a last resort method."[56]

131.   A reevaluation for A.K. was completed by the GISD on June 9, 2016 to determine if he had the qualifying disability of autism.   The reevaluation determined that his behaviors were a result of his Visual Impairment and found him ineligible for services based on the qualifying disability of autism, even though A.K.'s mother reports that her son's neurologist classifies him as having ASD.   It is unclear whether the GISD utilized an ASD specialist as a consultant during A.K.'s reevaluation process.

132.   A.K. was exposed to lead-contaminated water both at school and at home for a period of at least eighteen months from 2014-15.  His school, Durant-Tuuri-Mott, was found to have high levels of lead in the drinking water.   A.K. swam in the pool at Durant-Tuuri-Mott at least once per week during the 2014-15 school year.   In addition, the zip code in which A.K. resides was found to have elevated levels of lead in the water.

133.   Over the past two years, A.K.'s physical growth has been stunted.  He has not gained weight and has remained at 55 pounds.   When he saw his eye surgeon, Dr. Kim Drenser at Beaumont Hospital, at the end of 2015, she expressed

---

[56] *Id.* at 2.

concern about his vision.  She reported that he had lost sight over the last two years.  There was discussion at his last appointment about whether he is now legally blind.

134.  Despite A.K.'s known and prolonged exposure to lead, when his reevaluation was conducted by the GISD, the GISD did not assess the extent to which his lead exposure had adversely impacted his physical, psychological, behavioral, and academic needs.  Furthermore, although A.K. had a previously diagnosed visual impairment, his reevaluation also did not include routine vision and hearing screenings.

**Plaintiff C.D.M.**

135.  Plaintiff C.D.M. is an 8-year-old African-American student in the third grade at Pierce Elementary School, an FCS school, who resides in Flint, Genesee County.  Prior to the 2016-17 school year, he attended Brownell K-2 STEM Academy, another FCS school.  He brings this case through his parent and next friend, Crystal McCadden.

136.  C.D.M. has an IEP which provides for special education and related services to address his Other Health Impairment, which stems from the underlying chronic health problem of ADHD.  He also had a behavioral intervention plan ("BIP") in place to address his disability-related behaviors.

137.   Plaintiff C.D.M. was exposed to lead-contaminated water for a period of at least eighteen months from 2014-15.  Elevated levels of lead were found in the drinking water at Brownell K-2 STEM Academy, where he was enrolled as a student through the end of the 2015-16 school year.  He also resides in a zip code which is being monitored for high lead levels in the water supply.

138.   Over the eighteen-month period that he drank lead-contaminated water, C.D.M.'s physical growth was stunted.  He did not grow or put on any weight.

139.   C.D.M.'s disability-related behaviors also escalated over the period of at least eighteen months during which he was drinking lead-contaminated water. C.D.M.'s mother received multiple phone calls from Brownell K-2 STEM Academy over this period notifying her that C.D.M. would not do his work or sit down in class and that he was kicking and calling names.

140.   After misbehaving during an after-school program on October 12, 2015, C.D.M. was handcuffed for nearly an hour by a Flint Police Department school resource officer.  The use of handcuffs was inconsistent with C.D.M.'s BIP.

141.   The school resource officer was never informed by Brownell K-2 STEM Academy that C.D.M. was a child with a disability who had a BIP.

142.   By resorting to the use of physical restraints such as handcuffs, the school resource officer inflicted severe emotional trauma upon C.D.M.  For nearly

58

an hour, C.D.M. was publicly humiliated in front of his peers.  Since this incident,

C.D.M. has suffered from crippling fear and anxiety, which has exacerbated his

ADHD.  Being physically restrained in public also negatively shaped C.D.M.'s

self-image; he now perceives himself as a "bad kid."

143.   Subsequent to the incident in which he was handcuffed, C.D.M. was

regularly excluded from his educational placement.  C.D.M.'s teacher sent him

home from school on a near-daily basis due to his disability-related behaviors.

Many of these removals were undocumented.

144.   When C.D.M. was not sent home from school, he was placed in a

classroom at Brownell K-2 STEM Academy that lacked proper supervision with

twelve other boys.  C.D.M. was frequently hit, kicked, and pushed down by the

other boys in the classroom.  Chairs also were thrown regularly.  On some

occasions, C.D.M. would act out and kick others in order to fight back.

145.   On multiple occasions, due to the lack of supervision, C.D.M. walked

out of his classroom and got lost.  Staff members at Brownell K-2 STEM Academy

were unaware of his whereabouts.  C.D.M.'s mother feared for his safety at school.

146.   Brownell K-2 STEM Academy failed to reevaluate C.D.M. to assess

the potentially detrimental effects that lead exposure may have had on his physical,

psychological, behavioral, and academic development.  He also was not provided

with routine hearing or vision screenings.

147.   C.D.M.'s IEP has not been revised despite overwhelming evidence that it is not fully meeting his needs or addressing his disability-related behavioral issues.  C.D.M.'s BIP likewise has not been reviewed or updated.

148.   Although he was removed from school frequently after the October 12, 2015 incident in which he was placed in handcuffs, and missed over 10 days of school as a result, C.D.M. did not receive a Manifestation Determination Review ("MDR") to examine whether his behaviors are traceable to his disability.

149.   Even though a number of C.D.M.'s absences are due to suspensions or removals by the school, C.D.M.'s mother received a letter from FCS stating that C.D.M. had missed at least 10-15 consecutive days of school and that this would be reported to a truancy officer.  The letter also indicated that Child Protection Services and the Department of Health and Human Safety may be contacted.

150.   During the 2016-17 school year, a unilateral decision was made by FCS's Director of Student Services and of Learning Support Services to move C.D.M. to a placement in a full-time classroom for students with Emotional Impairments at Pierce Elementary School.  C.D.M.'s IEP Team was not convened to make this decision.  C.D.M.'s mother also was not consulted.  She thought that her son would attend Holmes 3-6 STEM Academy and that he would be placed in the general education environment for at least half of the school day.

151. C.D.M.'s mother is called at least three times per week to pick up C.D.M. from Pierce Elementary School even though he has been placed in a more restrictive setting there.

152. On September 27, 2016, C.D.M. was suspended by the principal at Pierce Elementary School.

153. At a meeting on September 28, 2016, a BIP could not be located. C.D.M.'s mother was told that her son was throwing chairs, walking on tables, and taking his shoes off.

154. C.D.M. has not received a FBA to account for his increased behavioral needs after the October 12, 2015 incident in which he was handcuffed.

155. C.D.M.'s mother will not pursue placement in a charter school because she was told by a charter school principal in Flint that her son would receive better services for his disability through FCS.

**Plaintiff C.M.**

156. Plaintiff C.M. is twelve-year-old who resides in Flint, Genesee County and who was a seventh grade student at the charter school New Standard Academy during the 2015-16 school year. She is now enrolled in Hamady Middle School, which is part of the Westwood Heights School District, located in Northern Flint. She is the older sister of C.D.M. and brings this case through her parent and next friend, Crystal McCadden.

61

157.   At the request of her mother, Plaintiff C.M. received an evaluation in April 2009 and was found eligible for special education and related services for a Speech and Language Impairment.  She was subsequently provided with an IEP. C.M. was not provided with a full and comprehensive initial evaluation, assessing all of her cognitive, learning, and behavioral needs.

158.   C.M. transferred to New Standard Academy in September 2009 and was reevaluated one year later, in September 2010.  In October 2011, C.M.'s mother reported to her IEP Team that C.M. continued to struggle with reading, spelling, and word endings.  At this time, her Northwest Evaluation Association ("NWEA") scores in Math, Reading, and Language fell to the one percentile mark.

159.   C.M.'s IEP goals were listed as decoding words, multiple meanings, and vocabulary.  Positive Behavioral Intervention Supports were considered for her increased behavioral needs and she was given access to a behavioral intervention specialist for behaviors which included fighting, hitting a student with a pencil box, and off-task behavior.  However, no FBA or BIP was provided.

160.   Despite her IEP, C.M. has not been provided with the speech and language services that she required.  Her IEP indicated that she should receive speech and language services 4-8 times per month for periods of 20-30 minutes with elementary resource support for 45-60 minutes 4-5 times per week.  A letter in her file dated October 4, 2011 states that speech and language services were not

available and that the hours of services that she missed would be made up. However, C.M.'s 2011-12 report card showed that her areas of need remained decoding meaning, vocabulary, writing sentences, and articulation. This indicates that she did not make progress in meeting her IEP goals.

161.   In 2013, C.M.'s mother expressed concerns about her daughter's lack of academic achievement. Despite these concerns, C.M.'s mother was informed that C.M. would no longer receive resource room support or in-classroom support for basic reading or vocabulary deficits as there was no evaluation indicating that C.M. had a learning disability in Broad Reading or Comprehension.

162.   In the 2013-14 school year, C.M. received C-level grades in every subject (English Language Arts, Social Studies, Math, and Science). Her academic performance caused C.M.'s mother to continue to raise questions about her academic progress. In the 2014-15 school year, C.M.'s grades fell further in light of the lack of necessary instructional support. She received a D in English Language Arts, a C- in Social Studies, a D+ in Math, and an E (59% or below) in Science.

163.   In September 2015, C.M.'s IEP noted two hospitalizations for migraine headaches. Concerns about focus and impulsiveness were also noted but not accommodated. C.M. was described as having a moderate language deficit in the areas of comprehension and expression as well as difficulty relaying thoughts

and communicating in writing. The IEP noted that this had a "significant impact on [her] academic progress, including: difficulty with complex academic discourse, difficulty attaching meaning to what is heard or read, and oral and written language difficulty." Despite these noted learning difficulties, C.M. was only provided with speech services for 20-30 minutes 3-6 times per month as well as social work consultation. Her grades continued to suffer, indicating that her instructional needs were not being met. In the 2015-16 school year, C.M. received an E in English Language Arts, a D- in Social Studies, a C in Math, and an E in Science.

164. In March 2016, C.M.'s mother informed New Standard Academy that C.M. needed additional support in the areas of reading and mathematics. The school denied her reading support and did not provide a reading evaluation, despite her NWEA scores at the one percentile mark. She was not provided with special education services since she was in the general education classroom, even though no meeting was held or documentation provided to formally decertify her from special education. Her grades were getting worse.

165. C.M. was exposed to lead-contaminated drinking water in Flint for a period of at least eighteen months. Despite her known and prolonged exposure to lead, and the difficulty that she has remembering what she has learned, she has not been evaluated to assess the potentially adverse impact of her lead exposure on her learning, psychological, behavioral, and physical needs. There also is no record

that she ever received routine vision or hearing screenings.  She did not receive a complete initial evaluation to assess the full spectrum of her needs.  Additionally, a complete reevaluation of her needs was not conducted before the decision was made to remove C.M.'s resource room support and other specialized instruction.

**Plaintiff J.T.**

166.   Plaintiff J.T. is a seven-year-old who resides in Flint, Genesee County and who is a student in the second grade at Brownell K-2 STEM Academy, an FCS school.   Previously, he was a student at the International Academy of Flint, a charter school, through the 2015-16 school year.   J.T. brings this case through his parent and next friend, Nakiya Wakes.

167.   J.T. has been diagnosed with ADHD by his pediatrician.

168.   J.T. resides in a zip code which is being monitored due to high lead levels in the water supply.   J.T.'s condition worsened over the eighteen-month period from 2014-15 that he drank the lead-contaminated water in Flint.   During the 2014-15 school year, he was sent home from school only once.   During the 2015-16 school year, his disability-related behaviors escalated dramatically.   He was suspended more than thirty times and had over 70 absences from school.   In addition, he received 56 student infractions during the four-month period between September 2015 and January 2016.

169.   When J.T.'s disruptive behavior became more pronounced in the 2015-16 school year, J.T.'s mother procured a lead screening for J.T. from an outside provider, the Genesee County Health Department.  J.T. tested positive for lead.

170.   J.T.'s pediatrician recommended that J.T. be evaluated for special education and related services because his ADHD, coupled with his lead exposure, increasingly manifested in unruly behavior.

171.   In December 2015, J.T.'s mother disclosed his ADHD diagnosis and his positive lead test to International Academy of Flint.  As J.T.'s pediatrician suggested, J.T.'s mother also made an oral request for the school to evaluate J.T. for special education and related services.

172.   International Academy of Flint rebuffed the request for an initial evaluation, claiming that it was unnecessary because the school already provided a Response to Intervention ("RTI") program for all students.  LEAs are not permitted to deny or defer evaluations because they offer RTI.  RTI is not a substitute for the special education and related services to which students with qualifying disabilities are entitled.   Moreover, even though J.T. struggles with reading, he was not provided with any RTI or Multi-tier System of Supports in this area.  Due to his numerous absences and suspensions, the school also could not properly gauge whether its RTI program was effective for J.T.

173.   Approximately two months after her oral request for an evaluation, J.T.'s mother submitted a written request for J.T. to be evaluated at the prompting of J.T.'s therapist.   In the letter, dated February 3, 2016, she stated that J.T.'s therapist believed that he needed to be evaluated "immediately."   By the time that JT's mother made this written request, J.T. had been subject to disciplinary action for disability-related behaviors more than fifty times.

174. International Academy of Flint responded to the written request submitted by J.T.'s mother by contracting a psychologist in private practice in Flint, Dr. Maxwell Taylor, to evaluate J.T.  Dr. Taylor described J.T. as "basically a non-reader."   The evaluation recommended that J.T. be referred to a Multidisciplinary Evaluation Team ("MET") for further evaluation and eligibility consideration.   Despite J.T.'s positive lead test, the evaluation did not assess the potentially deleterious impact of lead on his behavioral, learning, psychological, and physical needs.   He also was not provided with a vision or hearing screening.

175.   On March 28, 2016, J.T. received an IEP, three months after his mother's initial request for an evaluation.   The school's IEP Team found that J.T.'s ADHD had a "severe impact on alertness, time on-task, concentration, distractedness, the ability to follow directions or rules, and impulsivity."   While the IEP noted J.T.'s lead exposure, the team made no comment about how it may be impacting his learning, attention, or behavior.

67

176.   By the end of March when his IEP was put in place, J.T. had already been suspended from school at least seventeen times.  Despite the fact that J.T.'s challenges at school largely emanated from disability-related behaviors, his IEP did not include a FBA or BIP.

177.   As a result, even after the implementation of J.T.'s IEP, International Academy of Flint continued to address J.T.'s behavioral issues by suspending him and excluding him from the classroom environment.  J.T. was suspended on March 29, 2016, the day after he received his IEP.  He was thereafter suspended twelve additional times.  Four of J.T.'s more than thirty total suspensions during the 2015-16 school year were due to his acting out by hitting and kicking.  The majority of incidents leading to suspension, however, were for less serious behaviors, such as acting disrespectfully and throwing objects.   Despite the fact that J.T. was suspended over 30 times during the 2015-16 school year, and over 12 times since his IEP was put in place on March 28, 2016, no MDR is on file.

178.   On April 26, 2016, J.T. received an FBA and BIP, which were revised on May 19, 2016.  J.T.'s FBA revealed that his behavioral issues stem from a desire to escape his school work when he does not understand.   Thus, his disability-related behaviors are reinforced – not redressed – when he is disciplined by being suspended or removed from the classroom environment.  When J.T. becomes frustrated, his frustration escalates into verbal behavior and then verbal

68

behavior escalates into physical behavior and he receives a suspension despite his IEP team identifying the problem as pertaining to the loss of instruction due to absences and his desire to escape from the situation.

179.   J.T.'s FBA and BIP failed to result in effective behavioral and disciplinary interventions that would not lead to J.T.'s exclusion from the learning environment.   Even after J.T. received a BIP, International Academy of Flint continued to remove him from the classroom environment and to mete out suspensions and disciplinary infractions as punishments.

180.   J.T.'s March 28, 2016 IEP recognizes that J.T.'s "diagnosis of ADHD negatively impacts him in the school setting.  He can be disruptive in the academic setting which may lead to missed instruction.  His behavior may result in removal from the classroom which also leads to missed instruction."   His "negative behavior has been escalating throughout the school year" and "continues to lead to time in the . . . office and out of school suspensions, which has been impacting his academic success and ability [to] maintain relationships with teachers and peers."

181.   However, prior to his IEP date, there is no evidence that shows that a positive behavior support plan was in place.  There is also no reference to pre-IEP positive behavior interventions used or J.T.'s response to those interventions.  Staff responses to his behavior consisted of telling him to "stop," sending him out of

class, giving him a warning, writing out a disciplinary referral, and suspending him when he could not de-escalate.

182.   Although J.T. had more than 70 absences and more than 30 suspensions during the 2015-16 school year, his IEP Team determined that there was not a lack of appropriate instruction in reading.  J.T.'s IEP, overall, showed no link between his needs and the services provided.  He needed academic support, instruction in reading, and to be taught routines.  However, services were not provided to assist J.T. in these areas.

183.   In addition, despite finding that J.T. was eligible for an IEP, his IEP team checked that "Supplementary aids and services are not needed at this time" for advancing toward goals; increasing exposure to, and making academic progress in, the general education curriculum; and being educated alongside, and participating in activities with, all students.

184.   J.T.'s second IEP, dated May 19, 2016, removed him from the general education environment altogether and placed him in a contained special education resource room.  The IEP Team considered a statement made in December 2015 by J.T.'s teacher, remarking that J.T.'s "behavior and lack of self-control is not appropriate for my classroom."  His May 2016 IEP states that J.T. "will be in the resource room for all hours of the school day."  His IEP team chose to place him in a special education resource room 100% of the time without first providing

supplemental aids and services that would enable him to be educated in the least restrictive environment.

185.   J.T. is currently enrolled at Brownell K-2 STEM Academy, an FCS school, where he is placed in a self-contained special education classroom.

186.   J.T.'s mother is called at least once a week to pick J.T. up from school because he is acting out.  When she has come to the school, she has witnessed her son being hit by another student.  On one occasion, she was hit by a student at Brownell K-2 STEM Academy when she was picking up J.T.

187.   The school setting is causing J.T.'s behaviors to escalate and he is unable to learn.  At Brownell K-2 STEM Academy, as at International Academy of Flint, J.T. has not been provided with effective reading instruction and behavioral interventions in the least restrictive setting.

188.   Given the failure of both International Academy of Flint and Brownell K-2 STEM Academy to meet J.T.'s learning and behavioral needs, J.T.'s self-confidence has withered.  He has stated, "I can't read.  I am not good at reading" and "I don't know how to read.  I am a bad kid.  I hit and kick people at school." Before he enrolled at Brownell K-2 STEM Academy, he described International Academy of Flint in stark terms, saying "They are a bad school.  They don't teach me stuff."  He added, "I have no favorite teachers at school."

**Plaintiff N.S.**

189.   Plaintiff N.S. is a seventeen-year-old who resided in Flint, Genesee County and who attended Northwestern High School, an FCS school, through the 2015-16 academic year.  She is the older sister of Plaintiff J.T. and brings this case through her parent and next friend, Nakiya Wakes.

190.   N.S. has been diagnosed with epilepsy, a condition which causes her to suffer from seizures.

191.   Before moving to Flint, N.S. qualified for special education and related services for her disability when her family resided in Battle Creek, Michigan.  Her IEP at Battle Creek enabled her to receive some supports while simultaneously allowing her to remain assimilated in the general education environment alongside peers her own age.

192.   After moving to Flint, N.S.'s mother attempted to enroll her at International Academy of Flint.  She was given an academic entrance examination and based on the score, International Academy offered to place N.S. in a fifth grade classroom with other fifth grade students.  N.S. was sixteen at the time and expected to enter the tenth grade.  International Academy refused to provide a copy of the academic entrance evaluation that it administered to N.S.'s mother and did not offer an evaluation to assess what N.S.'s needs were so that they could be accommodated through an IEP to enable her to be with her same-age peers.

193.   N.S. declined to enroll at International Academy because she wanted to be among her peers.  She felt that she would be stigmatized as a sixteen-year-old in a classroom environment with students who were six years younger than her.

194.   After being effectively denied an appropriate placement at International Academy for a student of her age, N.S. enrolled in the tenth grade at Flint Southwestern Academy, an FCS school.  Southwestern did not reevaluate N.S. to determine her special education needs.  Her mother was not invited to an IEP meeting to review her IEP and discuss any placement.

195.   In light of the fact that she had been previously identified as a student with a disability in Battle Creek, Southwestern segregated N.S. from the general education population and placed her in a special education classroom.  N.S. was relentlessly teased by other students for being in such a placement.  Although she was in need of academic supports and accommodations for her disability, N.S. wanted to be placed in the least restrictive learning environment and incorporated into the general education curriculum.

196.   Dissatisfied with her segregated placement as a special education student at Southwestern, N.S. transferred to Northwestern High School, another FCS school, as an eleventh grade student at the beginning of the 2015-16 school year.

197.   When N.S. transferred to Northwestern High School at the beginning of the 2015-16 school year, Northwestern did not take steps to reevaluate her, even though she had been identified as a student with a disability in a previous school district, where she had received an IEP.

198.   She developed rashes and her hair would fall out in chunks.  Her self-esteem was adversely impacted.

199.   Northwestern neglected to review and revise N.S.'s IEP from Battle Creek.  It also failed to provide her with special education and related services in accordance with the requirements of her pre-existing IEP.

200.   Over a period of at least eighteen months from 2014-15, N.S. was exposed to lead-contaminated drinking water at home and at school.  Northwestern High School and the residential area in which she lives were found to have high levels of lead in their respective water supplies.  Her epileptic seizures became more severe and frequent over this timeframe.

201.   In light of her worsening condition, N.S.'s mother procured a lead test from an outside provider for her during the 2015-16 school year.  N.S. tested positive for lead.

202.   Despite her positive lead test, Northwestern did not conduct a reevaluation to examine the adverse impact of lead on her behavioral, learning,

psychological, and physical needs. N.S. also was not provided with a routine vision or hearing screening.

203. Prior to the commencement of the 2016-17 school year, N.S. was sent by her mother to live with family in Indiana on a temporary basis. The chaotic environment at Northwestern High School, the trauma caused by the lead contamination in Flint, and Northwestern's failure to identify and accommodate N.S.'s needs caused her mother to send her out of state to live with her relatives.

204. N.S.'s mother would like her daughter to return to Flint, but she is concerned that N.S. would continue to fall further behind academically within the FCS district.

205. N.S.'s mother is attempting to have N.S. reevaluated in her out-of-state school district in the hope that her out-of-state IEP will be implemented by the FCS district when N.S. returns and that the services provided will enable N.S. to graduate from high school.

**Plaintiff J.W.**

206. Plaintiff J.W. is a fourteen-year-old who is currently in a juvenile detention facility. He was repeating the sixth grade for the third time at Holmes 3-6 STEM Academy, an FCS school, when he was expelled from all FCS schools during the 2015-16 school year. He formerly attended Doyle/Ryder Elementary School, an FCS school, Northridge Academy, a charter school, and Durant-Tuuri-

Mott Elementary School, an FCS school, for four years.  Plaintiff J.W. resides in Flint, Genesee County and brings this case through his parent and next friend, Kathy Wright.

207.   J.W. has been diagnosed with ADHD and bipolar disorder by an outside provider of mental health services, Consumer Services, Inc.  He also has asthma and struggles with vision problems.  He needed his glasses to see the board at school.

208.   Despite his diagnosed conditions, J.W. has not received any special education or related services at school.

209.   J.W. has been subjected to numerous suspensions and disciplinary measures throughout his career at FCS schools, which have had the effect of removing him from the general education environment.  His history of suspensions started when he was in the second and third grade at Doyle/Ryder Elementary School.   This pattern continued into fourth through sixth grades, with J.W. receiving multiples suspensions and expulsions in those years.  As a result, J.W. has repeated the sixth grade three times.

210.   During the 2014-15 school year, when he was in sixth grade for the second time, J.W. was suspended or expelled from Holmes 3-6 STEM Academy for the majority of the school year, beginning in November 2014.

211.   He returned to Holmes 3-6 STEM Academy in September 2015 to commence sixth grade for a third time.   However, he was only in school for approximately one month before being suspended again.   The principal contacted J.W.'s mother in October 2015 after J.W.'s disability-related behavioral issues started to manifest.   J.W.'s mother disclosed that J.W. was diagnosed with ADHD and bipolar disorder.   However, no evaluation was conducted to determine whether J.W. was eligible for special education and related services.

212.   During the 2015-16 school year, J.W. had 51 unexcused absences and was suspended from school for 50 days.   He was suspended from Holmes 3-6 STEM Academy for an incident which occurred on April 25, 2016 and permanently expelled from all FCS schools on June 15, 2016.

213.   When J.W. was not removed from school, he experienced severe bullying.   He constantly feared for his safety at school and his mother expressed concern about the other students hitting him every day that he was on school premises.   She told him to yell, "Leave me alone" and to go to the office when the bullying started.   When J.W. did what his mother instructed, he was marked down for skipping class.

214.   J.W. states that it was "not safe at school.   People egg you on and taunt you."   There was "a lot of fighting in the bathrooms at school."   He says that he wanted to "be in a school that is a white school, without so much fighting."

J.W.'s mother states that on one occasion, "He was hit everywhere – on the side, back, across the head."

215.   His mother reports that J.W.'s teachers were aware of the bullying. Not only did they fail to intervene, but they also threatened J.W. and engaged in bullying tactics that targeted him.   At times, his teachers yelled at him and threw away his school work.   A teacher once put a used Kleenex on J.W.'s paper and told him to "throw it away or I will kick you out."   The punishment that J.W. dreaded most at school was being made to stand in front of all of the sixth graders while one of his teachers publicly broadcast how he had misbehaved.

216.   The April 25, 2016 incident that ultimately resulted in J.W.'s permanent expulsion from all FCS schools one June 15, 2016 was traceable to the unsafe environment at school, the bullying that J.W. experienced there, and his inability to cope given his disability-related issues.   On April 25, 2016, J.W. thought that he "was going to be jumped by three guys because people were saying they were bringing weapons to school and [that he] should, too."   He also received threats via text message and social media.   J.W. reported that he "brought a knife [to school] to protect himself and got kicked out for the [rest of the] year" even though he never brandished his knife or threatened anyone with it.

217.   Before being placed in a juvenile detention facility, J.W. met with a counselor at Consumer Services, Inc.   He struggles with trauma from the death of

his father and the absence of his brother who is incarcerated.  He also is afraid to lose his mother, who has been in and out of the hospital since the water crisis in Flint.  As a result of these major life stresses, as well as the bullying and disciplinary measures to which he was subjected at school without being provided with necessary academic or behavioral supports, J.W.'s mother believes that his mental health issues have worsened.

218.   J.W.'s mother made multiple verbal requests for evaluations over the course of J.W.'s academic career that were rebuffed because J.W. was "too bright" and could do the work if he chose to do so.

219.   J.W. was evaluated and found not to be eligible for special education and related services in February 2012.  J.W.'s mother continued to request that the school provide supports and services for her son, but her requests were denied.

220.   J.W.'s mother submitted a written request for an evaluation to Holmes 3-6 STEM Academy on April 15, 2016, noting that J.W. struggles with his school work, has difficulty understanding spoken directions, is not performing at his grade level, and has been exposed to lead both at home and at school.  Her letter to the school stated that she believed J.W. "may have an unidentified disability."  The written request for a special education evaluation was marked received by the school secretary on April 18, 2016.

221.  On April 25, 2016, J.W. was suspended from Holmes 3-6 STEM Academy and permanent expulsion from all FCS schools was recommended.  A letter dated May 9, 2016 informed J.W.'s mother that the Superintendent of FCS had reviewed and upheld the expulsion recommendation.

222.  A review of existing evaluation data ("REED") was completed in May 2016.  The purpose of this review is to decide if the existing evaluation data on the child is sufficient to establish the child's eligibility for special education services and to determine the child's educational needs, or if additional information is necessary.  The outcome of the REED was a determination that additional data was necessary to assess J.W.'s eligibility status and needs.  The existing data on J.W. that was reviewed did not include up-to-date classroom-based observations, observations by teachers or local service providers, or local or state assessments. The REED found that a cognitive assessment, achievement assessment, and speech and language assessment should be performed on J.W.  The REED did not find that behavioral, social, or emotional assessments were necessary.  The special education teacher whose name appeared on the REED form indicated that she was not involved in the REED.

223.  An expedited evaluation of J.W. was not conducted, even though J.W.'s mother had submitted a written request for an evaluation prior to the April

26, 2016 incident which resulted in his suspension from school and eventual expulsion from all FCS schools.

224.   As of June 15, 2016, J.W. was suspended from all Flint Community Schools.

225.   On July 13, 2016, Michigan Protection and Advocacy Services ("MPAS") filed a complaint with the MDE on behalf of J.W.  MDE found that FCS was not in compliance with its obligations under IDEA and its implementing regulations.

226.   FCS subsequently performed an evaluation of J.W. and convened an IEP team to determine his eligibility for special education and related services.  On July 25, 2016, he was evaluated for the suspected disabilities of a Specific Learning Disability, an Emotional Impairment, a Speech and Language Impairment, and an Other Health Impairment.  However, these evaluations were not comprehensive.

227.   The evaluation for a Specific Learning Disability did not include current observations of J.W. and did not consider teacher input.

228.   The evaluation for an Emotional Impairment did not include systematic observation of the behaviors of primary concern.  The evaluation team noted that "no known intervention strategies" had been in place for J.W. despite his academic need, permanent expulsion from school, treatment by a psychiatrist, and

81

behavioral records.  The team did not consider the negative impact of his numerous suspensions and the length of his expulsion on his ability to progress academically. The evaluation also did not mention any consideration of positive behavioral supports or recommendations for instructional or behavioral interventions.

229.   The evaluation team for an Other Health Impairment did not include a physician.  However, the evaluation refers to a medical release signed by J.W.'s mother on July 14, 2016.   The evaluation also did not consider J.W.'s prior evaluation data or medical conditions.  Although the school was aware that J.W. had been prescribed Vyvanse for ADHD and Seroquel for bipolar disorder, no attempt was made to solicit input from J.W.'s treating psychologist, Dr. Warner, during the evaluation process.  FCS shifted the burden to J.W.'s parent to provide the evaluation team with salient medical information.

230.   At a July 28, 2016 IEP meeting, the IEP Team found that all four evaluations showed that J.W. was ineligible for special education services.  The evaluation team noted that no systematic observations had been completed in any of the suspected areas of disability.  There is no evidence in the evaluation team report that the team reviewed J.W.'s attendance, behavior, disciplinary, suspension, or health records.  The evaluation report also did not include teacher interviews. The parent input that was assessed was dated February 9, 2012.

82

231.   Despite J.W.'s known and prolonged exposure to lead over the period from at least 2014-15 at Holmes 3-6 STEM Academy and at home, where elevated lead levels were found in the respective water supplies, J.W.'s evaluations did not consider this exposure or assess the potentially adverse impact of lead on his academic, behavioral, psychological, and physical needs.

232.   Despite J.W.'s known difficulties with his vision, he did not receive routine vision and hearing screenings during the evaluation process.

233.   Pursuant to the MDE corrective action plan, another IEP Meeting was to be held on September 19, 2016.

234.   Although J.W. has been suspended and expelled on a consistent basis, he has never received an MDR to determine if his disabilities are manifesting in behavior that causes him to be excluded from the school.

235.   J.W. remains in a juvenile detention facility as of October 13, 2016.

**Plaintiff C.D.**

236.   Plaintiff C.D. is a 16-year-old resident of Flint, Genesee County who was a tenth grade student at Northwestern High School, an FCS school, until February 2016 when he was expelled.  He brings this case through his parent and next friend, Twanda Davis.

237.   He has been diagnosed with bipolar disorder by Genesee County Community Mental Health.   He also has vision and hearing issues.   Due to his nearsightedness, he needs to wear glasses with a strong prescription.

238.   C.D. was evaluated for a Speech and Language Impairment and was determined to be eligible for special education and related services.   He has an IEP in place, but his IEP has not been updated or revised in the past two years.   After his exclusion from school, he has not received any services.

239.   C.D. drank the lead-contaminated water in Flint for a period of at least eighteen months from 2014-15.   He was exposed to such water both at his school, which has tested positive for elevated lead levels, and at home, where the water supply is being monitored for high lead levels.   He reports that during the lead crisis in Flint, staff members at Northwestern High School sold bottled water to the students.   Those who could not afford to pay for bottled water continued to drink the water from the fountains at school, which were not decommissioned or taped off.

240.   C.D. reports that his memory has suffered since he drank the lead-contaminated water.   He has difficulty recalling his multiplication tables, which he once had memorized.   He also frequently complains that his bones hurt, particularly in his legs.

241.   Despite his known and prolonged exposure to lead, he has not received an evaluation to assess the potentially adverse impact of his lead exposure on his learning, psychological, behavioral, and physical needs.  He also has not been provided with routine vision or hearing screenings even though he has vision and hearing issues.

242.   C.D. is not receiving the services that are required under his outdated IEP.  As a result, he continues to struggle in the areas of reading, writing, and math.

243.   Instead of providing the services delineated in his IEP, Northwestern High School placed C.D. in a self-contained classroom for the cognitively impaired, even though C.D. qualified for special education for his Speech and Language Impairment—not a cognitive impairment.   The students in this classroom were often disruptive, interrupting class and making it impossible to hear what was being taught.  When C.D. raised his hand to ask for assistance, he was told to wait his turn, but does not recall receiving individualized attention.

244.   Within the self-contained environment in which he was placed, C.D. was assaulted daily and ridiculed by his peers.  Students have even picked up C.D.'s desk and have thrown it.  When C.D. asked if he could move closer to the front of the classroom so that he could see the board and escape the students who were preying on him, the teacher denied his request.

85

245.   C.D. has also been subjected to a larger pattern of severe bullying and harassment at Northwestern High School outside of his self-contained classroom, as well as within it.  C.D. believes that he is targeted because he stutters.  He has been hit, kicked, stomped, verbally taunted, and has had his head slammed against the floor numerous times.

246.   On one occasion, the bullying by other students was so intense that C.D. was completely knocked out and his cell phone was stolen.  The perpetrators were not disciplined for their violent conduct.  On another occasion, two boys ganged up on C.D. in gym class, hitting him in the back of the head with a cell phone and throwing objects at him.

247.   A school employee once called C.D's mother and told her to come to school to retrieve C.D. because C.D. "would get killed" if she did not get him.

248.   The students who regularly bullied C.D. at school vandalized his family's home on Christmas Eve, breaking their windows, including the large picture window in front of the house.  C.D.'s mother reported this incident to the school and the school board, but the school did not take any action in response.  C.D.'s mother also informed the police about the incident.

249.   When C.D. fights back to protect himself against his assailants, he is subjected to disciplinary measures.  C.D. was once suspended for 10 days because he hit a student in self-defense after the student physically attacked him.  The other

student was not disciplined at all.  C.D. asked the school to review its security tapes to see how the fight started, but the school refused to do so.  Even when C.D.'s teacher has reported to the school's Principal that other students have initiated fights with C.D., C.D. is disciplined.  For example, his teacher once saw a student hit C.D. in the jaw and called for security.  The teacher told the Principal that C.D. did not hit the other student in self-defense or retaliation, but C.D. still got in trouble.

250.  Bullying is so pervasive among the students at Northwestern[57] that C.D. has been forced to intervene when his younger brother has been targeted.  On one occasion, C.D. defended his younger brother when ten students attacked him on the way home from school.  The next day, a large crowd formed at Northwestern High School seeking retribution against C.D.  When the crowd violently attacked C.D., the security guards did nothing.

251.  The security guards have, however, used unduly harsh physical restraint techniques with C.D.  He has been physically assaulted by the security guards at school even though he has an IEP.

---

[57] Videos recording students fighting in Flint are made publicly on YouTube, where they are sometimes identified by the school's name. *See*, *e.g.*, "Flint Michigan fight Northwestern" video, YOUTUBE.COM, https://www.youtube.com/watch?v=e2B8upZsRlw (last visited October 9, 2016).

252.   On one occasion, C.D. was thrown to the floor by a security guard, held down, and sprayed with mace.  On another occasion, C.D. was held against the wall by a security guard who proceeded to bang C.D.'s head against the wall. On a third occasion, a security guard slammed C.D.'s head against the floor and injured C.D.'s hand as he tried to shield his face.  C.D. went to the Principal's office for medical attention, where he was told that there was nothing wrong with him.  He was sent back to class and was not allowed to call his mother.  C.D. was not released to go home until the end of the school day.  When his mother later took him to the hospital with a severely swollen hand, X-rays revealed that his hand was broken.

253.   Notwithstanding the frequency and duration of his suspensions and expulsions, C.D. has never received a MDR, FBA, or positive behavioral interventions.

254.   In February 2016, C.D. was told to leave Northwestern High School after interjecting when his younger brother was being bullied.  C.D. was instructed to leave the school premises immediately.  The school's Principal explicitly told him to "get the F out."  C.D.'s mother was not called to pick him up from school. C.D. asked if he could get his winter coat before leaving, but the school's Principal barred him from retrieving his coat.  C.D. walked four miles from school to home in extreme winter conditions in February without a coat.  His mother went to the

school to find out why her son was put out, made to walk home, and without his coat. He did not receive any paperwork for the "snap" suspension. C.D. was able to return, but was put out later that month for fighting back when he was attacked by another student in the lunchrooms. He was expelled for six months.

255. No special education or related services have been provided to C.D. at home during the period of his expulsion, even though he qualifies for such services and has an IEP.

**Plaintiff D.K.**

256. Plaintiff D.K. is a seven-year-old African American student in the first grade at Eisenhower Elementary School, an FCS school, who resides in Flint, Genesee County. He brings this case through his parent and next friend, Rachel Kirksey.

257. Before he entered Kindergarten at Eisenhower Elementary School, the Children's Autism Center of Genesee Health System diagnosed D.K. with ASD. In addition, his psychologist diagnosed him with ADHD and the Hurley Medical Center diagnosed him with asthma and with allergies to shellfish and nuts.

258. The GISD's Early Childhood Special Education ("ECSE") program determined that D.K. was eligible for special education and related services for the qualifying disability of a Speech and Language Impairment. D.K. began receiving services to address his autism-related needs, including his speech and language

needs at the Children's Autism Center of Genesee Health System when he was five years old. He attended a half-day program at the Children's Autism Center for two hours in the morning followed by a three-hour ECSE program administered at Brownell K-2 STEM Academy, an FCS school, in the afternoon. When it was time for D.K. to transition to Kindergarten within FCS and to receive an IEP, his mother was contacted by a school psychologist who worked for FCS and was told that D.K. would be placed in a self-contained classroom for cognitively impaired students in grades K-2 at Durant-Tuuri-Mott Elementary School, an FCS school. D.K.'s placement was not arrived at through the IEP process. He also was not reevaluated to assess the status of his Speech and Language Impairment or other suspected disabilities, such as autism. He only lasted in that placement for two weeks, and was having problems in the classroom with the teacher. There was a meeting without D.K.'s mother, and it was determined that D.K. would be sent back to Brownell K-2 STEM Academy for the ECSE program.

259.   His mother was told that he was not ready for the school environment and that they had nowhere to put him within the FCS school system because the self-contained cognitively impaired classroom at Durant-Tuuri-Mott was not appropriate for him. His mother had objected to this placement since he was not cognitively impaired.

260.   An IEP meeting was subsequently convened to determine D.K.'s new placement.  The IEP Team (with the exception of D.K.'s mother) found that D.K. did not qualify for special education and related services for the qualifying disability of a Speech and Language Impairment or for the qualifying disability of autism.  D.K. was not reevaluated before this decision was made.

261.   Although D.K. was not provided with a written IEP because he was determined to be ineligible for special education and related services, the acting FCS Director of Student Services and Learning Support Services stated at the IEP meeting that D.K. would be denied admission to Brownell K-2 STEM Academy or any other school within the FCS district because the district did not have the resources necessary to support his educational needs.  D.K.'s mother was told to take him home and to "wait until next year" to enroll him in Kindergarten due to his limitations and his inability to negotiate the classroom environment without supports.

262.   When D.K.'s mother resisted this blanket denial of admission to FCS schools, the district conditioned her son's admission on her willingness to attend classes with him to help him maintain focus and transition between subjects.  Thus, the district recognized D.K.'s need for one-on-one support, but placed the burden of providing such support on his mother.  His mother had to care for D.K.'s baby sister and could not be in the school on a daily basis.

91

263.   Due to FCS's refusal to admit D.K. to a FCS school unless accompanied by his mother, D.K. was out of school for at least three months between preschool and kindergarten during a critical time in his development.

264.   An independent reevaluation – which was not school-based – was conducted only after an advocacy group, Michigan Protection and Advocacy Services ("MPAS"), intervened on D.K.'s behalf.   The reevaluation found that D.K. was eligible for special education and related services.   It also revealed that D.K. has sensory, expressive language, and motor needs.

265.   D.K. finally gained admission to Eisenhower Elementary School during the 2015-16 school year.   D.K. was not, however, provided with an IEP until February 23, 2016.   D.K. did not receive any Occupational Therapy until his IEP was put in place.

266.   Although D.K.'s IEP sets forth the services to which he is entitled, D.K.'s IEP has not been properly implemented.   For example, D.K. receives Speech and Language services in ten-minute intervals two times per month even though his IEP delineates that he should receive Speech and Language services for 15-25 minutes three-to-six times per month.   D.K.'s mother reports that D.K. needs to continue to improve in the area of expressive language.   She continually has to prompt him in order to make him use such language.

92

267.   On one occasion, Eisenhower's noncompliance with D.K.'s IEP culminated in a life-threatening situation.  D.K.'s February 23, 2016 IEP states on the front page that he has a peanut allergy and an EpiPen to treat an allergic reaction.  On May 17, 2016, D.K. was given a cookie containing nuts.  D.K. went into anaphylactic shock.  His skin became blotchy and he began vomiting.  The school did not administer the EpiPen or call 911.  Instead of calling emergency services, the school contacted D.K.'s mother.  His mother asked the school to call an ambulance, but staff members refused, stating that "[w]e cannot transport students."   Since D.K.'s mother is legally blind and cannot drive, D.K.'s grandmother picked her up and drove her to Eisenhower Elementary School. Together, they rushed D.K. to the Hurley Medical Center Emergency Room.  He was treated with epinephrine and steroids, administered through an intravenous drip.  The hospital discharge papers noted that anaphylaxis is "a life threatening allergic reaction that must be treated immediately."   In the report that D.K.'s teacher wrote concerning the incident, she erroneously stated that "there is no epi pen . . . or allergies noted for D.K."

268.   The school did not have a crisis plan in place to identify a child having an allergic or asthmatic reaction, to treat the child, and to contact emergency services.

269.   Over a period of at least eighteen months from 2014-15, D.K. was exposed to lead-contaminated water both at Eisenhower Elementary School, which has tested positive for elevated lead levels, and at home.  He resides in an area of Flint which is being monitored for high levels of lead in its water supply.  D.K.'s mother procured a lead test for him from an outside provider.  He tested positive for elevated blood lead levels.

270.   Despite his known and prolonged exposure to lead, D.K. has not been reevaluated to assess the potentially adverse impact of his lead exposure on his learning, psychological, behavioral, and physical needs.  He also has not received routine vision or hearing screenings from the school.

271.   Partially as a result, D.K.'s February 23, 2016 IEP, which was amended on June 15, 2016, does not address all of his academic and behavioral needs.  His IEP contains no supplementary aids and services.  For example, although D.K. has been diagnosed with ASD, he does not receive any ASD consultant services through his IEP.

272.   In addition, while D.K.'s IEP includes a BIP and FBA, it does not provide for necessary positive behavioral intervention supports.  D.K.'s mother reports that his behavioral needs are not being met or appropriately addressed. D.K. is consequently removed from the classroom environment for disability-related behaviors on a regular basis.  His mother has been called twice this school

year to pick him up because of his behaviors.  Interventions listed in D.K.'s FBA and BIP, which include "notes home" and "calls home[,]" were not being carried out consistently.  His mother is called every day to calm him down.  D.K. is also excluded from field trips due to the behavioral manifestations of his disability.  He is only allowed to attend if his parent or grandparent will accompany him.

273.   According to D.K.'s mother, D.K. had approximately 30 absences during the 2015-16 school year and was suspended three times for a total of approximately six days.  About two-thirds of his absences occurred when he was sent home for the rest of the school day and his mother was instructed by the school to keep him home the next day so that he could "cool off."

274.   Despite the frequency and duration of D.K.'s suspensions, D.K. has not received a MDR.

**Plaintiff M.K.**

275.   Plaintiff M.K. is a three-year-old who resides in Flint, Genesee County.  She is the younger sister of Plaintiff D.K. and brings this case through her parent and next friend, Rachel Kirksey.

276.   M.K. will turn four-years-old in November 2016.  Despite her age and eligibility, she is not currently enrolled in a preschool program.

277.   M.K.'s mother has attempted to enroll M.K. in preschool since June 2016.  At that time, she contacted GISD's Head Start Program and was told that an

95

application for enrollment would be sent to her home address.   M.K.'s mother never received an application for enrollment.

278.   In her initial conversation with a staff member at GISD's Head Start Program, M.K.'s mother was informed that the home services component of the program would commence in July 2016.

279.   M.K.'s mother contacted the Head Start Program again in July 2016 to notify the staff that she had not received the enrollment application that they committed to send to her via mail.   She also inquired about whether M.K. could begin receiving at-home services.   She was summarily informed that the office was closed for the summer.

280.   M.K.'s mother has followed up with the Head Start Program on a weekly basis, but still has not been able to secure a place for her daughter in the program.

281.   In September 2016, M.K.'s mother personally went to the GISD offices to fill out the paperwork to enroll M.K. in preschool.   However, M.K.'s enrollment still has not been confirmed.

282.   M.K. may have needs related to her lead water exposure.   However, since she is not enrolled in preschool, she has not been evaluated to determine whether she qualifies for special education and related services.

283.   Over a period of at least eighteen months from 2014-15, M.K. was exposed to lead-contaminated water.  She resides in an area of Flint which is being monitored for high levels of lead in its water supply.  Despite her known and prolonged exposure to lead, she has not been evaluated to assess the potentially adverse impact of her lead exposure on her learning, psychological, behavioral, and physical needs.  She also has not received routine vision or hearing screenings.

**Plaintiff O.N.**

284.   Plaintiff O.N. is an eight-year-old student in the third grade at Doyle/Ryder Elementary School, an FCS school, who resides in Flint, Genesee County.  He brings this case through his grandmother and next friend, Manita Davis.

285.  From the time that he was a preschool student, O.N. exhibited behavior characteristic of ASD.  His preschool teacher noticed and was concerned, since she had a child with ASD.  She encouraged O.N.'s guardian grandmother to request an initial evaluation to determine if he was a student with a disability who qualified for special education and related services.  The verbal request was denied and, as a result, O.N. was not evaluated at the preschool level.  The preschool teacher did not obtain an evaluation for O.N. even though she noted her concerns to his grandmother, and encouraged her to initiate the request.

286.   When O.N. entered Kindergarten at Doyle/Ryder Elementary School, his grandmother continued to orally request an initial evaluation for ASD.  School administrators were dismissive of her request, alternatively labeling O.N.'s behavior as "bad" and denying that such behavior was connected to an underlying disability.  As a result, O.N. did not receive an evaluation in Kindergarten.

287.   In first grade, O.N. was diagnosed with ADHD by Dr. Surina Minhas, a private practitioner.

288.   O.N.'s grandmother informed Doyle/Ryder of O.N.'s diagnosis and made a written request for an initial evaluation at the urging of O.N.'s pediatrician. Notwithstanding this diagnosis, the school did not conduct an evaluation to determine if O.N. qualified for special education and related services. Administrators told O.N.'s grandmother that O.N. was "too smart" and his "IQ is too high" and dissuaded her from pursuing her request.

289.   Student records at Doyle/Ryder were destroyed in a flood at the school.   Consequently, the date on which O.N.'s grandmother made a written request for an evaluation is unclear, as is the date on which she disclosed his ADHD diagnosis by an outside provider.

290.   Due to the school's refusal to provide O.N. with an evaluation to assess his needs and to provide him with the attendant special education and related services, O.N. does not have an IEP in place and has repeatedly been

98

suspended and removed from the classroom environment for disability-related behaviors.

291. When O.N. was in Kindergarten, his teacher and peers frequently approached his grandmother's car when she came to pick him up from school to inform her of all of the ways that O.N. misbehaved on a given day.

292. Instead of referring him for an evaluation, at the end of O.N.'s Kindergarten year, his Kindergarten teacher instructed the school to place him in a first grade classroom with a teacher who had a reputation for being a strict disciplinarian. O.N.'s Kindergarten teacher reasoned that this first grade teacher would not "put up with his crap."

293. Indeed, when O.N. reached the first grade, his disability-related behavioral needs were not properly addressed. During the 2014-15 school year, O.N. missed 20-30 days of school.

294. This pattern continued into the 2015-16 school year, when he entered the second grade. O.N. missed 68 days of school during the school year. Twenty-nine of his absences were for medical leave. O.N. was not provided with any homebound services or instructional supports for the duration of his medical leave and his medical leave was not documented. O.N. was also suspended twelve times in second grade. On June 10, 2016, the school suspended him for the remainder of the school year due to his "threatening" behavior when he used his hands to form a

make-believe gun and pretended to shoot other students.  His second grade teacher believed that he needed to be disciplined and "that's all it comes down to."

295.   Over a period of at least eighteen months from 2014-15, O.N. was exposed to lead in the drinking water at Doyle/Ryder and at home.  His school tested positive for elevated lead levels in the drinking water.  The residential area in which he lives is also being monitored for lead in the water supply.  Not only did his disability-related behaviors worsen over the timeframe in which he was exposed to lead-contaminated water, but his physical health also deteriorated.  His growth tapered off and he did not gain any weight.

296.   As O.N. was never evaluated by his school for any suspected disability—notwithstanding the concerns of his preschool teacher, multiple requests from his grandmother, and a disclosed ADHD diagnosis—— the school has not assessed the potentially adverse impact of O.N.'s known and prolonged lead exposure on his physical, psychological, behavioral, and learning needs.  The school also failed to administer routine vision and hearing screenings even though O.N.'s grandmother has concerns about his vision and hearing.

297.   O.N. is erroneously listed as "active" in the school's IEP system even though he has been denied both an initial evaluation and an IEP.

298.   O.N. has not received an MDR to assess whether his behaviors are attributable to a disability.

299.   Similarly, O.N. has never received a FBA, BIP, or positive behavioral intervention supports.

300.   The extent to which O.N.'s suspensions and removals were documented is unknown because O.N.'s records were destroyed in the flood at Doyle/Ryder.

301.   In addition to being excluded from the classroom environment through repeated suspensions and removals, O.N. was excluded from field trips for his "fidgety" behavior.

302.   This school year – third grade – he has been suspended twice.  His grandmother has again submitted her written request for an evaluation, on the second day of school and has received nothing, except repeated complaints from his teacher that he is not paying attention, will not sit still, and is disruptive in class.

303.   The exclusion that O.N. has faced, along with Doyle/Ryder's persistent labeling of him as a "bad apple" – without any recognition of the suspected underlying disabilities animating his behavior – has had a stigmatizing effect.  It has undermined O.N.'s confidence and destroyed his self-esteem.  He now wants to quit school and has attempted to inflict bodily harm on himself.

**Plaintiff D.T.**

304.   Plaintiff D.T. is a thirteen-year-old seventh grade student at Flint Southwestern Academy, an FCS school, who resides in Flint, Genesee County. Previously, she attended Doyle/Ryder Elementary School, another FCS school. She is the Plaintiff O.N.'s older sister and brings this case through her grandmother and next friend, Manita Davis.

305.   D.T. has been diagnosed with ADHD and bipolar disorder by an outside provider, Dr. Warner.

306.   Over a period of at least eighteen months from 2014-15, D.T. was exposed to lead in the water at Doyle/Ryder Elementary School and at home. Doyle/Ryder Elementary School has tested positive for elevated levels of lead in the water.   D.T. also resides in a zip code where the water supply is being monitored for high levels of lead.

307.   D.T.'s academic performance has declined over the period that she was exposed to lead-contaminated water, with her grades dropping precipitously over the course of the 2015-16 school year when she was in the sixth grade at Doyle/Ryder Elementary School.  During the first quarter of the year, she received all As and Bs.  By the third quarter, her grades had fallen to all Es (59% or below) in the same subjects.  Her grades were in the C and D range by the fourth quarter of the school year.  She has identified that she needs help with reading and math.

102

308. Over the same period, she received low scores on the Michigan Assessment of Educational Progress ("MEAP") examinations in Math, Reading, Language, and Science.

309. As a result of the rapid turnover in staff at Doyle/Ryder Elementary, D.T. had over thirteen different teachers during the sixth grade, disrupting the continuity of the instruction that she received. She also was often brought to tears at school due to the chaotic classroom environment. She reports that her teachers did nothing to keep students under control and to maintain decorum in the classroom. Fighting and bullying was also common. In fact, on one occasion, D.T.'s classmates wrote on her desk, "They are coming for you." After receiving this threat, she stayed close to her teacher.

310. D.T. has to miss school due to her disabilities. She is very sensitive to loud noises and chaotic environments and she would ask to stay home. During the 2015-16 school year, she had 13.5 absences. Despite her diagnosed disabilities, her known and prolonged exposure to lead-contaminated water, and the dramatic drop in her grades over the course of the 2015-16 school year, Doyle/Ryder Elementary did not conduct an evaluation to determine whether D.T. was eligible for special education and related services.

311. D.T.'s grandmother submitted a written request for an evaluation on April 11, 2016. The request expressed concern about D.T.'s "academic progress . .

. and accommodations."   The request was specifically for testing related to "emotional, behavioral impairments."   It detailed that D.T. was "having difficulty with numerous staff members and classroom expectations; also with being attentive, remaining engaged, completing assignments, and taking notes."   The written request additionally stated that D.T.'s "self-esteem issues have increased, significantly, this past year.   Academically, [D.T.] is struggling in almost every subject."

312.   To date, it appears that this request has been ignored and that D.T. has not received an evaluation.   The impact of D.T.'s known and prolonged lead exposure on her physical, psychological, behavioral, and academic needs remains unassessed as a result.   She also has not received routine vision or hearing screenings even though she needs to wear glasses to school on a daily basis.

**Plaintiff D.D.**

313.   Plaintiff D.D. is a twelve-year-old seventh grade student who resides in Flint, Genesee County and who currently attends school in the Carman-Ainsworth Community Schools district.   He previously attended Holmes 3-6 STEM Academy, an FCS school.   Plaintiff D.D. brings this case through his father and next friend, Willie Daniels.

314.   For the past two years, D.D. attended Holmes 3-6 STEM Academy in Flint.   During the 2014-15 school year, D.D. was a fifth-grade student at Holmes

STEM Academy and during the 2015-16 school year, he was a sixth-grade student there.

315.   D.D. has been diagnosed with ADHD and bipolar disorder.  He is treated for both through the New Hope Network.  He has been prescribed Concerta for his ADHD and Depakote and Abilify for his bipolar disorder.

316.   Over the period of at least eighteen months from 2014-15, D.D. was exposed to lead-contaminated water both at home and at school.  Holmes 3-6 STEM Academy tested positive for elevated levels of lead in the drinking water. Water fountains at the school were not taped off during the period of April 2014 to October 2015 and bottled water was not readily accessible to students during this time.

317.   Despite his known diagnoses for ADHD and bipolar disorder, and his known and prolonged exposure to lead, D.D. was not evaluated at Holmes 3-6 STEM Academy for suspected disabilities to determine his eligibility for special education and related services.  As a result, the potentially adverse impact of lead on his academic, behavioral, psychological, and physical needs has not been assessed.  Routine vision and hearing screenings also were not conducted at Holmes 3-6 STEM Academy.

318.   Over the period from 2014-16, fighting and bullying were common at Holmes 3-6 STEM Academy.  During this time, D.D. was hit by his peers at school

on at least five or six occasions. Fighting at school is so pervasive that at one point, D.D.'s entire grade was sent home from school for engaging in such behavior.

319. During the period in which he was exposed to lead-contaminated water, D.D.'s disability-related behaviors escalated and were not adequately addressed by Holmes 3-6 STEM Academy. D.D.'s father reported that D.D. increasingly engaged in aggressive behavior over this time period, both at home with his sibling and at school. He had over 20 absences during the 2015-16 school year, at least 9 of which were suspensions from school.

320. As a result of his exclusion from the general education environment, D.D.'s academic performance suffered at Holmes 3-6 STEM Academy. D.D.'s father states that D.D. did not receive necessary academic or behavioral supports, such as positive behavioral intervention services.

321. D.D.'s father met with the school liaison officer only once during the two years that D.D. was enrolled at Holmes 3-6 STEM Academy, even though D.D. was clearly struggling with his academics and behaviors. D.D.'s father reports that the school liaison officer seemed overwhelmed and did not provide parents with information about academics. He only heard about academics when D.D. brought a report card home. In his last report card from Holmes 3-6 STEM Academy, D.D. had four Ds and one C.

322.   D.D.'s father submitted a request in writing to have his child evaluated in May of 2016.  The school did an evaluation and held an IEP meeting on July 28, 2016.  D.D. was at the one percentile mark for processing speed and the 3rd percentile mark for his working memory.  The school psychologist wrote, "there were no vision, hearing or speech problems noted." Yet, there was no explanation of the assessment that was given to make this determination.  D.D. was found ineligible for special education and related services by FCS.

**Plaintiff C.W.**

323.   Plaintiff C.W. is a four-year-old resident of Flint, Genesee County who attends the daycare and Head Start preschool programs offered on site through the GISD at St. Luke's in Flint.  In June and July of 2015, C.W. attended the daycare program at Uniquely Created Children's Center, which is housed in New Standard Academy, a charter school in Flint.  He brings this case through his parent and next friend, Chandrika Walker.

324.   C.W. has been diagnosed with asthma.

325.   Over a period of at least eighteen months from 2014-15, C.W. was exposed to lead-contaminated water both at his daycare program at Uniquely Created Children's Center and at home.  At Uniquely Created Children's Center, C.W. drank the tap water and ate food onsite that was prepared using lead-contaminated water.

107

326.   C.W. tested positive for lead in September 2014 when his mother had procured a lead screening for him at Mott Children's Health Center.  However, his mother was not informed of the results of this test until December 2015, when she was contacted by Michigan Department of Health & Human Services.

327.   During the period over which C.W. was exposed to lead-contaminated water, his mother noticed that he had increased aggression.  He is also very hyper and has developed rashes.

328.   Although C.W. is currently enrolled in a GISD-run Head Start program at St. Luke's, he has not been evaluated for suspected disabilities to determine whether he qualifies for special education and related services.  As a result, the potentially adverse impact of lead on his academic, behavioral, psychological, and physical needs has not been assessed.

329.   C.W.'s mother attempted to enroll him in the Head Start program at Sunny Patch Learning Center.  She could not work until C.W. was placed in the Head start Program at Sunny Patch Learning Center, and her infant son could attend the daycare.  Sunny Patch required her to have birth certificates for her sons, which was cost-prohibitive.  They refused her children without it.

**Plaintiff J.B.**

330.  Plaintiff J.B. is a five-year-old African-American student in Kindergarten at Eisenhower Elementary School, an FCS school, who resides in

Flint, Genesee County.  He brings this case through his mother and next friend, Jeree Brown.

331.  J.B.'s mother became concerned about her son's lack of developmental progress when he was only nine months old.  At that time, a registered nurse who worked at J.B.'s daycare alerted his mother to delays in J.B.'s speech and socialization skills.

332.  J.B. was evaluated for, and diagnosed with, ASD by an outside provider, the Children's Autism Center of Genesee Health System, on September 2, 2014.  He was three years old.

333.  J.B.'s mother consequently requested an evaluation for a Speech and Language Impairment through *Early On* Michigan in 2014.  She made this request both orally and in writing through J.B.'s GISD *Early On* worker.

334.  This request was ignored and J.B. never received an evaluation for a Speech and Language Impairment which would enable him to receive Early Childhood Special Education through the GISD and then through FCS when he entered Kindergarten.

335.  Over a period of at least eighteen months from 2014-15, J.B. was exposed to lead-contaminated drinking water both at home and at the GISD Early Learning Program housed on the Holy Redeemer church grounds, which is in the City of Flint.

336.   In the 2015-16 school year, J.B. was enrolled in the GISD Early Learning Program.   He also attended a program run in the mornings by the Children's Autism Center for two hours per day, three days per week.

337.   J.B.'s teacher at the GISD Early Learning Program encouraged J.B.'s mother to make a written request for an initial evaluation to determine J.B.'s eligibility for an IEP.   J.B.'s teacher identified his areas of need, noting that he works better in small groups and that he excels most when he receives individual attention in a one-on-one setting.   She also added that J.B. needs frequent breaks.

338.   At the urging of J.B.'s Early Learning Program teacher, J.B.'s mother made a written request for an initial evaluation via email in September 2015.   J.B. did not receive an evaluation until January 2016, four months after his mother's written request.

339.   The evaluation found that J.B. was not eligible for special education and related services for the qualifying disability of a Speech and Language Impairment.   J.B.'s mother was, however, told that J.B. could attain access to speech and language services at the Children's Autism Center.   When J.B.'s mother approached the Autism Center, she was told that they did not provide speech and language therapy.

340.   Despite his known and prolonged exposure to lead, J.B.'s evaluation did not assess the potentially adverse impact of lead on his academic, behavioral,

psychological, and physical needs. Routine vision and hearing screenings also were not conducted.

341. Before she enrolled J.B. in the GISD Early Learning Program for the 2015-16 school year, J.B.'s mother inquired about enrolling him in the Head Start preschool program at Eisenhower Elementary School, an FCS school. She asked whether the program provided any accommodations for children with ASD. She was told by Eisenhower's Head Start teacher that "Maybe we should just leave people like him" where they are (at a GISD-run program). J.B.'s mother was left with the impression that the school was not accepting, or equipped to deal with the needs, of students with disabilities.

342. J.B.'s mother called the Principal at Eisenhower Elementary School on August 31, 2015 to report the comment made by the Head Start teacher. She was told that the Principal was unavailable. She made repeated attempts to contact the Principal over the course of the next month, but all of her attempts were rebuffed. She went to the school, and was told by Ms. Turner, the Principal, that the Principal was not available. J.B.'s mother was unaware that she was actually having a conversation with the Principal at the time.

343. J.B.'s mother did not receive a response from the Principal until October 5, 2015. Eisenhower had placed J.B. in a Head Start classroom with the teacher who had made demeaning remarks about him to his mother. J.B.'s mother

111

requested that he be placed in the other Head Start classroom with a different teacher than the one who stated he needed to stay at the GISD program. The Principal said that it was full. Since J.B.'s mother was unable to have J.B. reassigned to another classroom, or to obtain assurance that action would be taken to ensure that J.B. would not be discriminated against, she chose not to enroll J.B. in the Head Start program at Eisenhower. She decided to enroll him in the GISD Early Learning Program instead.

344. After J.B. was found ineligible for special education and related services, J.B.'s mother requested for an evaluation to be conducted again on July 18, 2016. She wanted J.B. to attend school at Eisenhower since this is their community school and where her daughter, J.B.'s sister, is enrolled.

345. For the 2016-17 school year, J.B. was enrolled at Eisenhower. Principal Turner, upon realizing that an evaluation had been requested, informed J.B.'s mother that if he received an IEP, he would be placed in a separate classroom. This was alarming to J.B.'s mother since she wanted J.B. to be placed in a general education classroom. At this point, J.B.'s evaluation had not even begun.

346. On September 26, 2016, J.B.'s mother completed the REED and gave written consent to have J.B. evaluated. Yet, she is concerned that the Principal will

place him in the "autism room" as she had previously indicated she would if he qualified for an IEP.

347.   J.B.'s mother identifies his areas of need as support for autism, speech and language services, and instruction in reading and writing.  She adds that he needs assistance with socialization skills (such as taking turns, maintaining eye contact, and exchanging greetings).

348.   He is currently receiving Applied Behavior Analysis services through the Children's Autism Center of Genesee Health System.  J.B.'s mother has shared this with the school, and provided documentation, and he is still being marked tardy when she checks him out at 2:15pm to obtain this service, which the school has failed to provide or assess him for.

## CAUSES OF ACTION

### COUNT I (as to all Defendants)

### Systemic Violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* and Implementing Federal Regulations

### Systemic Violation 1:
### Failure to Develop and Implement Child Find Procedures

349.   Plaintiffs re-allege paragraphs 90-348 as though fully set forth herein.

350.   Pursuant to the IDEA's child find mandate, the State must have in effect policies and procedures to ensure that all children with disabilities residing

in the State who are in need of special education and related services are identified, located, and evaluated, regardless of the severity of their disabilities.  20 U.S.C. §1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i).

351.  The IDEA and its implementing regulations define a "child with a disability" as a child with intellectual disabilities, mental retardation, a hearing impairment (including deafness), a speech or language impairment, visual impairment (including blindness), a serious emotional disturbance, an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.  20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(a)(1).

352. An "other health impairment" means having "limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that – (i) [i]s due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, *lead poisoning*, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and (ii) [a]dversely affects a child's educational performance."  34 C.F.R. § 300.8(c)(9)(i-ii) (emphasis added).

114

353.   Under the IDEA, a SEA or LEA must conduct a full and individual initial evaluation before the initial provision of special education and related services to a child with a disability.   20 U.S.C. § 1414(a)(1)(A); 34 C.F.R. § 300.301(a).  The initial evaluation shall consist of procedures to determine whether a child is a child with a disability and the educational needs of that child.   20 U.S.C. § 1414(a)(1)(C)(i); 34 C.F.R. § 300.301(c)(2).   The parent, SEA, other State agency, or LEA may initiate a request for an initial evaluation.  20 U.S.C. § 1414(a)(1)(B); 34 C.F.R. § 300.301(b).

354.   The initial evaluation must be conducted within 60 days of receiving parental consent, or within the timeframe established by the State, if the State establishes such a timeframe.   20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1).  Under Michigan law, the initial evaluation must be conducted and an eligibility determination must be made within 30 school days of receiving parental consent.  MARSE Rule 340.1721b(1).

355.   Defendants must ensure that a reevaluation of each child with a disability is conducted if the educational or related services needs of the child warrant a reevaluation.  20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. §300.303(a)(1).  A LEA is also responsible for ensuring that a reevaluation is conducted if the child's parent or teacher requests one.   20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. §300.303(a)(2).  At a minimum, a reevaluation must occur on a triennial basis,

115

even in the absence of an explicit request or qualifying circumstances, unless the parent and the LEA agree that a reevaluation is unnecessary. 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. §300.303(b)(2).

356. The IDEA outlines detailed and comprehensive procedures for the conduct of evaluations, requiring the Defendants to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, *including information provided by the parent*, that may assist in determining – (i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum." 20 U.S.C. § 1414(b)(2)(A) (emphasis added); *see also* 34 C.F.R. §300.304(b)(1).

357. Importantly, each LEA "shall ensure that the child is assessed *in all areas of suspected disability.*" 20 U.S.C. § 1414(b)(3)(B) (emphasis added). Areas related to the suspected disability include, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. 34 C.F.R. § 300.304(c)(4). The child find mandate expressly includes all children with a suspected disability, even if they are advancing from grade to grade. 34 C.F.R. § 300.111(c)(1).

116

358.   The Defendants must "use technically sound instruments that may assess the relative contribution of *cognitive and behavioral* factors, in addition to physical or developmental factors."  20 U.S.C. § 1414(b)(2)(C) (emphasis added); 34 C.F.R. § 300.304(b)(3) (emphasis added).  Each Defendant must also ensure that "assessments and other evaluation materials include those tailored to assess *specific areas of educational need* and not merely those that are designed to provide a single general intelligence quotient."   34 C.F.R. § 300.304(c)(2) (emphasis added).  The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

359.   As part of an initial evaluation, if appropriate, and as part of any reevaluation, the IEP Team and other qualified professionals shall review existing evaluation data on the child, including: "(i) evaluations and information *provided by the parents of the child*; (ii) current classroom-based, local, or State assessments, and classroom-based observations; (iii) and observations by teachers and related services providers."  20 U.S.C. § 1414(c)(1)(A) (emphasis added); 34 C.F.R. § 300.305(a)(1) (emphasis added).  On the basis of that review, *and input from the child's parents*, the IEP Team and other qualified professionals, as appropriate, shall identify what additional data, if any, are needed to fulfill the

child find obligations under the IDEA.  20 U.S.C. § 1414(c)(1)(B); 34 C.F.R. § 300.305(a)(2).  The LEA must administer the assessments and evaluation measures needed to produce such additional data.  20 U.S.C. § 1414(c)(2); 34 C.F.R. § 300.305(c).

360.   In addition, the LEAs are charged with ensuring that assessments "are administered by trained and knowledgeable personnel."   20 U.S.C. § 1414(b)(3)(A)(iv); 34 C.F.R. § 300.304(c)(1)(iv).

361. Finally, in interpreting the evaluation data for the purpose of determining if a child is a child with a disability and the educational needs of the child, Defendants must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, *parent input*, and *teacher recommendations*, as well as information about the child's physical condition, *social or cultural background*, and adaptive behavior."   34 C.F.R. § 300.306(c)(1)(i) (emphases added).  Defendants shall "[e]nsure that information obtained from all of these sources is documented and carefully considered.  34 C.F.R. § 300.306(c)(1)(ii).

362.  Despite community-wide exposure to elevated levels of lead, Defendants have a pattern and practice of systematically failing to provide early screening and timely referrals for evaluations for three- and four-year-olds residing in Flint to identify the existence of a qualifying disability and eligibility for special

education and related services, and are systematically failing to provide appropriate early intervention services, including universal, high-quality preschool education. With respect to children aged 3-4, the child find mandate, requiring proactive identification, location, and evaluation of children with disabilities, is not likely to be discharged unless children in this age range are provided early intervention services, or enrolled in universal preschool, which would allow suspected disabilities among this population to be observed and assessed.

363.   Defendants also have a pattern and practice of systematically failing to ensure that Flint students with disabilities are identified, located, and evaluated in compliance with the IDEA, even in the face of community-wide lead exposure known to cause disability.

364.   Defendants FCS and GISD have a pattern and practice of systemically failing to provide ongoing screening and timely referrals for evaluations to identify qualifying disabilities which make students eligible for special education services pursuant to IDEA's child find mandate.

365.   Moreover, Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants FCS and GISD with the resources and expertise to perform the necessary evaluations, meaning that the IDEA's child find mandate cannot be properly implemented by the Defendant LEAs.   As a result of the Defendants' failures, children with disabilities remain

unidentified and are denied the educational services and procedural safeguards to which they are legally entitled under the IDEA.

## Systemic Violation 2:
## Failure to Provide a Free Appropriate Public Education that Confers a Meaningful Educational Benefit in the Least Restrictive Environment

366.   Plaintiffs re-allege paragraphs 90-348 as though fully set forth herein.

367.   Federal law requires that qualifying children with disabilities receive a free appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a).  To achieve this goal, the IDEA requires that Defendants design and develop an individualized education program ("IEP") for each qualifying child with a disability in their district.  20 U.S.C. § 1412(a)(4), §1414(d); 34 C.F.R. § 300.112, §§ 300.320-24.

368.   IDEA requires IEPs to contain several key pieces of information to ensure that they are designed to confer a meaningful educational benefit, including: (1) a statement of the student's present levels of academic achievement and functional performance;  (2) a statement of measurable annual academic and functional goals; (3) a statement of the special education and related services that will be provided to the student; (4) an explanation of the extent, if any, to which the student will not participate with nondisabled students in regular classes; (5) a statement of any individual appropriate accommodations necessary to measure the

academic achievement and functional performance of the student; (6) the projected start date for any related services; and (7) transition services for students who have reached the age of 16.  20 U.S.C. § 1414(d)(3).

369.   The IDEA requires, to the maximum extent possible, that children with disabilities be educated with children who are not disabled, and that removal from the regular education environment occurs only when education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved.  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2).  Districts must have available a continuum of alternative placements for children with disabilities.  34 C.F.R. § 300.115.

370.   Defendants FCS and GISD have an ongoing pattern and practice of systemically failing to provide special education and related services compliant with students' IEPs in the least restrictive environment as required by the IDEA.

371.   Moreover, Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants FCS and GISD with the resources and expertise to provide the necessary services in the least restrictive environment.  As a result of the Defendants' failures, children with disabilities are denied the educational services to which they are legally entitled under the IDEA.

## Systemic Violation 3:
## Failure to Protect Students' Due Process Procedural Safeguards in the Disciplinary Process

372.   Plaintiffs re-allege paragraphs 90-348 as though fully set forth herein.

373.   In order to ensure that each child with a disability is provided with a free appropriate public education, the IDEA has established a number of procedural safeguards that must be provided to a student with a disability who is subject to disciplinary removals.

374.   IDEA requires that students with disabilities be granted certain procedural safeguards with respect to the disciplinary process to ensure that they are not removed from the learning environment on account of their disabilities.

375.   Under IDEA, when a child with a disability is removed from his or her original educational placement for more than ten cumulative school days in an academic school year, procedural protections and services must be provided to the student. 20 U.S.C. §1415(k).  One such procedural protection is a manifestation determination review ("MDR") to determine whether the student's behaviors are a manifestation of his or her disabilities.   20 U.S.C. §1415(k)(1)(E).   This requirement helps ensure that a school does not impose a long-term suspension, series of suspensions, or expulsion on a special education student on account of a behavior that is merely a "manifestation" of his or her disability.  20 U.S.C. § 1415(k)(1)(E).

376.   The IDEA mandates that if a child's behavior is a manifestation of that student's disability, the child must be permitted to return to, or remain at, his or her current school placement and be provided with all of the behavioral services necessary to support and reinforce the child's positive behavior. 20 U.S.C § 1415(k)(1)(F). These behavioral supports include a functional behavioral assessment ("FBA") to determine the function or cause of the child's disability and an accompanying behavioral intervention plan ("BIP") to adequately accommodate the student's educational and behavioral needs.  20 U.S.C § 1415(k)(1)(F)(i)-(ii).

377.   A manifestation determination review is triggered after ten cumulative days of suspensions or expulsions. Additionally, the IDEA and its implementing regulations state that a series of removals totaling more than 10 school days can form a "pattern" of behavior (e.g. "because the child's [disciplined] behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals") that also triggers a mandatory MDR.  34 C.F.R. 300.536(a)(2). Notably, the MDR is not limited to determining whether the behavior at issue is a byproduct of the child's disability, but must additionally inquire into whether it may be the consequence of the district's failure to adequately implement his or her IEP.  20 U.S.C. § 1415(k)(1)(E)(i).

378.   There are, however, certain specified behaviors that permit a school district to alter a student's prescribed placement in favor of an "interim alternative

123

educational setting" for up to 45 days. 20 U.S.C. § 1415(k)(1)G). This exception is restricted to the following three behaviors: (1) carrying a weapon to school; (2) knowingly possessing or using illegal drugs, or selling or soliciting the sale of a controlled substance, at school; or (3) inflicting serious bodily injury on another individual at school. *Id.*

379. Nevertheless the interim alternative educational setting must still provide the child a free appropriate public education. The placement must also include services designed to adequately address the behavior for which the student is being suspended. 20 U.S.C. § 1415(k)(1)(D).

380. Under the IDEA, even students who do not already have an IEP in place are equally entitled to the same procedural safeguards afforded to their special education peers. Indeed, disciplinary protections extend to students who the LEA knew or should have known are students with disabilities. 20 U.S.C. § 1415(k)(5).

381. Defendants FCS and GISD have an ongoing pattern and practice of systemically failing to provide students with disabilities with procedural safeguards as required by IDEA in the administration of disciplinary practices, as well as a pattern and practice of using unduly harsh disciplinary measures with students with disabilities, including physical restraints and seclusion techniques, in violation of IDEA. Defendant MDE has failed to appropriately monitor, conduct proper

oversight, and provide Defendants FCS and GISD with the resources and expertise to provide the necessary procedural safeguards. As a result of Defendants' failures, students with disabilities are subjected to disciplinary practices and excluded from the classroom environment, instead of receiving the instructional and behavioral supports they need.

### Systemic Violation 4:
### Discrimination on the Basis of Disability and Denial of Access to Educational Services

382. Plaintiffs re-allege paragraphs 90-348 as though fully set forth herein.

383. Defendant MDE must ensure that each LEA in Michigan, including Defendants FCS and GISD, takes steps to ensure that children with disabilities within its jurisdiction have available to them the variety of educational programs and services available to nondisabled children, including art, music, industrial arts, consumer and homemaking education, and vocational education. 20 U.S.C. § 1412(a)(2), § 1413(a)(1); 34 C.F.R. § 300.110.

384. Defendants' systematic failure to ensure that children with disabilities have available the same variety of programs and services as nondisabled children is a violation of their rights under the IDEA.

## COUNT II (as to all Defendants)

## Discrimination Based on Disability in Violation of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

385.   Plaintiffs re-allege paragraphs 90-348 as though fully set forth herein.

386.   As detailed above, all Defendants have—through their respective actions and inactions—exercised gross misjudgment and discriminated against Plaintiffs and similarly situated children by denying them access to essential services and programming that is available to non-disabled students solely on account of their disabilities in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794 *et seq.*, 34 C.F.R. § 104 *et seq.*).

387.   As described above, Defendants have failed to provide Plaintiffs and similarly situated children with a FAPE and/or reasonable accommodations due to their disability-related behaviors.

388.   Defendant MDE has further failed to comply with its general supervisory responsibilities by failing to adequately oversee and supervise Defendants GISD and FCS to ensure that the representative Plaintiffs and the class of similarly situated individuals receive a free appropriate public education and/or reasonable accommodations.

## COUNT III (as to all Defendants)

## Discrimination Based on Disability in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

389.   Plaintiff re-allege paragraphs 90-348 as though fully set forth herein.

390.   As detailed above, all Defendants have—through their respective actions and inactions—exercised "gross misjudgment" and discriminated against Plaintiffs and similarly situated children by denying them access to essential services and programming that is available to non-disabled students solely on account of their disabilities and/or behaviors related to those disabilities in violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*).

391.   Each of the class members has been denied meaningful access to an adequate public education by Defendants.

## COUNT IV (as to Defendants FCS and GISD only)
## Violation of Mich. Comp. Laws § 380.1701 *et seq.*

392.   Plaintiffs re-allege paragraphs 90-348 as though fully set forth herein.

393.   Under Michigan law, each child with a disability shall be provided with programs and services designed to develop his or her maximum potential. Mich. Comp. Laws § 380.1711(1)(a).

394.   By failing to provide a free and appropriate public education, Defendants have, *a fortiori*, failed to meet their obligations under Michigan law to

127

provide children with programs designed to reach the higher threshold of developing the maximum potential of each child.

## **DEMAND FOR RELIEF**

395.   WHEREFORE, Plaintiffs request that this Court:

A. Assert jurisdiction over this matter;

B. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

C. Issue a declaratory judgment that Defendants' laws, policies, practices, procedures, acts, and omissions complained of herein deprive Plaintiffs of their statutory rights, are illegal and/or invalid, and contravene Defendants' statutory duties to ensure that Plaintiffs and similarly situated children receive access to a free appropriate public education and freedom from disability-based discrimination associated with disability-related behaviors;

D. Issue a declaratory judgment that "other health impairments" under IDEA gives rise to an affirmative duty to conduct testing and enhanced screening of all children ages 3-5 and all those attending, or who may attend, FCS for elevated blood levels and a determination as to whether the child is eligible for special education services.

E. Order Defendants to take action to address the public health crisis caused by the lead-contaminated water by (1) ensuring that all children living in Flint who

are attending or may attend FCS receive appropriate enhanced educational screening to identify any physical (including hearing and vision), social, emotional, learning, and behavioral needs; (2) identifying appropriate mitigation measures to address the physical, social, emotional, learning, and behavioral needs of each child and implementing such measures with fidelity; (3) ensuring that every public school has sufficient qualified personnel to evaluate and complete IEPs, including nurses; (4) implementing electronic medical recordkeeping within each school to track medical records, disciplinary records, attendance records, IEPs and progress reports; (5) implementing a Multi-Tiered Support System to enable a district-wide Positive Behavioral Intervention System to track the academic and behavioral needs of all students while implementing a "Positive School Climate Project" for all children within FCS; and (6) informing the public of the availability of these services and producing quarterly reports summarizing the results of these imperatives.

F. Order Defendants MDE and GISD to test the water supply for lead levels in the water supply in each FCS and GISD school facility located within Flint zip codes found to have elevated levels of lead on a regular basis and issue quarterly reports on progress.

G. Order Defendants to implement a universal, high-quality preschool program for all children aged 3-5 in Flint.

H. Order Defendants MDE and GISD to provide teacher training in positive behavioral interventions and end the practice of restraint and seclusion.

I. Order a review of all current IEPs to ensure compliance with the IDEA in order to provide each student with a free appropriate public education in the least restrictive environment possible, order Defendants to prepare quarterly reports on IEP progress, and order Defendants to devise an effective complaint process to handle and resolve IDEA violations with meaningful oversight.

J. Convene an expert group to evaluate the provision of special education services as mandated by law, identify corrective measures that address the medical, health, and trauma issues that result from lead exposure and that can be adopted by this court, and recommend a special monitor to ensure implementation of a plan including but not limited to:

    i. **Identification:** Allocate responsibility for identifying, locating and evaluating individuals suspected of having a disability attending FCS schools, including individuals who are not currently enrolled in school, detained in a juvenile detention center or adult correctional facility in Flint; and/or housed in a public or private hospital, institution or other health care facility in Flint;

    ii. **Health Care**: Address ways in which access to health care can be improved for all children attending the FCS schools and ensure adequate

training, protocol, and implementation of crisis intervention plans for healthcare emergencies;

    iii. **Discipline**: Review the code of conduct and/or discipline policy for compliance with the IDEA, require that each FCS school contain a written description of the IDEA's disciplinary procedural protections and procedural safeguards for students with disabilities and a plan for supporting school behavior and discipline. Each FCS school's plan will be monitored on a quarterly basis and the rates of suspensions and expulsions will be accurately recorded.

    iv. **Professional Development:** Provide annual professional development to all FCS schools on disciplinary procedures for students with disabilities and on best practices to reduce suspensions and expulsions for students with disabilities.

    v. **Enrollment:** Ensure that all FCS schools enroll and serve students with disabilities pursuant to federal law.

K. Assign a Special Monitor for a period of seven years to oversee implementation of the expert recommendations within one year and to continue to monitor the implementation of those recommendations for the entire seven year period.

L. Award Plaintiffs costs and attorneys' fees pursuant to 29 U.S.C. § 794a and 20 U.S.C. § 1415(i)(3)(B)(i)(I);

M. Retain jurisdiction over this action until such time as this Court is satisfied that the unlawful laws, policies, practices, procedures, acts, and omissions complained of herein have been rectified; and

N. Grant other appropriate relief as this Court deems just and proper.

Respectfully submitted,

By: /s/   Gregory G. Little

Kary L. Moss (P49759)
Kristin L. Totten (P72942)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
ACLU Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6800
kmoss@aclumich.org
ktotten@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

David G. Sciarra
Jessica Levin
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
(973) 624-1815
dsciarra@edlawcenter.org
jlevin@edlawcenter.org

Dated:  October 18, 2016

Gregory G. Little
Lindsay M. Heck
Walter Ciacci
Dominique Forrest
Laura Grai
1155 Avenue of the Americas
New York, NY 10036-2787
(212) 819-8200
gregory.little@whitecase.com
lindsay.heck@whitecase.com
walter.ciacci@whitecase.com
dominique.forrest@whitecase.com
laura.grai@whitecase.com

*Counsel for Plaintiffs*