# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

D.R., as a minor through parent and next friend Dawn Richardson, A.K., as a minor through parent and next friend, Angy Keelin, C.D.M., as a minor through parent and next friend Crystal McCadden, C.M., as a minor through parent and next friend Crystal McCadden, J.T., as a minor through parent and next friend Nakiya Wakes, N.S, as a minor through parent and next friend Nakiya Wakes, J.W., as a minor through parent and next friend Kathy Wright, C.D., as a minor through parent and next friend Twanda Davis, D.K. as a minor through parent and next friend Rachel Kirksey, M.K. as a minor through parent and next friend Rachel Kirksey, O.N., as a minor through parent and next friend Manita Davis, D.T. as a minor through parent and next friend Manita Davis, D.D. as a minor through parent and next friend Willie Daniels, C.W. as a minor through parent and next friend Chandrika Walker, J.B. as a minor through parent and next friend Jeree Brown, individually and on behalf of all similarly situated persons,

      Plaintiffs,

v.

Michigan Department of Education, Genesee Intermediate School District, Flint Community Schools,

      Defendants.

_____/

No. 16-CV-13694-AJT-APP

Hon. Arthur J. Tarnow

Mag. Anthony P. Patti


**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Kary L. Moss (P49759)
Kristin L. Totten (P72942)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
ACLU Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6800
kmoss@aclumich.org
ktotten@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

Gregory M. Starner
Lindsay M. Heck
Walter A. Ciacci
Dominique N. Forrest
Laura A. Grai
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
gstarner@whitecase.com
lindsay.heck@whitecase.com
walter.ciacci@whitecase.com
dominique.forrest@whitecase.com
laura.grai@whitecase.com

David G. Sciarra
Gregory G. Little
Jessica A. Levin
Education Law Center
60 Park Place, Suite 300
Newark, NJ  07102
(973) 624-1815
dsciarra@edlawcenter.org
jlevin@edlawcenter.org
glittle@edlawcenter.org

Timothy J. Haynes (P41196)
Travis M. Comstock (P72025)
Richard S. Kuhl (P42042)
Margaret A. Bettenhausen (P75046)
Nathan A. Gambill (P75506)
Zachary C. Larsen (P72189)
*Attorneys for Defendant Michigan Department of Education* Michigan Department of Attorney General
Health, Education & Family Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 373-7700
haynest3@michigan.gov
comstockt@michigan.gov
kuhlr@michigan.gov
bettenhausenm@michigan.gov
gambilln@michigan.gov
larsenz@michigan.gov

Timothy J. Mullins (P28021)
John L. Miller (P71913)
Giarmarco, Mullins & Horton, P.C.
*Attorneys for Defendant Genesee Intermediate School District*
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com

Donald B. Miller (P23419)
Frederick A. Berg, Jr. (P38002)
James S. Rosenfeld (P39434)

*Attorneys for Plaintiffs*

Brett J. Miller (P68612)
Michael Griffie (P79836)
Hannah Treppa (P80978)
Butzel Long, a professional corporation
*Attorneys for Defendant Flint Community Schools*
150 W. Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7020
miller@butzel.com
berg@butzel.com
rosenfeld@butzel.com
millerbr@butzel.com
griffie@butzel.com
treppa@butzel.com

_____/

## <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

Plaintiffs, through their undersigned attorneys, respectfully ask this Court to issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a), requiring Defendants Michigan Department of Education, Genesee Intermediate School District, and Flint Community Schools to comply with the "child find" mandate of the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1400 *et seq.*, section 504 of the Rehabilitation Act of 1973, and, where applicable, state law, by providing comprehensive screening and evaluations to identify all children in Flint with disabilities, in all areas of disability, consistent with the detailed request for relief set forth in the accompanying brief.

In support of their Motion, Plaintiffs assert as follows:

1.     At a status conference held before this Court on October 2, 2017, Plaintiffs expressed their intent to file a Motion for a Preliminary Injunction.

2.     Pursuant to Local Rule 7.1(a), Plaintiffs' counsel conferred with Defendants' counsel, explained the nature of this motion and its legal basis, and requested but did not obtain concurrence in the relief sought.

3.     Plaintiffs have demonstrated a likelihood of success on the merits factually supported in detail in the expert reports attached as Exhibits 1-4 hereto and legally supported in detail in the Brief in Support of Plaintiffs' Motion for Preliminary Injunction.

4.     Injunctive relief is necessary to prevent irreparable injury.  Plaintiffs lack an adequate remedy at law to redress the imminent irreparable harm suffered if this Court does not intervene to prevent it.

5.     The irreparable harm to Plaintiffs if the injunction is denied far outweighs the minimal or non-existent harm to Defendants if it is granted; therefore, a balance of the harms supports granting the Motion.

6.     The injunctive relief requested will not harm third parties; in fact, it is necessary to protect the public interest.

7.     The public interest will be harmed if the injunctive relief requested is not granted.

8.     An immediate preliminary injunction is necessary to preserve the

Court's ability to render a meaningful decision on the merits.

9.     Plaintiffs' prayer for relief is set forth in detail in the Brief in Support

of Plaintiffs' Motion for Preliminary Injunction.

10.     The Court has scheduled an evidentiary hearing on this Motion for

December 4, 2017, at 9:00 a.m.  Plaintiffs intend to present evidence at the hearing

in further support of this Motion.


DATED: October 16, 2017


                                            By: /s/ Lindsay M. Heck


Kary L. Moss (P49759)                       Gregory M. Starner
Kristin L. Totten (P72942)                  Lindsay M. Heck (*pro hac vice*)
Daniel S. Korobkin (P72842)                 Walter A. Ciacci
Michael J. Steinberg (P43085)               Dominique N. Forrest
ACLU Fund of Michigan                       Laura A. Grai
2966 Woodward Ave.                          1221 Avenue of the Americas
Detroit, MI 48201                           New York, NY 10020
(313) 578-6800                              (212) 819-8200
kmoss@aclumich.org                          gstarner@whitecase.com
ktotten@aclumich.org                        lindsay.heck@whitecase.com
dkorobkin@aclumich.org                      walter.ciacci@whitecase.com
msteinberg@aclumich.org                     dominique.forrest@whitecase.com
                                            laura.grai@whitecase.com

David G. Sciarra
Gregory G. Little
Jessica A. Levin
Education Law Center

60 Park Place, Suite 300
Newark, NJ 07102                    *Counsel for Plaintiffs*
(973) 624-1815
dsciarra@edlawcenter.org
glittle@edlawcenter.org
jlevin@edlawcenter.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 16th day of October, 2017 the undersigned filed through CM/ECF with the Clerk of the Court the foregoing Plaintiffs' Motion for a Preliminary Injunction, and I hereby request that a copy of this document be served by the Clerk's office via the Court's CM/ECF system upon all counsel of record in this case who are participants in the CM/ECF system.

BY:  /s/ Lindsay M. Heck

Lindsay M. Heck (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212)-819-8200
lindsay.heck@whitecase.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

D.R., as a minor through parent and next friend Dawn Richardson, A.K., as a minor through parent and next friend, Angy Keelin, C.D.M., as a minor through parent and next friend Crystal McCadden, C.M., as a minor through parent and next friend Crystal McCadden, J.T., as a minor through parent and next friend Nakiya Wakes, N.S, as a minor through parent and next friend Nakiya Wakes, J.W., as a minor through parent and next friend Kathy Wright, C.D., as a minor through parent and next friend Twanda Davis, D.K. as a minor through parent and next friend Rachel Kirksey, M.K. as a minor through parent and next friend Rachel Kirksey, O.N., as a minor through parent and next friend Manita Davis, D.T. as a minor through parent and next friend Manita Davis, D.D. as a minor through parent and next friend Willie Daniels, C.W. as a minor through parent and next friend Chandrika Walker, J.B. as a minor through parent and next friend Jeree Brown, individually and on behalf of all similarly situated persons,

     Plaintiffs,

v.

Michigan Department of Education, Genesee Intermediate School District, Flint Community Schools,

     Defendants.

_____/

No. 16-CV-13694-AJT-APP

Hon. Arthur J. Tarnow

Mag. Anthony P. Patti

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

Kary L. Moss (P49759)
Kristin L. Totten (P72942)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
ACLU Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6800
kmoss@aclumich.org
ktotten@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

Gregory M. Starner
Lindsay M. Heck
Walter A. Ciacci
Dominique N. Forrest
Laura A. Grai
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
gstarner@whitecase.com
lindsay.heck@whitecase.com
walter.ciacci@whitecase.com
dominique.forrest@whitecase.com
laura.grai@whitecase.com

David G. Sciarra
Gregory G. Little
Jessica A. Levin
Education Law Center
60 Park Place, Suite 300
Newark, NJ  07102
(973) 624-1815
dsciarra@edlawcenter.org
jlevin@edlawcenter.org
glittle@edlawcenter.org

*Attorneys for Plaintiffs*

Timothy J. Haynes (P41196)
Travis M. Comstock (P72025)
Richard S. Kuhl (P42042)
Margaret A. Bettenhausen (P75046)
Nathan A. Gambill (P75506)
Zachary C. Larsen (P72189)
*Attorneys for Defendant Michigan
Department of Education* Michigan
Department of Attorney General
Health, Education & Family Services
Division
P.O. Box 30758
Lansing, MI 48909
(517) 373-7700
haynest3@michigan.gov
comstockt@michigan.gov
kuhlr@michigan.gov
bettenhausenm@michigan.gov
gambilln@michigan.gov
larsenz@michigan.gov

Timothy J. Mullins (P28021)
John L. Miller (P71913)
Giarmarco, Mullins & Horton, P.C.
*Attorneys for Defendant Genesee
Intermediate School District*
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com

Donald B. Miller (P23419)
Frederick A. Berg, Jr. (P38002)
James S. Rosenfeld (P39434)
Brett J. Miller (P68612)
Michael Griffie (P79836)
Hannah Treppa (P80978)
Butzel Long, a professional corporation
*Attorneys for Defendant Flint
Community Schools*
150 W. Jefferson, Suite 100
Detroit, MI 48226

(313) 225-7020
miller@butzel.com
berg@butzel.com
rosenfeld@butzel.com
millerbr@butzel.com
griffie@butzel.com
treppa@butzel.com

_____/

## **PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................................ii

ISSUE PRESENTED ..................................................................................................................... v

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..................................................... vi

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 5

    A.  The Lead Crisis .................................................................................................................5

    B.  Lead Causes Brain Damage ..............................................................................................6

    C.  Lead Lacks a Signature Injury...........................................................................................7

    D.  The Role of Neuropsychological Evaluations...................................................................9

    E.  The Lag Effect..................................................................................................................10

    F.  Results of Plaintiffs' Experts' Evaluations of Representative Plaintiffs............................11

    G.  Systemic Failures in Defendants' Child Find Process .......................................................17

ARGUMENT ............................................................................................................................... 20

    A.  Legal Standard.................................................................................................................20

    B.  Plaintiffs are Likely to Succeed on the Merits ...............................................................21

        i.  Under IDEA and Section 504 and (for FCS and GISD) Analogous Michigan State Law Provisions, Defendants Are Required to Identify, Locate, and Evaluate Children with Suspected Disabilities ........................................................22

        ii. IDEA Requires Testing in *All* Areas of Suspected Disability ...................................... 24

        iii.The IDEA Requires a Comprehensive Evaluation........................................................ 27

        iv.Children in Flint are not Receiving Comprehensive Evaluations in All Areas of Suspected Disability ................................................................................................... 29

    C.  Failure to Issue a Preliminary Injunction Will Cause Irreparable Harm............................31

    D.  The Balance of the Equities Weigh Heavily in Plaintiffs' Favor, as No Substantial Harm to Others Would Result from the Proposed Injunction ...............................................33

    E.  A Preliminary Injunction is in the Public Interest.................................................................34

RELIEF REQUESTED.................................................................................................................. 36

CONCLUSION............................................................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*A.T. ex rel. Z.T. v. N. Y. State Educ. Dep't*, No. 98-CV-4166, 1998
U.S. Dist. LEXIS 23275 (E.D.N.Y. Aug. 4, 1998).....................................31

*B.H. v. W. Clermont Bd. of Educ.,* 788 F. Supp. 2d 682 (S.D. Ohio
2011) ..............................................................................................................27

*Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307 (6th Cir. 2007) ...........21, 28, 29

*Borough of Palmyra Bd. of Educ. v. F.C.*, 2 F. Supp. 2d 637 (D.N.J.
1998) ..............................................................................................................31

*Caspar v. Snyder*, 77 F. Supp. 3d 616, 638 (E.D. Mich. 2015).....................20, 31

*Clay T. v. Walton Cty. Sch. Dist.*, 952 F. Supp. 817 (M.D. Ga. 1997)...................22

*D.L. v. D.C.*, 194 F. Supp. 3d 30, 97 (D.D.C. 2016) .........................................30, 32

*D.L. v. D.C.*, 730 F. Supp. 2d 84 (D.D.C. 2010) ....................................................29

*D.L. v. D.C.*, 860 F.3d 713 (D.C. Cir. 2017) ..........................................................29

*Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004) ........................34

*Dep't of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190 (D. Haw. 2001)...................21

*Elida Local Sch. Dist. Bd. of Educ. v. Erickson*, 252 F. Supp. 2d 476
(N.D. Ohio 2003) ..........................................................................................27

*Flight Options, LLC v. Int'l Brotherhood of Teamsters*, *Local 1108*,
863 F.3d 529 (6th Cir. 2017) ........................................................................19

*Greenwich Bd. of Educ. v. G.M.*, No. 3:13-cv-00235, 2016 U.S. Dist.
LEXIS 81008 (D. Conn. June 22, 2016)........................................................27

*J.B. v. Killingly Bd. of Educ.*, 990 F. Supp. 57 (D. Conn. 1997)............................31

*John T. v. Delaware Cty. Intermediate Unit*, Civ. A. No. 98-5781,
2000 U.S. Dist. LEXIS 6169 (E.D. Pa. 2000) ..............................................32

*K.I. v. Montgomery Pub. Sch.*, 805 F. Supp. 2d 1283 (M.D. Ala. 2011) ...............26

*LIH v. N.Y.C. Bd. of Educ.*, 103 F. Supp. 2d 658 (E.D.N.Y. 2000) ........................31

*M.A. ex rel. E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335 (3d Cir. 2003) ........................................................................................................32

*M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389 (3d Cir. 1996) .................25

*Mark H. v. Lemahieu*, 513 F.3d 922 (9th Cir. 2008) ................................22

*N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 (9th Cir. 2008) ........................................................................................23, 24, 25, 28

*NCUA Bd. v. Jurcevic*, 867 F.3d 616 (6th Cir. 2017).............................................19

*Orange Unified Sch. Dist. v. C.K.*, 11-cv-1253, 2012 U.S. Dist. LEXIS 92423 (C.D. Cal. June 4, 2012) ........................................................22, 25

*Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928 (E.D. Va. 2010)....................................................................................21, 23, 24

*Streck v. Bd. of Educ. of E. Greenbush Cent. Sch. Dist.*, 408 F. App'x 411 (2d Cir. 2010) .....................................................................................27

*United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Trans. Auth.*, 163 F.3d 341 ........................................................19, 20

*W.H. v. Clovis Unified Sch. Dist.*, No. 08-cv-0374, 2009 U.S. Dist. LEXIS 47736 (D. Conn. June 8, 2009)...................................................22

*Warren G v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80 (3d Cir. 1999) .................25

## STATUTES AND RULES

34 C.F.R. § 104 .......................................................................................22

34 C.F.R. § 300.111 .................................................................................21

34 C.F.R. § 300.304 ................................................................23, 26, 27

20 U.S.C. § 1400.................................................................................2, 34

20 U.S.C. § 1412(a)(3)(A) ......................................................................21

20 U.S.C. § 1414(a)-(c)..........................................................................21, 23, 24, 26

Mich. Comp. Laws § 340.1701................................................................................2

## MISCELLANEOUS

Individuals with Disabilities Education Improvement Act of 2004.................passim

Rehabilitation Act of 1973 § 504.....................................................................passim

## <u>ISSUE PRESENTED</u>

Should this Court issue a preliminary injunction requiring Defendants to comply with their Child Find obligations under federal law and, for Defendants Flint Community Schools and Genesee Intermediate School District, under analogous state law provisions?

Plaintiffs' answer: YES

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

Individuals with Disabilities Education Improvement Act of 2004

Rehabilitation Act of 1973 ("Section 504")

Mich. Comp. Laws § 340.1701 *et seq.*

*Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616 (6th Cir. 2017)

*Flight Options, LLC v. Int'l Brotherhood of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017)

*United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Trans. Auth.*, 163 F.3d 341(6th Cir. 1998)

*Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307 (6th Cir. 2007)

*N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 (9th Cir. 2008)

*K.I. v. Montgomery Pub. Sch.*, 805 F. Supp. 2d 1283 (M.D. Ala. 2011)

*D.L. v. D.C.*, 860 F.3d 713 (D.C. Cir. 2017)

*D.L. v. D.C.*, 194 F. Supp. 3d 30, 97 (D.D.C. 2016)

*M.A. ex rel. E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335 (3d Cir. 2003)

*Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004)

## <u>INTRODUCTION</u>

The government-created public health crisis in Flint, Michigan, which culminated in an entire population being poisoned with lead-contaminated water for a period of at least eighteen months, is now well known.  What remains unknown is the full scope and magnitude of the impact of the crisis, especially on the children of Flint, who comprise the subset of the population most vulnerable to lead's pernicious effects.  It is well-established that lead, a potent neurotoxin, causes brain damage, inducing a functionally similar type of brain injury as would result from a traumatic car accident or from oxygen deprivation to the brain.

For Flint children, education is the antidote to the harm that has been inflicted upon them.  Education offers the only avenue through which the cognitive and behavioral effects of lead poisoning can be mitigated.  Thus, the public schools in Flint must be at the front lines of a proactive and comprehensive effort to provide the children of Flint with educational opportunities that they must have and are entitled to under law.

The first step to a systemic response to the lead crisis is to understand the full extent of the harm endured by Flint children.  The Superintendent of Flint public schools, Bilal Tawwab, recognized as much when he testified before Congress on February 10, 2016, stating:

> We need resources to measure the intellectual and emotional damage done to each, and *possibly every child*.

> This will require *complete* testing – both medical and intellectual assessment – to understand the magnitude of our issues.[1]

That is the relief sought by this motion.

Lead's presence in the blood is transient, and the window for detection through blood lead level testing is short-lived.  The use of blood testing as a barometer of harm at this juncture is thus foreclosed.  While lead dissipates in the blood, its effects throughout the body, and especially on cognitive and behavioral functions, are long-lasting.  Those effects are detectable through sophisticated screening and testing that is uniquely calibrated to capture lead's impact on brain functions.

Such tailored testing is essential because of lead's distinctive properties.  Lead lacks a signature injury, meaning that it impacts each individual differently, and can have a lag effect, meaning that its impact may manifest long after it enters the body.  Thus, in a population that has been subjected to community-wide lead poisoning – i.e., Flint children – it is impossible to predict *which* children will be affected, *how* they will be affected, and *when* they will be affected.  A system of screening and evaluations is therefore necessary to identify those children and determine their needs.

---

[1] Testimony of Superintendent Bilal Kareem Tawwab, "*The Flint Water Crisis: Lessons for Protecting America's Children*," House Democratic Steering and Policy Committee (Feb. 10, 2016) (emphases added).

Plaintiffs seek a preliminary injunction requiring Defendants Flint Community Schools ("FCS"), Genesee Intermediate School District ("GISD"), and Michigan Department of Education ("MDE") to comply with the "child find" mandate of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.* and § 504 of the Rehabilitation Act of 1973 ("Section 504"), and requiring Defendants FCS and GISD to comply with the analogous provisions of state law, Mich. Comp. Laws § 340.1701 *et seq.*, by providing comprehensive evaluations to identify all children in Flint with disabilities. A comprehensive system of screenings and evaluations is a necessary first step in developing Individualized Education Programs ("IEPs") and/or 504 accommodation plans to meet the educational needs of all children eligible for special education and/or related services. The tools for conducting such evaluations should include, but not be limited to, neuropsychological evaluations consistent with the detailed roadmap set forth below.

A preliminary injunction is warranted under the familiar four-factor test for such relief. *First*, Plaintiffs will demonstrate a likelihood of success on the merits. Defendants' current child find process is woefully inadequate, deficient, and dysfunctional on a systemic level. It fails to identify all students who need special education services and fails to identify students in *all* areas of disability, whether or not related to lead poisoning, in the aftermath of a crisis that puts all Flint

children at risk of newly identified disabilities and the exacerbation of pre-existing disabilities.  Defendants' child find failure violates both IDEA and Section 504, and for Defendants FCS and GISD, Michigan state law.

*Second*, Defendants' systemic child find failure, if not immediately addressed through a comprehensive system of screenings and evaluations, will cause irreparable harm by allowing children's disabilities to go undetected and unaddressed.  Children who are not properly evaluated at all for suspected disabilities, or who are not evaluated in all areas of suspected disability, will not receive the special education and related services, supports, and accommodations needed to confer upon them a meaningful educational benefit.  In turn, they will be denied the free appropriate public education ("FAPE") to which they are entitled under law.  Where undetected disabilities manifest in behavioral issues that are not traced to their root cause, children are not only deprived of essential educational services, they are also placed at an additional risk of being disciplined and removed from the classroom environment, compounding their cumulative educational deficit.  Thus, proper and timely identification of all Flint students with disabilities in all areas of suspected disability is crucial to ending the untenable cycle in which Defendants do not proactively find and identify the students with disabilities, do not address their disabilities, and then blame and punish them for behavioral manifestations of those very same disabilities.  To address this systemic

failure, comprehensive evaluations, including neuropsychological assessments, must be available and administered in all areas of suspected disability.

*Third*, the balance of equities weighs heavily in favor of injunctive relief. As stated, Plaintiffs and the plaintiff class face immediate and concrete irreparable harm if the requested injunctive relief is not issued.  Any harm to Defendants, by contrast, is necessarily *de minimis* – even non-existent – because the preliminary injunction merely compels their compliance with statutory and regulatory mandates.

*Fourth*, the preliminary injunction serves the bedrock public interest of ensuring the effective delivery of special education and related services to Flint students with disabilities, thus effectuating educational opportunities essential to prepare these children for full civic participation and to make a contribution to Michigan's economic future.

## BACKGROUND

### A.   The Lead Crisis

The children of Flint were exposed to elevated lead levels in the drinking water for a period of at least eighteen months beginning in April 2014, when Flint's water source was changed from Detroit-supplied Lake Huron water to the

Flint River as a temporary cost-saving measure, awaiting a new pipeline to Lake Huron in 2016.[2]

A study conducted in February 2016 by Hurley Medical Center found that the incidence of blood levels in Flint doubled, increasing from 2.4% to 4.9%, after the water source change, and that the neighborhoods with the highest water lead levels experienced a 6.6% increase.[3]

**B.   Lead Causes Brain Damage**

Lead is a potent neurotoxin, a poison that has deleterious and lasting effects on the nervous system.[4]  Lead affects every major system in the body: the blood, the kidneys, the lungs, the immune system, and the brain.  Once lead enters the body, it is distributed in the blood to all of the organs – including the brain, the

---

[2] Mona Hanna-Attisha et al., *Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response*, 106 AM. J. PUB. HEALTH 283, 283 (2016).

[3] *Id.*  This retrospective study includes all children younger than five years who had a Blood Lead Level test processed through Hurley Medical Center's laboratory.  The pre time period (before the water source change) was January 1, 2013 to September 15, 2013, and the post time period (after the water source change) was January 1, 2015 to September 15, 2015.  *Id.* at 284.

[4] *See generally* Report of Dr. Theodore I. Lidsky (hereinafter "Lidsky Report"), Exhibit (hereinafter "Ex.") 1.

kidneys, and the lungs – and is deposited anywhere that calcium typically resides in the body, including in the bones[5] and in brain cells.

Although lead is harmful to all of the body's systems, the brain is the most sensitive organ to lead exposure. Lead fundamentally affects the structure of the brain by altering both (1) the formation and structure of brain cells in isolation and (2) the connection between brain cells[6] (i.e., how they communicate with each other through cell signaling). Lead, therefore, causes brain damage and leads to a reduction in the volume of brain tissue.

### C.    Lead Lacks a Signature Injury

Brain damage induced by lead poisoning, like brain damage from other causes, manifests in the impairment of neuropsychological functioning. A child's developing nervous system is uniquely vulnerable to the neurotoxic effects of lead because children absorb and retain more lead than adults; more of the lead that is

---

[5]    The body's substitution of lead for calcium in this manner explains lead's intergenerational effects. Women exposed to lead as children have lead stored in their bones where calcium would usually be deposited. When the body needs calcium for the developing fetus during pregnancy, it is taken from the mother's bones. Thus, where lead deposits have replaced calcium deposits in the mother's bones, the lead may be passed to the developing fetus.

[6] Calcium is typically found in the gap – or synapse – between a brain cell that is sending a signal and the brain cell that is receiving the signal. When a child is exposed to lead, lead is deposited in the synapse and blocks the flow of calcium. Without calcium, synapses get weaker and brain function suffers.

absorbed by children is deposited in their brains; and lead is more injurious to developing brain cells.

Although the entire brain can be affected by lead and is therefore at risk when a child has been lead poisoned, the frontal lobes, hippocampus and cerebellum are particularly sensitive. These areas of the brain are involved in critical neuropsychological processes such as motor control, balance, perception, language, attention, impulse control, memory and learning, and higher-level executive functions (such as abstract reasoning, concept formation, planning, cognitive flexibility, and social judgment). Because lead injures the corresponding areas of the brain, it has been shown to impair these vital neuropsychological functions. As a result, many children exposed to lead experience IQ decrements, poor school performance, and problematic behavior such as aggression and poor impulse control.

While there is scientific consensus about the neuropsychological functions that are at risk and that can potentially be affected when a child is lead poisoned, lead lacks a signature injury. In other words, it is impossible to predict in advance how lead will impact a specific individual; experts cannot forecast which of the at-risk neuropsychological functions will be affected in the individual, when they will be affected, or how they will be affected. Thus, in dealing with a population of lead-exposed children, one cannot predict which children will be adversely

8

affected or, in affected children, the specific nature of a particular child's deficits. Different affected children will exhibit different combinations of deficits.

### D.     The Role of Neuropsychological Evaluations

The testing routinely administered to determine a child's special education eligibility is known as *psychoeducational* evaluation.  Given lead's potential effects on specific neuropsychological functions and the absence of a signature injury, however, psychoeducational evaluations do not necessarily capture or detect lead's impact.  Psychoeducational evaluations are designed to test IQ and aggregate the subject's summed performance on multiple subtests that tap into myriad cognitive functions.  Thus, results on these tests can obscure the existence of impairments precipitated by underlying brain injury.  While brain injury can certainly affect IQ, it is also possible for such injury to manifest in other ways that will not be reflected in IQ-based examinations that assess broad functions.  Many important aspects of language, memory, attention and executive functioning either are not measured or are poorly measured by IQ tests that average the performance of many brain systems.  Simply put, psychoeducational tests are not designed to assess brain injury and its effects.

A *neuropsychological* evaluation, by contrast, does assess specific and discrete neuropsychological functions.  As discussed above, brain injury, whether from trauma, oxygen deprivation, or toxic agents such as lead, typically has a

circumscribed impact on a limited number of neurobehavioral systems.  For example, those who have sustained brain damage may have deficits affecting only certain aspects of language such as object naming or specific memory functions, leaving other cognitive functions intact, including other aspects of memory.

The information gleaned from neuropsychological evaluations about the cognitive and behavioral manifestations of brain injury in the individual child will assist in determining students' disability classifications, including but not limited to classifications under federal and state law for Other Health Impairment, Traumatic Brain Injury, Emotional Impairment, Cognitive Impairment, Autism Spectrum Disorder, and Specific Learning Disabilities.  It will also provide information necessary to develop and implement IEPs that provide all of the special education and related services required for a student to receive FAPE.

### E.    The Lag Effect

Lead poisoning often has a "lag effect," meaning that cognitive and behavioral impairments due to early poisoning may not be observable until the child is older.  According to the CDC, there are three stages of development when both newly emerging effects of early childhood lead poisoning and the exacerbation of existing deficits are likely to be observable: (1) in kindergarten to first grade when children begin to acquire basic academic skills; (2) in the third to fourth grade when children start to use basic skills to learn new material; and (3) in

the teenage years when executive functions such as planning and organizational skills are needed.

**F.  Results of Plaintiffs' Experts' Evaluations of Representative Plaintiffs**

Plaintiffs retained two of the nation's leading experts on the effects of lead poisoning in children, Dr. Theodore I. Lidsky, Ph.D. and Dr. Vicki Sudhalter, Ph.D., to produce detailed assessment reports for eight of the representative plaintiffs based on in-person evaluations.[7]  Dr. Lidsky is a licensed psychologist broadly trained in neuroscience and psychology who specializes in behavioral neuroscience and neuropsychology.  Over his decades-long career, he has performed more than 1,500 neuropsychological evaluations of lead poisoned children as well as young adults who had been poisoned as infants.  Dr. Sudhalter is a licensed psychologist with extensive training and clinical experience in the neuropsychological assessment of children with a variety of cognitive and behavioral deficits.  She has evaluated over 500 children with lead poisoning and also has experience as a teacher in the Massachusetts and New York public school systems.  Dr. Lidsky's professional expertise in the effects of metals, such as lead, on the brain and the developing nervous system is complemented by Dr. Sudhalter's background in education prior to her transition into the field of

_____

[7] Dr. Lidsky and Dr. Sudhalter each authored written assessments of four plaintiffs. These assessments are appended to their respective expert reports.

psychology.  (*See* Lidsky Report, Ex. 1-A; *see also* Report of Dr. Vicki Sudhalter (hereinafter "Sudhalter Report"), Sudhalter Report, Ex. 2-A).

Dr. Lidsky drew the following conclusions from the results of the neuropsychological evaluations that he conducted on four of the representative plaintiffs and his review of relevant documents:

1. For several of the children, lead exposure is only one of multiple risk factors.  A brain rendered fragile by other risk factors, would be even more negatively impacted by this potent neurotoxin.  The neurocognitive impairments identified in the appended evaluations are entirely consistent with the types of impairments observed in children with lead exposure.

2. Each child had an abnormal neuropsychological profile indicative of brain damage.

3. There was no signature injury; i.e. each child had a unique constellation of neurocognitive functions that were impaired and other neurocognitive functions that were intact.

4. Because there was no signature injury, the educational intervention required has to be tailored individually for each child.

5. I am not aware that any of these children has previously received a neuropsychological evaluation.  As a result, their neurocognitive areas of impairment have not been identified by the school system and accordingly they are not receiving services appropriate to their unique neuropsychological profiles.

6. Review of the extant educational records indicates that these children are struggling in school.  Apart from any consideration of brain damage, they are not receiving appropriate special education services.

(Lidsky Report, Ex. 1 at 6-7).

Dr. Sudhalter likewise found that the evaluated plaintiffs' continuing inability to progress and acquire age appropriate behaviors was consistent with

lead poisoning.  The deficits known to be caused by lead (among many others, inattention, inability to control impulses, and cognitive deficits across many domains) had not been addressed in any of these students.  (Sudhalter Report, Ex. 2-C at 7, Ex. 2-D at 7, Ex. 2-E at 5, Ex. 2-F at 5).

Specifically, on the basis of conducting neuropsychological evaluations (and, for two of the plaintiffs, autism evaluations), Dr. Lidsky and Dr. Sudhalter made the following findings with respect to the individual representative plaintiffs they evaluated—findings that the plaintiffs' previous psychoeducational evaluations did not detect.  The below are excerpts from their reports:

*CDM*

Unless a comprehensive plan of intervention to mitigate his neurocognitive impairments is initiated without delay, CDM's educational prognosis is grim.  Impairments of aspects of executive functioning (i.e. concept formation and planning) in combination with verbal memory problems strike at the very foundations of learning.  In isolation, each impairment imposes a serious handicap; in combination their adverse effects are exacerbated.  When ADHD is added to the mix, the result can be educationally catastrophic.  With an appropriate plan of intervention, CDM would be able to complete high school, albeit with ongoing assistance and course modifications.  Without such intervention his chances for success are dismal.  (Lidsky Report, Ex. 1-C at 3-4).

*ON*

ON's neuropsychological impairments impose limitations on his educational potential.  His IEP, that addresses articulation problems and visual-motor impairments, doesn't even scratch the surface when it comes to the services needed to address this child's difficulties. . . .

Educational intervention is needed without delay.  As is characteristic of many types of brain injury, despite his impairments ON has other

13

neurocognitive processes that are not only intact but strong. With an appropriate plan of intervention, he can learn to use his intact functions to mitigate the adverse influence of his impairments and thereby function at a higher level. His impairments will become more entrenched the longer such intervention is postponed. In addition, fundamentals typically acquired early in education will not be learned and he will therefore be missing the strong educational foundation needed to progress in the higher grades. (Lidsky Report, Ex. 1-D at 4-5).

*DT*

DT's neuropsychological impairments adversely affect neurocognitive processes whose normal functioning is crucial for not only academic success but also for independent living beyond the school years. The negative influence of her impairments is evident in her record of mediocre academic performance. It is unclear from the records provided for my review whether or not she has ever even been evaluated by the special education committee.

The neuropsychological picture presented by DT, similar to many patients with brain injury, is that of areas of impairment observed along with other neuropsychological functions that appear to be relatively preserved. Because there has been no intervention that effectively addresses her impairments, she has not learned how to capitalize on her strengths and, as a result, she is struggling academically. If allowed to continue to flounder, her prospects for a high school diploma are problematic. However consideration of her overall pattern of neuropsychological findings indicates that with appropriate intervention, DT would have the potential to complete high school and perhaps succeed at the level of community college. (Lidsky Report, Ex. 1-E at 5).

*JT*

JT's neuropsychological impairments impose limitations on his educational potential. Classroom instruction is heavily dependent upon the ability to remember what is demonstrated and written on the blackboard or read in a textbook. The patient's memory problems will render these traditional modes of instruction markedly less effective than for a uninjured child. Moreover his weaknesses in this area are compounded by difficulties in paying attention, a problem of particular significance in a classroom environment that is typically rife with distractors. Deficits such as these will

become increasingly felt as he progresses to the higher grades in which more conceptually difficult material must be learned. . .

JT's current IQ, in conjunction with his neuropsychological impairments and behavioral problems, indicates that, absent appropriate intervention, he will not obtain a high school diploma.  With an appropriate plan of intervention, however, he can learn to use his intact functions to mitigate the adverse influence of his impairments and thereby function at a higher level.  (Lidsky Report, Ex. 1-F at 4).

*DR*

DR meets the diagnostic criteria for Autism Spectrum Disorder.  He has not developed appropriate social skills.   These deficits in socialization have affected D's language development and his ability to acquire age appropriate behavior and have led to his social isolation.  Though he wants to have friends, he has no idea how to make and keep them.  In addition, D's unaddressed cognitive, attentional and impulsivity control deficits have led to his failure in school.  D is presently obsessed with food and little else.  All of these unaddressed deficits will lead to an unproductive, isolated adulthood. . .

D's behaviors (which lead to a diagnosis of Autism Spectrum Disorder) have not been recognized by his school, though school personnel have been given documentation attesting to his diagnosis.   The Flint School System apparently disallowed the diagnoses brought in by D's mother from outside experts though did not perform an Autism Evaluation of D, using nationally recognized assessment tools.  And as a result, D has not received appropriate schooling to help him acquire the behaviors which would lead to a more productive and satisfying adulthood. . .

The fact that D has not received the appropriate schooling will lead to his inability to gain adult employment, the lack of a social life, and perhaps even incarceration.  D exhibits maladaptive behaviors (such as temper tantrums, and willful disobedience) that can lead to problems with the law.  He has been shown to have impulse control deficits.  D also is easily persuaded by others; and perhaps in his desire to please others could easily be convinced to do something that would lead to incarceration.  (Sudhalter Report, Ex. 2-C at 6-8).

*CW*

CW is displaying a distinctive profile of strengths and weaknesses.  He displayed strength in the areas of defining words, most areas of memory (excepting the one that required the manipulation of small objects), nonverbal concept formation and fluid reasoning.  However, C exhibited severe to profound deficits in many areas of language, sensory motor functioning and his ability to control attention.  This profile of strengths and weaknesses is indicative of pediatric brain injury.  Furthermore, such impairments have been described as sequella of early childhood exposure to lead.  Lead is a known environmental toxin whose effects on the developing nervous system have been well documented, and often lead to such cognitive and behavioral consequences as language disorders, hyperactivity, attention deficits and mental retardation.  Elevated lead levels in young children have also been associated with poor performance on standardized assessments of emotional regulation and orientation-engagement.

It is imperative for C's long term development that his deficits be recognized and that appropriate schooling be put in place.  And such deficits can only be recognized through a thorough and comprehensive neuropsychological evaluation. . . .

If appropriate therapies are not implemented immediately, CW who is presently an easy to please and eager learner will fail in school.  (Sudhalter Report, 2-D at 7).

*DK*

DK meets the diagnostic criteria for Autism Spectrum Disorder and has met the accepted national definition of ASD for the length of time he has been in the Flint School System.  D's behaviors (which lead to a diagnosis of Autism Spectrum Disorder) have not been recognized by his school, though school personnel have been given documentation attesting to his diagnosis.  Only in 2017 was there a mention of D having ASD on an IEP.  However, what was deemed appropriate to address D's ASD behaviors was an ASD consult which was to be provided twice per month for 10-15 minutes.  One consult was to be provided by phone and one was apparently to be provided on site.  This was deemed sufficient.  It clearly is not.

D has not received appropriate schooling to help him acquire the behaviors which would lead to a more productive and satisfying adulthood.  In fact, not

recognizing D's ASD and not preparing an appropriate IEP with the amount of therapy which would actually address some of D's outstanding deficits, has led to the emergence of his maladaptive behaviors. . . (Sudhalter Report, Ex. 2-E at 4).

*JB*

JB meets the diagnostic criteria for Autism Spectrum Disorder and has met the accepted national definition of ASD for the length of time he has been in the Flint School System.

J has not received appropriate schooling to help him acquire the behaviors which would lead to a more productive and satisfying adulthood. . . .

. . . Clearly being provided with 20 minutes of expertise PER MONTH is not enough to provide an adequate educational environment or experience for JB. . . .

The fact that J has not received the appropriate schooling will lead to his inability to gain adult employment and any hope of contentment in his lifetime.  (Sudhalter Report, Ex. 2-F at 4-5).

**G.    Systemic Failures in Defendants' Child Find Process**

The multiple failures Dr. Lidsky and Dr. Sudhalter observed in their evaluations of the representatives Plaintiffs – failures to identify children with suspected disabilities, to evaluate children in *all* areas of suspected disability, and to administer comprehensive evaluations within areas of suspected disability – reflect broader systemic deficits in Defendants' child find process.  These systemic deficits are attributable to at least three major problems in Defendants' policies, practices and procedures.

First, as discussed extensively above, there is a systemic failure to perform neuropsychological evaluations when doing so is necessary to identify children with disabilities and evaluate children in all areas of suspected disability.

Second, FCS's existing training for teachers and bureaucratic structure for referring students for evaluations is appallingly deficient.  Dr. William J. Therrien, Ph.D., an expert in special education, and Dr. Gail Lovette, Ph.D., an expert in general education, were retained by Plaintiffs to assess the existing child find process and implementation at FCS.  They found major deficiencies in the most basic respects.  For example, teachers have not received training on how to identify suspected disabilities that might be related to lead poisoning.  Middle and high school teachers are unaware of the referral process that they should undertake when they suspect that a child has a disability.  Elementary school teachers are not aware that they can refer a child for a special education evaluation without first directing them to meet with the student assistance team ("SAT") at each school, which applies a response to intervention ("RTI") model in which students are to receive instructional and behavioral supports before being formally referred for a special education eligibility determination.  This RTI model is now conducted under the umbrella of Michigan's Integrated Behavior and Learning Support Initiative ("MIBLSI").  Additionally, teachers do not receive training on RTI that would make the pre-referral interventions effective; and there are such significant

delays for students to receive SAT meetings in the first place that the RTI model as currently implemented effectively serves to block, rather than facilitate, the identification of children for special education. (Report of William J. Therrien (hereinafter "Therrien Report"), Ex. 3, ¶¶ 20-29; Report of Dr. Gail Lovette (hereinafter, "Lovette Report,"), Ex. 4). In short, the system is broken.

Third, GISD and MDE have affirmative oversight responsibilities and there is nothing to indicate that they have taken action to effectively address the serious deficits in the child find process for Flint students in the wake of the lead crisis. In short, MDE and GISD have failed to exercise oversight to ensure compliance with IDEA, 504, and, for GISD, applicable state law. Michigan Protection & Advocacy Service, Inc. ("MPAS"), the agency designated by the State of Michigan to protect and advocate for the rights of individuals with disabilities, has documented systemic child find failures in Flint for over five years and has repeatedly sought MDE's intervention in securing systemic reform. MDE has nonetheless refused to conduct thorough systemic investigations or implement systemic reform. For example, MPAS has an open administrative complaint against MDE based on its failure to correct identified, systemic child find noncompliance in FCS schools. The complaint follows seven separate complaints against FCS between 2014 and 2017 in which FCS was repeatedly found noncompliant with its child find

obligations but MDE failed to order systems-level corrective action.  (Declaration of Kris Keranen (hereinafter "Keranen Decl."), Ex. 5, ¶ 31).

## ARGUMENT

### A. Legal Standard

In deciding whether to grant a motion for preliminary injunction, a court must consider "(1) the likelihood of success on the merits; (2) irreparable harm absent injunctive relief; (3) substantial harm to others from the proposed injunction; and (4) the broader public interest."  *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017).  "These factors are not prerequisites, but are factors that are to be balanced against each other."  *Flight Options, LLC v. Int'l Brotherhood of Teamsters*, *Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017).

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."  *United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Trans. Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (citations and internal quotation marks omitted).  For this reason, the Sixth Circuit has recognized that "preservation of the court's ability to exercise meaningful review may require *affirmative* relief in order to prevent some future irreparable injury."  *Id.* (citations and internal quotation marks omitted) (emphasis in original).  Where the "currently existing status quo itself is causing . . . irreparable injury, it is necessary to alter the

situation so as to prevent the injury." *Id.* (citations and internal quotation marks omitted).   Accordingly, the Sixth Circuit has rejected the distinction between mandatory and prohibitory injunctive relief and has held that the traditional preliminary injunction standard – the balancing of equities – applies to motions for both mandatory and prohibitory preliminary injunctive relief.  *Id.*; *see also Caspar v. Snyder*, 77 F. Supp. 3d 616, 638 (E.D. Mich. 2015) ("The premise that there are 'disfavored' injunctions finds no support in Sixth Circuit law. . . . The Sixth Circuit . . . has rejected . . .  authority requiring more exacting judicial scrutiny of injunctions that alter the status quo, are mandatory in nature, or grant substantially all of the relief to which a plaintiff may ultimately be entitled after trial.").

As demonstrated below, all four preliminary injunction factors weigh heavily in Plaintiffs' favor, and class-wide affirmative relief is necessary now to prevent irreparable injury to the children of Flint.

### B.    Plaintiffs are Likely to Succeed on the Merits

Defendants have not discharged their child find obligations under IDEA or Section 504 and, for Defendants FCS and GISD, under state law analogues, to provide children with comprehensive evaluations in *all* areas of suspected disability and to gather information from such evaluations that may assist in determining the content of their resultant IEPs and/or 504 Plans.  This is true both with respect to suspected disabilities that pre-existed, and are potentially

exacerbated by, the lead crisis as well as those triggered by the community-wide lead exposure that has placed all Flint children at risk of a disability.

### i. Under IDEA and Section 504 and (for FCS and GISD) Analogous Michigan State Law Provisions, Defendants Are Required to Identify, Locate, and Evaluate Children with Suspected Disabilities

"The IDEA imposes a 'child find' requirement on the states: their schools must have policies and procedures in place to identify, locate, and evaluate children with disabilities who need special education and related services." *Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (citing 34 C.F.R. § 300.111(a)(1)); *see also* 20 U.S.C. § 1412(a)(3)(A). IDEA's child find obligations extend to local educational agencies ("LEAs"), such as FCS and GISD, as well as the state. 20 U.S.C. § 1412(a)(3)(A); 20 U.S.C. § 1414(a)-(c); 34 C.F.R. § 300.111. "Even children who are only suspected of having a disability . . . are protected by this requirement," although they are progressing from grade to grade. *Bd. of Educ. of Fayette County,* 478 F.3d at 313 (*citing* 34 C.F.R. § 300.111(c)). "The 'child find' obligation is triggered where the state has reason to suspect that the child may have a disability and that special education services may be necessary to address that disability." *Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 942 (E.D. Va. 2010); *see also Dep't of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1194 (D. Haw. 2001). The "threshold for suspicion of a disability is 'relatively low'; the inquiry is not whether the student actually

qualifies for special education services, but whether the student should be referred for an evaluation." *Orange Unified Sch. Dist. v. C.K.*, 11-cv-1253, 2012 U.S. Dist. LEXIS 92423, at *18 (C.D. Cal. June 4, 2012) (citing *Cari Rae S.*, 158 F. Supp. 2d at 1195). "Identification is generally accomplished through various screening processes, such as periodic testing of all students," and "training which would help teachers to identify signs of possible disabilities." *Clay T. v. Walton Cty. Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997).

Section 504 of the Rehabilitation Act applies to all public schools that receive federal financial assistance. *Mark H. v. Lemahieu*, 513 F.3d 922, 929 (9th Cir. 2008) (citing 29 U.S.C. § 794(b)(2)(B)). Section 504's implementing regulations, 34 C.F.R. §§ 104.32 and 104.33, mandate that the recipient that operates a public elementary or secondary education program or activity identify and locate every qualified handicapped person residing in the recipient's jurisdiction and take the appropriate steps to notify them and their parents of the recipient's duty to provide them with a FAPE, regardless of the nature or severity of their handicap. The implementing regulations, 34 C.F.R. §§ 104.35 and 104.36, also require evaluation and testing of all those who need or are believed to need special education or related services. *Mark H.*, 513 F.3d at 930. These regulations impose requirements similar to IDEA with respect to the identification and evaluation of students with disabilities. *W.H. v. Clovis Unified Sch. Dist.*, No. 08-

cv-0374, 2009 U.S. Dist. LEXIS 47736, at *17 (D. Conn. June 8, 2009).  Section 504 protects those who have a physical or mental impairment that substantially limits one or more of life activities, or who have a record of, or are regarded as having such an impairment.  *Id.* (citing 29 U.S.C. § 794; 34 C.F.R. § 104.3(j)).

Michigan state law also codifies analogous mandates, applicable to both FCS and GISD.  Mich. Comp. Laws § 340.1701 *et seq.*

### ii.  IDEA Requires Testing in *All* Areas of Suspected Disability

Under IDEA, a child must be tested in *all* areas of suspected disability.  *See N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1208 (9th Cir. 2008) (citing 20 U.S.C. § 1414(b)); *see also Sch. Bd. of the City of Norfolk*, 769 F. Supp. 2d at 942.  The evaluation "includes gathering information 'that may assist in determining . . . the *content of the child's individualized education program*, including information related to enabling the child to be involved in and progress in the general curriculum, or for preschool children, to participate in appropriate activities."  *N.B.*, 541 F.3d at 1208-09 (emphasis added); *see also* 34 C.F.R. § 300.304(b)(1).  Defendants are required to "use a variety of assessment tools and strategies to gather [this] relevant functional, developmental, and academic information."  20 U.S.C. § 1414(b)(2)(A); *see also* 34 C.F.R. § 300.304(b)(1).

Therefore, even where students have a disability classification and a corresponding IEP, it is a violation of the IDEA if they have not been evaluated in

24

*all* areas of suspected disability.  In *N.B.*, for example, the Ninth Circuit held that the school district's failure to meet its obligation to evaluate a student with a pre-existing IEP in all areas of suspected disability, including autism, unlawfully denied the student a FAPE.  541 F.3d at 1208-11.  Similarly, the Court found a child find violation in *School Board of the City of Norfolk*, 769 F. Supp. 2d at 943, where a student had an IEP but continued to struggle with behavioral problems that could possibility be traced to underlying psychiatric issues, holding that "there was substantial evidence to support the Hearing Officer's conclusion that the School Board 'overlooked clear signs of disability' and thus failed to *fully* evaluate Student's suspected disabilities which adversely impacted his academic performance." (Emphasis added.)

The Ninth Circuit in *N.B.* specifically found that the school district failed to meet its obligation to evaluate the student in all areas of suspected disabilities after becoming aware of an autism diagnosis that the parents had obtained by an outside practitioner.  541 F.3d at 1209.  The Ninth Circuit also ruled that the school district did not fulfill its statutory obligations by simply referring the student's parents to the Missoula Child Development Center where free autism testing could be performed with parent consent.  *Id.* at 1206, 1209.  Such action does not ensure that the child is assessed in all areas of suspected disability as required by 20 U.S.C. § 1414(b)(3).  *Id.* at 1209.  The Ninth Circuit clarified that a school district

"cannot abdicate its affirmative duties under the IDEA" in this manner. *Id.* at 1209 (citation omitted). The Court ultimately concluded that "without evaluative information that [the student] has autism spectrum disorder, it was not possible for the IEP team to develop a plan reasonably calculated to provide [the student] with a meaningful educational benefit." *Id.* at 1210; *see also M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996) ("[A] school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a *de minimis* educational benefit must correct the situation.").

Defendants do not fulfill their child find obligations merely because they identify some of a student's disabilities. *See Warren G v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 87-88 (3d Cir. 1999); *see also Orange Unified Sch. Dist.*, 2012 U.S. Dist. LEXIS 92423 at *20, *23-24 (holding that where student had an IEP for a Speech or Language Impairment, the District's failure to assess him for autism prior to the initial IEP resulted in a denial of FAPE and that the District's speech and language pathologist's observations during her initial interview with the student, coupled with the parents' express concern that the student may suffer from autism, undoubtedly met "the 'relatively low' threshold of suspicion that [s]tudent may be autistic.") (citing *Cari Rae S.*, 158 F. Supp. 2d at 1195).

### iii.  The IDEA Requires a Comprehensive Evaluation

The IDEA requires comprehensive evaluations of students with disabilities within the areas of their suspected disability.  The evaluation must be "sufficiently *comprehensive* to identify *all* of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." *K.I. v. Montgomery Pub. Sch.*, 805 F. Supp. 2d 1283, 1293 (M.D. Ala. 2011) (quoting 34 C.F.R. §300.304(c)(6)) (emphases added) (internal quotation marks omitted).  In *K.I.*, the Court found that the school district did not properly evaluate the student before developing her IEP by failing, at a minimum, to perform either a cognitive evaluation or an assistive technology evaluation.  *Id.* at 1294.  The Court held that the district's failure to properly evaluate the student violated the IDEA and resulted in the denial of a FAPE because the failure to evaluate corresponded to a failure to develop an adequate IEP.  *Id.*

Evaluations for suspected disabilities also must "use technically sound instruments that may assess the relative contribution of *cognitive and behavioral* factors, in addition to physical or developmental factors."  20 U.S.C. § 1414(b)(2)(C) (emphasis added); 34 C.F.R. § 300.304(b)(3) (emphasis added). Defendants must ensure that "assessments and other evaluation materials include those tailored to assess *specific areas of educational need* and not merely those that

are designed to provide a single general intelligence quotient." 34 C.F.R. § 300.304(c)(2) (emphasis added).

Notably, purported progress that a student may make under a RTI model does not obviate the need for a comprehensive evaluation for a suspected disability. *See Greenwich Bd. of Educ. v. G.M.*, No. 3:13-cv-00235, 2016 U.S. Dist. LEXIS 81008, at *27 (D. Conn. June 22, 2016) ("The Board's argument that K.M.'s purported progress through SRBI [scientific research-based intervention] obviated the need for a comprehensive disability evaluation does not conform to the requirements of the IDEA.").

Neuropsychological examinations have been recognized as an evaluative and diagnostic tool that may be warranted under IDEA's child find obligations. *See, e.g.*, *Elida Local Sch. Dist. Bd. of Educ. v. Erickson*, 252 F. Supp. 2d 476, 490 (N.D. Ohio 2003) (stating that the most convincing evidence that the student should be classified as requiring services under IDEA was the "report to the school district" prepared by a neuropsychologist); *B.H. v. W. Clermont Bd. of Educ.,* 788 F. Supp. 2d 682, 694-96 (S.D. Ohio 2011) (holding that in making special education determinations, the school district should have considered reports including the privately obtained neuropsychological assessment); *Streck v. Bd. of Educ. of E. Greenbush Cent. Sch. Dist.*, 408 F. App'x 411, 414 (2d Cir. 2010)

(affirming district court's ruling that parents were entitled to reimbursement for independent neuropsychological evaluation).

### iv.  Children in Flint are not Receiving Comprehensive Evaluations in All Areas of Suspected Disability

Dr. Lidsky and Dr. Sudhalter's assessments demonstrate that Defendants are either failing to evaluate students with suspected disabilities altogether, as in the case of Plaintiff D.T., or are failing to evaluate students comprehensively in all suspected areas of disability, as in the case of the other representative plaintiffs they assessed.  Both failures violate the IDEA, resulting in denial of a FAPE.  *See Bd. of Educ. of Fayette County,* 478 F.3d at 313; *see also N.B.*, 541 F.3d at 1209. In fact, the cases of D.R. and D.K., who have not been evaluated for and classified with Autism Spectrum Disorder by the public education agencies, despite the fact that the district is on notice of their medical diagnoses of autism, fall squarely within the fact pattern that was found to violate the IDEA in *N.B.*, 541 F.3d at 1209.  *N.B.* also clarifies that even if blood lead level testing was timely to detect the presence of lead – which, in this case, it is not – making such testing available at designated events hosted on school premises, and placing the burden on the parents to bring their children for such testing, does not satisfy the Defendants' affirmative obligation under IDEA to evaluate children in all suspected areas of disability.  *Id.* at 1209.

Due to their prolonged exposure to lead-contaminated water, the children of Flint face suspected disabilities in light of lead's known effects on cognitive and behavioral functioning.  Yet Defendants do not "have policies and procedures in place to identify, locate, and evaluate children" who have such disabilities and who need special education and related services.  *Bd. of Educ. of Fayette County,* 478 F.3d at 313; *see also D.L. v. District of Columbia*, 730 F. Supp. 2d 84 (D.D.C. 2010) (finding failure to comply with child find duties in class action based on inadequacy of district's attempts to find disabled children through "public awareness, outreach, and even direct referrals" and as evidenced by "the large number of children to whom defendants denied a FAPE"); *see also D.L. v. District of Columbia*, 860 F.3d 713, 731 (D.C. Cir. 2017) ("[G]iven the district court's finding that the District has failed, year after year, to comply with IDEA's Child Find requirement, we have no doubt that the statute's remedial provision – authorizing courts to 'grant such relief as [they] determine[] is appropriate,'. . . and implicating 'broad discretion' and 'equitable considerations'. . .  – vests the court with all the authority it needs to remedy these violations through injunctive relief.") (internal citations omitted).

As discussed above, Dr. Lidsky and Dr. Sudhalter found that Plaintiffs are not receiving the comprehensive neuropsychological evaluations, and other testing (for example, for autism) required to assess and pinpoint their deficits where such

evaluations would be appropriate.  And, in examining existing child find policies and practices in Flint, Dr. Therrien and Dr. Lovette found that the lack of training and the bureaucratic structure currently in place leads to an abysmal, systemic failure to identify and evaluate children that may have a disability. (*See* Therrein Report, Ex. 3; *see also* Lovette Report, Ex. 4).  Finally, effective oversight by MDE and GISD is either inadequate or wholly lacking, also in violation of IDEA, Section 504 and, for GISD, Michigan state law.  (*See* Keranen Decl.)

## C.   Failure to Issue a Preliminary Injunction Will Cause Irreparable Harm

Dr. Lidsky and Dr. Sudhalter explain that if the Plaintiffs do not immediately receive appropriate educational services and interventions to address their needs in all areas in which they are demonstrating deficits, they will continue to struggle academically and behaviorally and will, in many cases, continue to fall behind and fail out of school.  (*See* Lidsky Report, Ex. 1-C, 1-D, 1-E, and 1-F; *see also* Sudhalter Report, Ex. 2-C, 2-D, 2-E, and 2-F).  Thus, Defendants' ongoing failure to comply with child find obligations to identify and evaluate children with disabilities and to tailor IEPs to address their educational needs will result in irreparable harm that is both imminent and concrete.  *See D.L. v. District of Columbia*, 194 F. Supp. 3d 30, 97 (D.D.C. 2016) ("The Court again finds that these violations [of IDEA, its implementing regulations, and analogous provisions of District law] result in irreparable injury to all eligible children . . . including [those]

. . . whom the District did not identify, locate, evaluate, or offer special education and related services to, or for whom the District did not timely issue eligibility determinations.").

Where there is a failure to properly evaluate in all areas of suspected disability, IEPs will lack key pieces of information that would ensure they are designed to confer a meaningful education benefit.  Such loss of a meaningful educational benefit or opportunity is a paradigmatic form of irreparable harm.  *See, e.g.*, *A.T. ex rel. Z.T. v. New York State Educ. Dep't*, No. 98-CV-4166, 1998 U.S. Dist. LEXIS 23275 (E.D.N.Y. Aug. 4, 1998) (holding that a child who was denied a FAPE under the IDEA was suffering actual and imminent harm); *Borough of Palmyra Bd. of Educ. v. F.C.*, 2 F. Supp. 2d 637, 645 (D.N.J. 1998) (holding that loss of appropriate education for child with Attention Deficit Disorder would constitute irreparable harm); *J.B. v. Killingly Bd. of Educ.*, 990 F. Supp. 57, 72 (D. Conn. 1997) (holding that continued denial of a FAPE satisfied irreparable harm element).

The hallmark of irreparable injury is the unavailability of money damages to redress the injury.  *Caspar*, 77 F. Supp. 3d at 640.  The irreparable injury suffered by Plaintiffs in the loss of access to meaningful educational opportunity during a critical stage in their development cannot be remedied by monetary damages.  *See LIH v. New York City Bd. of Educ.*, 103 F. Supp. 2d 658, 665 (E.D.N.Y. 2000)

("No level of monetary damages could possibly compensate . . . students for the educational opportunities they will lose."); *see also John T. v. Delaware Cty. Intermediate Unit*, Civ. A. No. 98-5781, 2000 U.S. Dist. LEXIS 6169, at *24 (E.D. Pa. 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time.").

### D. The Balance of the Equities Weigh Heavily in Plaintiffs' Favor, as No Substantial Harm to Others Would Result from the Proposed Injunction

The balance of equities strongly supports injunctive relief here and tips decidedly in favor of the Plaintiffs. An injunction requiring the Defendants merely to satisfy and comply with their legal obligations cannot harm them. *D.L.*, 194 F. Supp. 3d at 98 (noting that an "injunction requiring the District to do nothing more than comply with its legal obligations cannot, by definition, harm it."). This is especially so where the Defendants have undertaken to participate in the IDEA, thereby choosing to receive federal funds in exchange for complying with IDEA's mandates. *See M.A. ex rel. E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335, 352 (3d Cir. 2003) ("[T]he potential harm to Defendants appears to have been minimal because they undertook to provide these services by participating in the IDEA."). Where, as here, the actions required to comply with IDEA have become more extensive as the result of a government-created lead crisis that placed all Flint children at risk of a disability resulting from lead exposure, Defendants cannot

reasonably assert that the increased burden of compliance should be weighed in their favor when balancing the equities. Such a result would be both absurd and antithetical to the underlying goals of the system of special education that IDEA has put in place.

By contrast, as explained in the section above, Flint children who are not evaluated in all areas of suspected disability face irreparable harm through the denial of the timely and proper identification of all disabilities and the delivery of special education services necessary to ensure a meaningful public education. As a result of not being properly identified, their educational needs are not being addressed, and in many cases, they are being doubly disadvantaged through improper removal from the learning environment, further increasing the cumulative impact of their educational deficits.

### E.    A Preliminary Injunction is in the Public Interest

The issuance of an injunction ensuring and compelling the Defendants' compliance with child find obligations serves the salient public interest of providing appropriate education services to children with disabilities, as Congress has detailed in the IDEA. *Id.*  Congress explicitly set forth in the IDEA its belief that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals

with disabilities." 20 U.S.C. § 1400(c)(1).  One of the stated purposes of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their *unique needs* and *prepare* them *for further education, employment, and independent living*." 20 U.S.C. § 1400(d)(1) (emphases added).

The situation in Flint

> is precisely the sort of situation where judicial intervention is necessary to fulfill congressional intent and serve the public interest.  Left to its own devices, a school system is likely to choose the educational option that will help it balance its budget, even if the end result of the system's indifference to a child's individual potential is a greater expense to society as a whole.

*Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 864-65 (6th Cir. 2004).

Flint can no longer be left to its own devices in the wake of an unprecedented crisis.  Dr. Lovette concluded:

> As Mr. Tawwab rightly stated, "the day has come to stop asking the children of the Flint community to pay the price for the mistakes of others."  The inadequate education provided to FCS students coupled with the complete lack of expedient, comprehensive and responsive support from FCS, GISD, and MDE leadership in the aftermath of the widespread, prolonged lead poisoning of all FCS students continues to make victims of the very community who have already paid so significantly for the mistakes of others.

> (Lovette Report, Ex. 4).

It is certainly in the public interest to provide the children of Flint with the services they so desperately need and to do so immediately.

## **RELIEF REQUESTED**

As demonstrated above, Defendants do not have adequate policies and procedures in place to identify, locate, and evaluate children who have disabilities and who need special education and related services. Further, the standard psychoeducational evaluations routinely administered by school districts to children with suspected disabilities are not sufficient to fully evaluate all of the effects of childhood lead poisoning. (*See, e.g.*, Lidsky Report, Ex. 1, ¶¶ 15-16). Therefore, Plaintiffs ask this court to order immediate implementation of a comprehensive child find system that will screen all children in Flint for suspected disabilities and provide for full neuropsychological evaluations for children who qualify. Comprehensive child find relief should be made available to all Flint children who are under the authority, for special education purposes, of FCS, GISD, or MDE.[8]

Based on the recommendations of Plaintiffs' experts, Plaintiffs propose a two-stage triage system to first identify students with suspected disabilities and

---

[8] For purposes of this requested relief, "all Flint children" means all individuals ages 3 through 26, residing within Flint, Michigan, who have been exposed to lead. All such students are potentially entitled to special education and related services in or under the supervision of FCS, GISD, or MDE.

then provide for comprehensive evaluations in all areas of suspected disability. (*See* Lidsky Report, Ex. 1, ¶¶ 23-28).   At the first stage, an initial screening mechanism will be used to find children with suspected disabilities.  Defendants must have child find policies and procedures in place to identify children with suspected disabilities and, as demonstrated above, Defendants' existing policies and procedures are inadequate to do so, given that the entire population of children has been subjected to long-term lead exposure.   At the second stage, a comprehensive neuropsychological evaluation will be provided for children identified through the initial screening mechanism.   As explained above, a neuropsychological evaluation is necessary to identify *all* areas of disability in children for whom a lead-related disability is suspected.  (*See* Lidsky Report, Ex. 1, ¶¶ 15-22).   Because the exposure of Flint's population to lead-contaminated water renders all Flint children at risk of the disabilities potentially caused by lead (*see* Lidsky Report, Ex. 1, ¶¶9-13), the court should order the screening of all children to determine if a neuropsychological evaluation is warranted.  For those children for whom screening indicates a suspected disability, a neuropsychological evaluation should follow.

The Stage 1 screening mechanism, encompassing all Flint children, should consist of the *Vineland – II Adaptive Behavior Scales* (administered to parents and teachers of the child) and, to identify all children who should move to Stage 2, it

would be highly beneficial to also include the *Wide-Range Intelligence Test* (administered to the child). These tests can be administered by trained non-professionals in approximately 30-45 minutes each, and then interpreted by a neuropsychologist to determine which children should be referred for a neuropsychological evaluation.

At Stage 2, children identified in Stage 1 should receive a full neuropsychological evaluation, comprised of neuropsychological tests to assess fine motor functioning, language, attention, learning, memory, and executive functioning.[9]

All students who reach Stage 2, the neuropsychological evaluation, should also be referred to a Review of Existing Evaluation Data ("REED") to determine whether additional types of assessments by the Multidisciplinary Evaluation Team ("MET") are necessary. Children whose results do not indicate they should move to Stage 2 but nonetheless indicate possible disability should be referred to a REED as well. When a parent or guardian presents a diagnosis from an outside

---

[9] Lead poisoning often has a "lag effect," meaning behavioral impairments due to early poisoning may not be observable until the child is older. (Lidsky Report, Ex. 1, ¶ 14). Therefore, periodic testing is necessary to identify all students who were exposed to lead and require special education and/or related services. Permanent injunctive relief, not included in this motion, should include such testing for Flint students at future dates.

provider, such as a diagnosis for Autism Spectrum Disorder, the REED must also consider the diagnosis and determine appropriate evaluations to be performed.

If the court does not order the two-stage triage process outlined above, an alternative form of relief is to order that for all children who are otherwise identified by existing systems for intervention or for special education evaluation, Defendants must also provide for a neuropsychological evaluation.  However, due to the deficiencies in Defendants' existing child find procedures described above (*see supra* at 11-19 and 28-31; see generally Therrien Report, Ex. 3), relying on existing systems alone, rather than screening all children through the two-stage triage process outlined here, risks missing children who should receive a neuropsychological or other evaluation to determine all areas of deficiency that need to be addressed in order to provide a FAPE.

Finally, this court should order that the information gleaned from the above-described neuropsychological evaluations and any other necessary assessments be used by the MET in making determinations of eligibility for special education and related services under IDEA and/or Section 504.  If a child is found eligible for an IEP under the IDEA or a Section 504 Plan, the evaluation data must also be used in formulation of the IEP or 504 Plan.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' Motion for a Preliminary

Injunction should be granted.


DATED: October 16, 2017



By: <u>/s/ Lindsay M. Heck</u>

| | |
|---|---|
| Kary L. Moss (P49759) | Gregory M. Starner |
| Kristin L. Totten (P72942) | Lindsay M. Heck (*pro hac vice*) |
| Daniel S. Korobkin (P72842) | Walter A. Ciacci |
| Michael J. Steinberg (P43085) | Dominique N. Forrest |
| ACLU Fund of Michigan | Laura A. Grai |
| 2966 Woodward Ave. | 1221 Avenue of the Americas |
| Detroit, MI 48201 | New York, NY 10020 |
| (313) 578-6800 | (212) 819-8200 |
| kmoss@aclumich.org | gstarner@whitecase.com |
| ktotten@aclumich.org | lindsay.heck@whitecase.com |
| dkorobkin@aclumich.org | walter.ciacci@whitecase.com |
| msteinberg@aclumich.org | dominique.forrest@whitecase.com |
| | laura.grai@whitecase.com |

David G. Sciarra
Gregory G. Little
Jessica A. Levin
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102               *Counsel for Plaintiffs*
(973) 624-1815
dsciarra@edlawcenter.org
glittle@edlawcenter.org
jlevin@edlawcenter.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 16th day of October, 2017 the undersigned filed through CM/ECF with the Clerk of the Court the foregoing Plaintiffs' Brief in Support of their Motion for a Preliminary Injunction, and I hereby request that a copy of this document be served by the Clerk's office via the Court's CM/ECF system upon all counsel of record in this case who are participants in the CM/ECF system.

BY: /s/ Lindsay M. Heck

Lindsay M. Heck (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212)-819-8200
lindsay.heck@whitecase.com