UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D.R., as a minor through parent and next
friend DAWN RICHARDSON, *et al.*, on
behalf of all similarly situated persons,

       Case No. 16-cv-13694

       Plaintiffs,

v.

       Hon. Arthur J. Tarnow

MICHIGAN DEPARTMENT OF
EDUCATION, *et al.*,

       Defendants.

_____/

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................4

   A.  Widespread exposure to lead, a known neurotoxin, requires a systemic response to identify and mitigate the potential harm to children in Flint. ....... 4

   B.  IDEA requires that Defendants have policies and procedures to identify and locate children who are suspected of having a disability. .................................. 8

   C.  A preliminary injunction will not violate IDEA's parental consent requirements. ............................................................................................. 9

   D.  MDE and GISD are proper defendants for systemic claims. ............................. 9

   E.  Preliminary classwide relief is appropriate because there is a likelihood of success on Plaintiffs' systemic claims. ................................................................ 11

   F.  Plaintiffs' motion seeks systemic changes to child find, not individualized modifications to Plaintiffs' IEPs. ........................................................................ 12

   G.  Plaintiffs were not required to exhaust administrative procedures before seeking preliminary injunctive relief. .................................................................. 12

   H.  Defendants cannot justify the continuing irreparable harm of children by accusing Plaintiffs of "delay" in seeking relief. .................................................. 13

   I.  The relief Plaintiffs seek is not "disfavored" in this Circuit. ............................. 14

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307 (6th Cir. 2007) ..........................8

*Hamama v. Adducci*, F. Supp. 3d , 2017 WL 3124331 (E.D. Mich. 2017) ......................................................................................................11

*Helwig v. Kelsey-Hayes Co.*, 857 F. Supp. 1168 (E.D. Mich. 1994), *aff'd*, 93 F.3d 243 (6th Cir. 1996)......................................................11

*Ligon v. City of New York*, 925 F. Supp. 2d 478 (S.D.N.Y. 2013)..........................11

*N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 (9th Cir. 2008)...................8

*N.S. v Tenn. Dep. of Educ., No. 3:16-cv-0610, ECF 130 (M.D. Tenn. Sep. 28, 2017).* .....................................................................................9

*Porter v. Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064 (9th Cir. 2002) .............................................................................................13

*Rodriguez v. Providence Cmty. Corrs., Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) ...........................................................................11

*Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928 (E.D. Va. 2010)....................................................................................8

*Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 (D.D.C. 2014) .............................................................................................14

*United Food & Comm. Workers Union v. Sw. Ohio Reg'l Trans. Auth.*, 163 F.3d 341 (6th Cir. 1998)..................................................14

*Warrior Sports, Inc. v. NCAA*, 2009 WL 230562 (E.D. Mich. Jan. 30, 2009) .............................................................................................14

*Yolton v. El Paso Tenn. Pipeline Co.*, 318 F. Supp. 2d 455 (E.D. Mich. 2003), *aff'd*, 435 F.3d 571 (6th Cir. 2006)................................11

## STATUTES AND RULES

34 C.F.R. § 300.111 ...................................................................................11

34 C.F.R. § 300.151(b)(2) .........................................................................13

20 U.S.C. § 1412(a)(3)(A) ..........................................................................8

20 U.S.C. § 1412(a)(11) ...........................................................................10

20 U.S.C. §§ 1414(a)-(c) ..........................................................................11

20 U.S.C. § 1415 ......................................................................................13

Mich. Comp. Laws § 380.1711 ................................................................10

**INTRODUCTION**

When reports of the Flint lead crisis first came to light, they were met with denial rather than a swift response.  The government attempted to downplay, debunk, and dismiss evidence of the crisis.  Defendants' responses to Plaintiffs' Motion for a Preliminary Injunction reveal that the denial continues until today.  Outrageously, they cite Dr. Mona Hanna-Attisha, the pediatrician who sounded the alarm about the crisis, and whose research state officials initially attempted to discredit,[1] to support their stance.  They distort her position by asserting that she acknowledges that:

> *No one is saying that these children are all going to have problems.  Most should be fine.*[2]

---

[1] Dr. Mona Hanna-Attisha, *Will We Lose the Doctor Who Would Stop the Next Flint?*, THE N.Y. TIMES, Feb. 11, 2017, *available at* https://www.nytimes.com/2017/02/11/opinion/sunday/will-we-lose-the-doctor-who-would-stop-the-next-flint.html?_r=0 Hanna-Attisha (last visited Nov. 17, 2017) ("State officials called my science faulty and accused me of creating hysteria."); Dr. Sanjay Gupta, Ben Tinker, and Tim Hume, '*Our mouths were ajar': Doctor's fight to expose Flint's water crisis*, CNN, Jan. 22, 2016, *available at* http://www.cnn.com/2016/01/21/health/flint-water-mona-hanna-attish/index.html (last visited Nov. 17, 2017) ("Even though General Motors stopped using the city's water supply because it was corroding engine parts, the official reaction, Hanna-Attisha says, was one of 'denial, denial, denial.'").

[2] (Defendant Michigan Department of Education's ("MDE") Response to Plaintiffs' Motion for a Preliminary Injunction (hereinafter "MDE Response"), Dkt.  82, p. ID 4132; Defendant Genesee Intermediate School District's ("GISD") Response to Plaintiffs' Motion for a Preliminary Injunction (hereinafter "GISD Response"), Dkt.  79, p. ID 3282; Defendant Flint Community School's ("FCS")

1

Defendants' attempt to trivialize the harm inflicted upon the children of Flint is fundamentally unsound and echoes the state's initial disavowal of responsibility. First, the quote that Defendants set forth from Dr. Mona Hanna-Attisha is taken wildly out of context. The article they cite states that what worries Dr. Hanna-Attisha "is that any cognitive deficits associated with lead exposure—at whatever level—seem to be made worse by poverty, and poverty is rampant in Flint."[3] Dr. Hanna-Attisha has explained that, "When a pediatrician hears the word lead, we don't sleep. . . . It's a call to action because we know what it does, and we know what it can potentially do to our most vulnerable children."[4]

Second, the blood lead level testing on which Defendants rely does not reflect the overall harm to Flint's children because lead's presence in the blood is transient.[5] Therefore, blood lead level testing is not an accurate measure of

---

Response to Plaintiffs' Motion for Preliminary Injunction (hereinafter "FCS Response"), Dkt. 84, p. ID 4725-26) (emphasis added).

[3] Ellen Ruppell Shell, *The Brains of Flint's Children, Imperiled by Lead, Could Still Escape Damage*, SCIENTIFIC AMERICAN, July 2016, *available at* https://www.scientificamerican.com/article/the-brains-of-flint-s-children-imperiled-by-lead-could-still-escape-damage/ (last visited Nov. 17, 2017).

[4] Karen Bouffard, *Mona Hanna-Attisha: Resolve exposed Flint water crisis*, DETROIT NEWS, Nov. 17, 2016, *available at* http://www.detroitnews.com/story/news/michigan/michiganians-of-year/2016/11/17/mona-hanna-attisha-resolve-exposed-flint-water-crisis/94049860/ (last visited Nov. 17, 2017).

[5] *See* Krist Tanner, *All Flint's children must be treated as exposed to lead*, LANSING STATE JOURNAL, Jan. 16, 2016, *available at* http://www.lansingstatejournal.com/story/opinion/contributors/raw-

exposure.  (*See* Mot. for Prelim. Inj., Dkt. 62, Pg ID 1851; *see also* 10/2/17 Hr'g Tr., Dkt. 70-3, Pg ID 2949).

Third, Plaintiffs do not, as Defendants contend, argue that the lead crisis in Flint took place in a vacuum.  To the contrary, Plaintiffs fully recognize that there are "pre-existing medical diagnoses" and other "behavioral, environmental, or socio-economic factors" that may give rise to suspicion of – or ultimately manifest in – a disability, in *addition* to lead exposure.  (MDE Resp., Dkt. 82, Pg ID 4135; *see also* Compl., Dkt. 1, ¶ 2).  As this Court distilled, Plaintiffs' premise is that there are other factors that may place these students at risk of being behind academically or behaviorally, on top of which two years of lead exposure has been superimposed.  (10/2/17 Hr'g Tr., Dkt. 70-3, Pg ID 2948).  For this reason, Defendants' systemic child find failure, if not immediately addressed through a comprehensive system of screenings and evaluations, will cause irreparable harm. (Mot. for Prelim. Inj., Dkt. 62, Pg ID 1853).

Finally, in their responses, Defendants not only grossly understate the extent of the harm inflicted upon the children of Flint, but they also grossly overstate the breadth of the requested relief.  Plaintiffs do not request that the Court order that every child within Flint be provided with a neuropsychological assessment.  To the contrary, Plaintiffs set forth a two-tiered, streamlined triage process.  The first tier

---

data/2016/01/16/map-8657-flints-youngest-children-exposed-lead/78818888/ (last visited Nov. 17, 2017).

consists of a universal screening procedure whereby students with suspected disabilities will be properly identified in a timely manner.  Only that subset of children will be escalated to the second tier for comprehensive evaluations, including neuropsychological assessments, to be administered in all areas of suspected disability.  (Mot. for Prelim. Inj., Dkt 62, at Pg ID 1885-88).

A R G U M E N T

**A.  Widespread exposure to lead, a known neurotoxin, requires a systemic response to identify and mitigate the potential harm to children in Flint.**

Defendants' effort to minimize the seriousness of the Flint Water Crisis is troubling.  For over 18 months, water contaminated with high levels of lead flowed into residents' homes as state officials insisted that the water was safe to drink.  MDEQ testing also revealed that lead directly contaminated the water flowing from the drinking fountains used by children in Flint's public schools.

Consequently, it is widely recognized, including by top state officials as well as public health experts, that *all* Flint children must be treated as having been exposed to lead.[6]  There is no safe level of lead exposure, and lead's potential long-term impact on neurological functioning, especially for young children, is beyond dispute. (*See* Mot. for Prelim. Inj., Ex. 1 Lidsky Report, at 2).

---

[6] *See* Kristi Tanner, *All Flint's Children Must Be Treated As Exposed To Lead*, DETROIT FREE PRESS, Jan. 16, 2016, at https://goo.gl/64Pqqr.

4

Defendants' rosy interpretation of blood lead level testing data is easily debunked. The impact of lead can be life-long, but the lead itself is detectable in the blood for only a short period of time.  As Defendants have conceded, blood testing after lead has had time to dissipate will reveal neither whether a child has been exposed in the past nor whether the child's health will be impacted later in life.[7]  Therefore, the spike in blood lead levels in Flint's children proved that children *were exposed* to a dangerous neurotoxin.  But the number of positive tests in no way indicates that only a small percentage of children were exposed.  The raw data from blood lead level tests "underestimates the risk."[8]  Indeed, the Michigan Department of Health and Human Services report attached as an exhibit to the MDE brief shows that, based on blood lead level testing of 8,316 children in Flint between the ages of six and seventeen, 43 had elevated blood lead levels between October 1, 2015 (the approximate time period during which the state officially recognized there was a crisis) and June 2, 2017.  (MDE Resp. Ex. 2-E,

---

[7] *See* Hr'g Tr., 12:15–18 , Oct. 2 2017 (Mr. Donald Miller: "[T]he length of time that lead remains in a person's body isn't all that long.  So it's our position that whatever these children were exposed to at the height of the crisis, if you will, has come and gone."); 27:9–15 (The Court: "[T]he lead doesn't stay in the system for testing purposes.  You can't do a blood test six months after, a year after, whatever the time is that it dissipates.  But you can do evaluations to see if the fact the poison was in the system . . . stays in the body.  I don't think there's any question of that."); FCS Resp., Dkt. 84, Pg ID 4710, n. 1.

[8] Joanna Walters, *Flint's 'Toxic Soup' Polluted Water Worse For Children Than Thought, Doctor Says*, THE GUARDIAN, Dec. 17, 2015, at https://goo.gl/1pWePm.

Table 2, Dkt. 82-3, Pg ID 4313). There is a well-known disconnect between these blood lead level results and an accurate understanding of the scope of exposure. The State's Chief Medical Executive, Eden Wells, made this point when she stated in January 2016: "It is important when we think about a public health perspective that we consider the whole cohort . . . exposed to the drinking water, especially 6 years and under since April 2014, as exposed, regardless of what their blood level is on Jan. 11 [2016]."[9]   There is no safe level of lead exposure, and all Flint's children must be treated as exposed to lead.[10]

Similarly, Defendants' selective quoting from a *Scientific American* article misses its main point. Dr. Mona Hanna-Attisha and others interviewed in the cited article explained that "robust wraparound services in nutrition, education and health" are needed to "mitigate the potential impact of this exposure."[11]   Indeed, the very thesis of the article, and the consensus view of public health experts, is that Flint children are not doomed *if steps are taken to mitigate the impact of*

---

[9] *Id.*
[10] *Id.*; *see also* Complaint, Dkt. 1, p. ID 30.
[11] Ellen Ruppel Shell, *The Brains of Flint's Children, Imperiled by Lead, Could Still Escape Damage*, SCIENTIFIC AMERICAN, July 1, 2016, at https://goo.gl/Zsu9dW.

*lead*.[12]   Such mitigation must begin with effective policies and practices for

identifying which children are affected.

In an article she wrote for *The New York Times*, Dr. Hanna-Attisha described

the impact of lead exposure on the children of Flint in stark terms:

> Numerous epidemiologic studies of lead exposure in children, particularly those under the age of 6, indicate an increased risk for damage to cognition, behavior and employment prospects, also lower I.Q.s, poor impulse control and decreased lifetime earnings.  Epigenetic research suggests that lead exposure in women can lead to DNA changes in their grandchildren.  Their *grandchildren*. . . .

> Developmental neurobiology has taught us that adverse childhood experiences and toxic stress change the trajectory of a child's life in predictable ways. . . .

> [The State's proposed measures, if enacted,] would not address the full magnitude of this problem, which will continue throughout these children's lives.  We must make a yearslong commitment. . . .

> [W]e are not a nation that can accept 11,846 parts per billion of lead in drinking water.  Or the consequences for the children of Flint.[13]

---

[12] *See also* Mona Hanna-Attisha, *The Future For Flint's Children*, N.Y. TIMES, Mar. 26, 2016, *available at* https://www.nytimes.com/2016/03/27/opinion/sunday/the-future-for-flints-children.html (last visited Nov. 17, 2017) .

[13] Dr. Mona Hanna-Attisha, *The Future For Flint's Children*, N.Y. TIMES, Mar. 26, 2016, at, *available at* https://www.nytimes.com/2016/03/27/opinion/sunday/the-future-for-flints-children.html (last visited Nov. 17, 2017) (emphasis in original).

**B.      IDEA requires that Defendants have policies and procedures to identify and locate children who are suspected of having a disability.**

Defendants' emphasis on the need for "individualized suspicion" of a child's disability before ordering an evaluation mischaracterizes both the relief Plaintiffs seek and Defendants' obligations under the law.

Contrary to Defendants' repeated assertions, Plaintiffs are not asking for a neuropsychological evaluation for every child in Flint.  Plaintiffs' motion proposes a two-stage triage system. (Mot. for Prelim. Inj. at 36-37).  The first stage is an effective universal screening mechanism that will help identify and locate those individual children who are suspected of having a disability. The second stage is an evaluation to determine any and all areas of disability for that child. *See N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1208 (9th Cir. 2008) (citing 20 U.S.C. § 1414(b)); *Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 942 (E.D. Va. 2010).

Defendants' "individualized suspicion" argument is flawed both legally and logically.  Under IDEA, it is necessary, but not sufficient, that Defendants evaluate children who are individually suspected of having a disability.  IDEA also requires Defendants to have *policies and practices* that will *identify* and *locate* children with suspected disabilities. *See Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (citing 34 C.F.R. § 300.111(a)(1)); *see also* 20 U.S.C. § 1412(a)(3)(A).   An effective screening system is needed to provide school

8

officials with an informed basis from which to form the individualized suspicion that Defendants say is required for an evaluation. Children will not be "found" if Defendants do not have an effective system in place to find them.

**C. A preliminary injunction will not violate IDEA's parental consent requirements.**

Nowhere in Plaintiffs' motion do they ask the Court to order Defendants to administer a neuropsychological evaluation to a child against the wishes of the child's parent. Plaintiffs' motion requests that such evaluations be *made available* by Defendants, and *provided* by them, when the two-stage system indicates that such an evaluation is warranted. There is no need to alter the parental consent requirement that otherwise applies to a special education evaluation.[14] The problem with the current system is that the evaluations are not even offered.

**D. MDE and GISD are proper defendants for systemic claims.**

MDE's argument that it has only supervisory responsibilities under the IDEA is not a valid defense to Plaintiffs' evidence of systemic violations and claims for systemic relief. *N.S. v. Tenn. Dep. of Educ.*, No. 3:16-cv-0610, ECF 130 at 29-31 (M.D. Tenn. Sep. 28, 2017) (holding that defendant department of education can be liable as a matter of law in its supervisory responsibilities for

---

[14] Defendants do not argue that the *Vineland* universal screening segment of Plaintiffs' proposal, at Stage 1, requires parental consent. Its purpose is to assist Defendants in locating and identifying children who are eligible for evaluation.

school district's systemic failure to comply with IDEA). Plaintiffs are not asking for MDE's intervention in an individual case regarding an individual child; they seek an order requiring MDE to exercise its oversight responsibilities to ensure that appropriate policies and practices are utilized throughout Flint to identify, locate and evaluate children with disabilities. *See* 20 U.S.C. § 1412(a)(11).

Similarly, GISD's argument that Plaintiffs failed to join other local school districts as indispensable parties misreads the relief Plaintiffs seek.  Contrary to GISD's assertion, Plaintiffs are not asking the Court to issue an injunction against local school districts that are not parties.[15]  Rather, consistent with Plaintiffs' claims for systemic relief, Plaintiffs seek an order requiring GISD to implement its own policies and practices that will administer, monitor, investigate and make available the oversight, support services, training, coordination, and other resources consistent with a comprehensive child find program described in Plaintiffs' motion. *See* Mich. Comp. Laws § 380.1711.  It is true, but ultimately irrelevant to this litigation, that the Court cannot directly order non-party school districts or charter schools to take action.  Non-party school districts and schools are much more likely to properly screen and evaluate children if provided appropriate systemic oversight, support and coordination from MDE and GISD—

---

[15]  GISD's statement that there are no representative plaintiffs from non-FCS schools is simply inaccurate.  Plaintiffs D.R., A.K., C.M., J.T., J.B., C.W. and D.D. either attend or attended non-FCS schools that are within GISD's jurisdiction.

services that MDE and GISD are legally obligated to provide.  Defendants must monitor, investigate, and, when appropriate, directly administer child find programs. 20 U.S.C. §§ 1412(a)(3)(A), 1414(a)-(c); 34 C.F.R. § 300.111.

**E.    Preliminary classwide relief is appropriate because there is a likelihood of success on Plaintiffs' systemic claims.**

Defendants' argument that preliminary injunctive relief cannot benefit anyone except the individual named plaintiffs should be rejected.  A long line of cases, in this District and elsewhere, establish that a "district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers." *Hamama v. Adducci*, __ F. Supp. 3d __, 2017 WL 3124331, at *17 n.13 (E.D. Mich. 2017); *Rodriguez v. Providence Cmty. Corrs., Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) (citing cases); *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013); *Yolton v. El Paso Tenn. Pipeline Co.*, 318 F. Supp. 2d 455, 472 (E.D. Mich. 2003), *aff'd*, 435 F.3d 571 (6th Cir. 2006); *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp. 1168, 1180 (E.D. Mich. 1994), *aff'd*, 93 F.3d 243 (6th Cir. 1996); *Newberg on Class Actions* § 4:30 n.8.50 (5th ed.) (citing cases).

**F.     Plaintiffs' motion seeks systemic changes to child find, not individualized modifications to Plaintiffs' IEPs.**

FCS's argument that Plaintiffs' claims are barred by "judicial estoppel" is unfounded.  Contrary to FCS's argument, there is nothing in Plaintiffs' motion that asks the Court to order individualized modifications of Plaintiffs' IEPs.  Rather, Plaintiffs submitted expert reports which are partly based on the experts' evaluations of eight of the children involved in this lawsuit.  The conclusions the experts drew from those evaluations are submitted as evidence of systemic child find violations.  (*See* Mot. for Prelim. Inj. at 17).  The relief sought by Plaintiffs' motion is systemic relief—a comprehensive screening and evaluation system to identify children with disabilities, in all areas of disability.[16]

**G.     Plaintiffs were not required to exhaust administrative procedures before seeking preliminary injunctive relief.**

As this Court has already concluded, Plaintiffs are not required to exhaust because they assert systemic violations.  Defendants' argument that exhaustion is nonetheless a requirement for a preliminary injunction defies common sense.  Exhaustion is futile because it does not address systemic violations, which is the preliminary injunctive relief sought here. *See* Order denying Motion to Dismiss, Dkt. 48, Pg ID 1620 ("[C]hallenges such as these are incapable of correction in the

---

[16] *See* Mot. for Prelim. Inj. at 36 ("Plaintiffs ask this court to order immediate implementation of a comprehensive child find system that will screen all children in Flint for suspected disabilities and provide for full neuropsychological evaluations for children who qualify.").

individual administrative exhaustion procedure, and instead, are of a systemic nature that is properly addressed by the Court.").

GISD's suggestion that Plaintiffs were also required to use the *state* complaint process to assert a systemic claim finds no support in the law. The state complaint process under 34 C.F.R. § 300.151(b)(2) is different from the administrative exhaustion procedure under 20 U.S.C. § 1415. Filing a state complaint is not "exhaustion" under IDEA, and Plaintiffs are not required to file a state complaint as a prerequisite to filing an IDEA lawsuit. *Porter v. Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1074 (9th Cir. 2002) ("Nothing in the IDEA or its legislative history requires a complainant to exhaust every procedure established by a state that is consistent with its supervision responsibilities under the IDEA."). In any event, the declaration of Kris Karanen demonstrates that such state complaints alleging systemic child find violations have been filed, and MDE has not taken corrective action. (*See* Dkt. 62-5, Pg ID 2624-2632.) Therefore, Plaintiffs are not barred from seeking injunctive relief.

## H. Defendants cannot justify the continuing irreparable harm of children by accusing Plaintiffs of "delay" in seeking relief.

Defendants' argument against a preliminary injunction on grounds of Plaintiffs' alleged "delay" in filing their motion is untethered from both the facts and the law. Although Defendants cite cases in which excessive delay in seeking a preliminary injunction counsels against a finding of irreparable harm, courts draw

such an inference only if a plaintiff "has no reasonable explanation for its delay." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 (D.D.C. 2014).  One such explanation is an attempt to "pursue[] non-litigation avenues first."  *Id*.

As the Court knows, Plaintiffs spent months engaged in good-faith efforts to negotiate a settlement in this case both before and after it was filed, hoping that some or all of the systemic reforms that are desperately needed to help the children of Flint could be achieved without litigation.  Plaintiffs' goal has always been to provide the children of Flint with relief as expeditiously as possible.  The fact that a settlement could not be reached is a reason to move ahead, not to deny preliminary injunctive relief, especially when it is clear that *further* delay will cause irreparable harm.  "To find otherwise would discourage parties from fully exploring whether their disputes could be resolved without resorting to litigation." *Warrior Sports, Inc. v. NCAA*, 2009 WL 230562, at *5 (E.D. Mich. Jan. 30, 2009).

## I.     The relief Plaintiffs seek is not "disfavored" in this Circuit.

The Sixth Circuit has rejected Defendants' argument that a preliminary injunction is disfavored or faces a different level of scrutiny if it alters the status quo.  The cited unpublished district court decisions all rely on Tenth Circuit precedent for that proposition.  The Tenth Circuit standard, however, has been expressly rejected by the Sixth Circuit.  *See United Food & Comm. Workers Union*

*v. Sw. Ohio Reg'l Trans. Auth.*, 163 F.3d 341, 348 (6th Cir. 1998).  As explained

more recently in *Caspar v. Snyder*, 77. F. Supp. 3d 616, 638 (E.D. Mich. 2015):

> The premise that there are 'disfavored' injunctions finds
> no support in Sixth Circuit law. . . .  The Sixth Circuit . . .
> has rejected Tenth Circuit authority requiring more
> exacting judicial scrutiny of injunctions that alter the
> status quo, are mandatory in nature, or grant substantially
> all of the relief to which a plaintiff may ultimately be
> entitled after trial.

Respectfully submitted,

By:  /s/ Lindsay M. Heck

| | |
|---|---|
| Daniel S. Korobkin (P72842) | Gregory M. Starner |
| Kristin L. Totten (P72942) | Lindsay M. Heck (*pro hac vice*) |
| Michael J. Steinberg (P43085) | Walter A. Ciacci |
| Kary L. Moss (P49759) | Dominique N. Forrest |
| American Civil Liberties Union | Laura A. Grai |
|   Fund of Michigan | White & Case LLP |
| 2966 Woodward Ave. | 1221 Avenue of the Americas |
| Detroit, MI 48201 | New York, NY 10020 |
| (313) 578-6824 | (212) 819-8200 |
| dkorobkin@aclumich.org | gstarner@whitecase.com |
| ktotten@aclumich.org | lindsay.heck@whitecase.com |
| msteinberg@aclumich.org | walter.ciacci@whitecase.com |
| kmoss@aclumich.org | dominique.forrest@whitecase.com |
| | laura.grai@whitecase.com |

David G. Sciarra
Gregory G. Little
Jessica A. Levin
Education Law Center
60 Park Place, Suite 300
Newark, NJ  07102
(973) 624-1815
dsciarra@edlawcenter.org
glittle@edlawcenter.org
jlevin@edlawcenter.org

15

Attorneys for Plaintiffs

Dated: November 17, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2017, I filed the foregoing document using the ECF system which will provide electronic notice to all counsel of record.

By:  /s/ Lindsay M. Heck
    Lindsay M. Heck (*pro hac vice*)
    White & Case LLP
    1221 Avenue of the Americas
    New York, NY 10020
    (212) 819-8200