# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

D.R., as a minor through parent and next
friend DAWN RICHARDSON, *et al.*, on
behalf of all similarly situated persons,

       Case No. 16-cv-13694

      Plaintiffs,

v.                              Hon. Arthur J. Tarnow

MICHIGAN DEPARTMENT OF         Hon. Mag. J. Anthony P. Patti
EDUCATION, *et al.*,

      Defendants.

_____/

# BRIEF IN SUPPORT OF
# PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# Table of Contents

                                                                                      **Page**

**I**   PRELIMINARY STATEMENT .................................................................. 1

**II**  APPLICABLE LEGAL FRAMEWORK.................................................... 7
**A.**  The IDEA................................................................................................... 8
    1.   Defendants' General Obligations Under the IDEA ............................ 9
    2.   The IEP Process................................................................................ 10
    3.   Special Education and Related Services under the IDEA................. 11
    4.   Procedural Safeguards for Children and Parents ............................. 13
**B.**  Section 504 and Title II ......................................................................... 16
**C.**  Michigan State Law................................................................................ 17

**III** BACKGROUND AND SYSTEMIC FACTS RELATING TO THE
    PROPOSED CLASS CLAIMS ............................................................... 18
**A.**  The Lead Crisis is Both a Public Health and an Educational Crisis ........... 18
**B.**  FCS's Chronic Lack of Special Education Staff, Programs and Services .. 22
**C.**  The Defendants Have Systemically Failed to Provide A Free Appropriate
    Public Education in the Least Restrictive Environment and Procedural
    Safeguards in the Administration of Disciplinary Practices ...................... 32
    1.   FCS's Chronic and Severe Special Education Staffing Shortages
        Undermine the Delivery of Special Education and Related
        Services in Conformance with IEPs and/or 504 Plans ........... 32
    2.   Defendants' Systemic Failure to Provide A Free Appropriate
        Public Education  In The Least Restrictive Environment ...... 41
    3.   Defendants' Systemic Failure to Provide Procedural Safeguards in
        the Student Discipline ........................................................... 42
    4.   Special Education Students Have Poor Achievement Outcomes In
        FCS Schools.......................................................................... 45
**D.**  Defendants MDE and GISD Have Systemically Failed to Discharge
    Their Monitoring and Enforcement Responsibilities .................................. 48

**IV**  ARGUMENT............................................................................................ 58

**V**   The Proposed Class Satisfies Rule 23(a) Requirements ............................ 58
**A.**  The Proposed Class Satisfies the Numerosity Requirement of Rule
    23(a)(1) .................................................................................................... 59
**B.**  The Proposed Class Satisfies the Commonality Requirement of Rule
    23(a)(2) .................................................................................................... 63
**C.**  The Claims of the Class Representatives are Typical of the Claims of the
    Proposed Class.......................................................................................... 70

**D.**   Plaintiffs and Plaintiffs' Counsel Will Fairly and Adequately Protect the Interests of the Proposed Class................................................................... 73

**VI**   Plaintiffs Seek Certification of Their Claims for Injunctive and Declaratory Relief Under Rule 23(b)(2)...................................................... 75

**VII**   The Court Should Designate Plaintiffs' Counsel as Class Counsel............ 76

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## CASES

*Andre H. v. Ambach*, 104 F.R.D. 606 (S.D.N.Y. 1985) ..........................................63

*Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982) ............................................................8

*Calloway v. Caraco Pharm. Labs., Ltd.*, 287 F.R.D. 402 (E.D. Mich. 2012) ...............................................................................................................58, 62

*CG v. Commonwealth Dep't of Educ.*, Civil Action No. 1:06-CV-1523, 2009 U.S. Dist. LEXIS 90028 (M.D. Pa. Sep. 29, 2009)..................65, 66

*Cole v. City of Memphis*, 839 F.3d. 530 ...................................................................76

*Davidson v. Henkel Corp.*, 302 F.R.D. 427 (E.D. Mich. 2014) .............................60

*Endrew F. v. Douglas County School District Re-1,* 137 S. Ct. 988 (2017)...............................................................................................................10

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998)..................64, 65

*Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653 (E.D. Mich. 1995) ..................66, 69

*Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982)..............................70

*Glazer v. Whirlpool Corp.*, 722 F.3d 838 (6th Cir. 2013) .......................................65

*Glover v. Johnson*, 85 F.R.D. 1 (E.D. Mich. 1977).................................................75

*Hillson v. Kelly Servs.*, 2017 U.S. Dist. LEXIS 8699 (E.D. Mich. 2017) ...............................................................................................................71

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996)..........................................60

*In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174 (E.D. Mich. 2002)..........................................................................................66, 69

*J.B. v. Killingly Bd. of Educ.*, 990 F. Supp. 57 (D. Conn. 1997)............................12

*J.G. v. Board of Education of Rochester City School District*, 830 F.2d 444 (2d Cir. 1987)..............................................................................................59

*J.S. v. Attica Cent. Sch.*, No. 00-CV-513S, 2006 U.S. Dist. LEXIS 12827 (W.D.N.Y. Mar. 7, 2006) ............................................................61, 66, 69

*Johnson v. District of Columbia*, 248 F.R.D. 46 (D.D.C) ........................................71

*LV v. N.Y.C. Dep't of Educ.*, 2005 U.S. Dist. LEXIS 20672, at *10 (S.D.N.Y. Sep. 15, 2005 ....................................................................................61

*McBride v. Mich. Dep't of Corr.*, 2017 U.S. Dist. LEXIS 113144 (E.D. Mich., July 30, 2017) ................................................................................71

*Michigan Protection and Advocacy Service, Inc. v. Flint Community Schools*, No. 15-12470 (E.D. Mich. Sept. 10, 2015) ..........................................24

*P.V. v. Sch. Dist. of Phila.*, 289 F.R.D. 227 (E.D. Pa. 2013) .............................60, 69

*Pelzer v. Vassalle*, 655 F. App'x 352 (6th Cir 2016) ..............................................74

*R. A-G v. Buffalo City Sch. Dist. Bd. of Educ.*, No. 12-CV-960S, 2013 U.S. Dist. LEXIS 93924 (W.D.N.Y. June 30, 2013) ...............................60, 61, 71

*R.A.G. v. Buffalo City School Dist. Bd. of Educ.*, 569 Fed. App'x 41 (2d Cir. 2014) ..............................................................................................59

*R.P.-K. v. Dep't of Educ.*, 272 F.R.D. 541 (D. Haw. 2011) ........................60, 61, 62

*Ray M. by Juana D. v. Bd. Of Educ. Of City Sch. Dist. Of City of N.Y.*, 884 F. Supp. 696 (E.D.N.Y. 1995) .................................................................61, 63

*Reese v. CNH America LLC*, 227 F.R.D. 483 (E.D. Mich. 2005) .....................64, 71

*Rikos v. Procter & Gamble*, 799 F.3d 497 (6th Cir. 2015) ......................................64

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011) ..................64, 70, 71, 76

## STATUTES AND RULES

28 C.F.R. § 35.130(b)(7) .........................................................................................16

34 C.F.R. 300.536(a)(2) ..........................................................................................15

34 C.F.R. § 104 .......................................................................................................16

34 C.F.R. § 300.8(c) ............................................................................................8, 11

34 C.F.R. § 300.39(b)(3).............................................................................12

34 C.F.R. § 300.43(a)(1).............................................................................12

34 C.F.R. § 300.106...................................................................................13

34 C.F.R. § 300.114.................................................................................9, 10

34 C.F.R. § 300.115...................................................................................13

34 C.F.R. § 300.149.....................................................................................9

34 C.F.R. § 300.150...............................................................................10, 14

34 C.F.R. § 300.170...................................................................................15

34 C.F.R. § 300.320...............................................................................11, 13

34 C.F.R. §§ 300.500.................................................................................14

34 C.F.R. §§ 300.530-300.536...................................................................14

20 U.S.C. § 1400(d)(1)(A)...........................................................................8

20 U.S.C. § 1401.................................................................................8, 12, 13

20 U.S.C. §§1407(a-b),.................................................................................9

20 U.S.C. § 1412(a).........................................................................8, 9, 14, 15

20 U.S.C. § 1412(b).....................................................................................10

20 U.S.C. § 1412(d)(1)(B).............................................................................8

20 U.S.C. § 1414...................................................................................10, 11

20 U.S.C. § 1415.............................................................................10, 14, 15

29 U.S.C. § 705(9)(A).................................................................................16

29 U.S.C. § 794.......................................................................................7, 16

42 U.S.C. § 12102(1)(A).............................................................................16

42 U.S.C. § 12131.........................................................................................7

42 U.S.C. § 12132 ...................................................................................................16

M.C.L.A. 380.1701 ...............................................................................................17

M.C.L.A. 380.1711 ...........................................................................................17, 18

M.C.L.A. 380.1751(1) ..........................................................................................17

## ISSUE PRESENTED

Should this Court certify the class pursuant to Fed. R. Civ. P. 23 of all present and future children, ages 3 through 26, who attend or will attend FCS schools and who are eligible or who will be eligible for special education and related services pursuant to the IDEA and its federal implementing regulations, and/or 504 services pursuant to Section 504, as well as analogous provisions of Michigan state law?

Plaintiffs' answer: YES

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

*Calloway v. Caraco Pharm. Labs., Ltd.*, 287 F.R.D. 402 (E.D. Mich. 2012)

*C.G. v. Commonwealth of Pa. Dep't of Educ.*, 2009 U.S. Dist. LEXIS 90028 (M.D. Pa. Sept. 29, 2009)

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998)

*Glazer v. Whirlpool Corp.*, 722 F.3d 838 (6th Cir. 2013)

*Hillson v. Kelly Servs.*, 2017 U.S. Dist. LEXIS 8699 (E.D. Mich. 2017)

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996)

*In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174 (E.D. Mich. 2002)

*J.S. v. Attica Cent. School District*, 2006 U.S. Dist. LEXIS 12827 (W.D.N.Y. 2006)

*McBride v. Mich. Dep't of Corr.*, 2017 U.S. Dist. LEXIS 113144 (E.D. Mich., July 30, 2017)

*Pelzer v. Vassalle*, 655 F. App'x 352 (6th Cir 2016)

*R.A.G. v. Buffalo City School Dist. Bd. of Educ.*, 569 Fed. App'x 41 (2d Cir. 2014)

*Reese v. CNH America LLC*, 227 F.R.D. 483 (E.D. Mich. 2005)

*Rikos v. Procter & Gamble*, 799 F.3d 497 (6th Cir. 2015)

*R.P.-K. v. Dep't of Educ.*, 272 F.R.D. 541, 547 (D. Haw. 2011)

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)

# I   PRELIMINARY STATEMENT

The children of Flint were systemically exposed to lead in their water for almost two years.  That systemic exposure came at a time when Flint Community Schools ("FCS") was systemically failing to meet the special education needs of its students.  Meanwhile Michigan Department of Education ("MDE") and Genesee Intermediate School District ("GISD") systemically failed to provide adequate resources and support to help FCS meet the challenges they were facing.  The systemic nature of the failure generally was highlighted when Michigan became the only state in the country to receive a "Needs Intervention" rating from the United States Department of Education for failing to meet special education requirements under the IDEA.  The combination of these systemic failures has led to a special education crisis that requires a systemic solution.  Certifying a class under these circumstances ensures an opportunity for Plaintiffs to obtain global relief that will benefit every FCS student with special education needs.[1]

When reports of the Flint lead crisis first came to light, they were met with denial.  The denial continues to this day.  Outrageously, the MDE's expert in this

---

[1] The Defendants have not yet fully complied with their discovery obligations by producing all of the Class Certification Discovery requested.   Accordingly, Plaintiffs reserve the right to include information and documents obtained from outstanding productions, which they are to receive on a rolling basis, in their reply brief in support of their Motion for Class Certification.

case characterized the public health crisis in Flint as illusory, premised on unjustified paranoia, propaganda, and fear. He testified:

> [I]f people have a fear that their children have been poisoned and will have lifelong irreversible effects, I think that's the public health crisis right there, that that fear is going to modify behavior of parents, self-perceptions of children, anxieties among teachers.

It is well-established that lead, a potent neurotoxin, causes brain damage, inducing a functionally similar type of brain injury as would result from a traumatic car accident or from oxygen deprivation to the brain. Given that lead is recognized as a neurotoxin that causes cognitive, developmental and behavioral impairment in children, it is imperative that Flint's public schools be equipped to provide students with disabilities the services required by law. Yet, as detailed below, Defendants have systemically failed to ensure appropriate education for FCS students with disabilities in the least restrictive environment and to provide them with the programs, services, and procedural safeguards to which they are entitled by law. The result is that FCS students have been denied a free appropriate public education, the bedrock guarantee afforded to them under federal and state law.

In short, the lead crisis that Flint children have endured is not only a public health catastrophe, but an educational crisis of unprecedented magnitude. Even before the lead exposure, FCS faced significant challenges related to an endemic lack of resources. In 2014, when Flint's water source was changed and lead from

the city's deteriorating pipes began leaching into the city's water supply, FCS faced a crippling deficit of $21 million in its budget.  Under directive by the MDE, the district was forced to make extreme staffing and program cuts.

By fall 2015, when the State of Michigan ("State") finally acknowledged the lead crisis – eighteen months after its onset – FCS still faced a budget deficit of over $10 million.  Instead of providing assistance to FCS, the MDE, on October 5, 2015, approved a deficit elimination plan whereby FCS was forced to freeze wages and fringe benefits for employees for the duration of the deficit.

The severe budgetary shortfalls trapped FCS in a dilemma of the State's making.  Its resources were unduly constrained at a time when – as then-Superintendent Tawwab's February 2016 testimony before Congress firmly establishes – the district urgently needed to prepare for a surge in the needs of its students.  Superintendent Tawwab's Congressional testimony was prescient.  The percentage of special education students in FCS schools has increased by one-third to nearly 20% over the four-year period from 2014-15 to the 2017-18 school year. This percentage will inevitably increase even higher once the screening and assessment process established by the partial settlement in this case becomes fully operational.  As underscored by Dr. Mona Hanna-Attisha, the pediatrician who

sounded the alarm about the lead crisis, children will be affirmatively harmed if they receive a diagnosis of a disability and do not receive treatment for it.[2]

Yet, from 2014-15 to 2017-18, while the percentage of special education students in FCS schools rose by one-third, FCS received no concomitant increase in resources from MDE or GISD.  As a result, FCS has been unable to attract and retain essential special education teachers and support personnel, including social workers and psychologists.  These personnel are the cornerstone for the delivery of special education and related services to FCS' students with disabilities.

Shockingly, 25% of FCS's positions for special education teachers remain vacant today, five weeks into a new school year.  ***This means that in a district where one out of every five students qualifies for special education and related services, one out of every four special education teacher positions remains unfilled.***  Estimating that each of these teachers would have a caseload of 15-20 students, between 240 and 320 students – representing one-fourth to one-third of FCS's entire special education population – have ___no___ special education teacher. This untenable situation is traceable to the MDE and GISD's failure to provide FCS with resources adequate to meet the overwhelming special education needs.

---

[2] Lori Higgins, *Up to 30,000 Flint kids to get screened for lead impact settlement*, DETROIT FREE PRESS, Apr. 8, 2018, *available at* https://www.freep.com/story/news/education/2018/04/09/flint-water-crisis-lead/478577002/ (last visited June 26, 2018) ("'We will harm children if we diagnose them with something and we do not get them into the proper treatment,' Hanna-Attisha said.").

Without adequate special education teachers and support staff, FCS is failing its students with disabilities in systemic violation of federal and state law. Specifically, and as detailed below, FCS is not educating these students in the least restrictive environment and providing them with procedural safeguards in the administration of disciplinary practices. Approximately one-fourth to one-third of students with IEPs aged 6-21 received their education inside the regular classroom environment *less than 40% of the day*, which was nearly two times the state average, from 2012-13 to 2015-16, the last four years for which data is available.

The rates of suspensions and expulsions for students with disabilities of more than 10 cumulative days in a school year increased by a whopping ***282% percent*** from the 2012-13 to 2013-14 school year, when the lead crisis began. The rates thereafter remained at levels that ***were four to ten times*** the state average during the period from 2013-14 to 2015-16. Teachers uniformly report that behavioral issues have significantly increased in FCS schools in the wake of the lead crisis. Despite this, the behavioral specialists contracted by the district – paid roughly $14/hour with no additional benefits – receive no formal training from either FCS or GISD in positive behavior intervention strategies and behavior intervention plans.

The achievement outcomes for students with IEPs in FCS schools demonstrate these systemic failures. The dropout rates for FCS students with

disabilities have consistently been nearly 1.5 to 2 times higher than the statewide average from 2012-13 to 2015-16. The graduation rates over this same period show only one out of every two special education students graduated from high school with a regular diploma in four years, and the scores for all students, including special education students, on standardized testing in the last year are abysmal. At the end of the 2017-18 school year, only 4.2% of students in third through eighth grade were proficient in Math and English Language Arts, 10.8% of third grade students were proficient in English Language Arts, and 0.9% of 11th graders were proficient on the state M-STEP test in all subjects. Teachers report that student achievement is lower since the lead crisis, there has been an increase in the number of kindergarten students who are non-verbal, and students in the current cohort of first graders were unable to even recognize letters – a basic skill that should be mastered in kindergarten.

Notwithstanding these systemic failures and the looming impact of lead exposure on children's learning and memory, the MDE refuses to even acknowledge the crisis in FCS schools. The Director of the MDE's Office of Special Education testified that despite her years of special education experience and her understanding of the risks of lead exposure, she did not consider the lead crisis to be "an educational emergency." She further characterized the impact of the lead crisis on Flint students as nothing more than a mere "inconvenience."

The MDE's dismissal of the harm inflicted upon Flint children from lead exposure is fundamentally unsound and echoes the State's initial disavowal of responsibility for the crisis.  Flint children were the canaries in the coal mine whose elevated blood lead levels signaled that there was a lead crisis.  They continue to be canaries in the coal mine whose poor achievement outcomes are stark evidence of an educational crisis on an unprecedented scale.  Students with disabilities in Flint face an educational and civil rights disaster.  Plaintiffs respectfully seek the certification of a class comprised of these students to address and ameliorate this systemic crisis.

## II     APPLICABLE LEGAL FRAMEWORK

Plaintiffs allege that Defendants are systemically violating the rights of FCS students under the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S. § 1400 *et seq.*; § 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with Disabilities Act ("Title II"),[3] 42 U.S.C. § 12131 *et seq.*; and Michigan law.  The legal rights relevant to these systemic violations are set forth below.

---

[3] The Title II claim has been dismissed against the MDE only.

## A.     The IDEA

Congress enacted the IDEA to protect "the rights of children with disabilities and parents of such children."   20 U.S.C. § 1412(d)(1)(B).   To that end, the purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Accordingly, Defendants are obligated to ensure that a free appropriate public education ("FAPE") is provided to all eligible children with disabilities between the ages of 3 and 26, including those who have been suspended or expelled from school.  20 U.S.C. § 1412(a)(1); MARSE Rule 340.1702.  To be eligible, a child must have at least one of thirteen disabling conditions.  20 U.S.C. § 1401(3)(A)(i); 34 C.F.R. § 300.8(c).[4]

A FAPE must, *inter alia*, "include an appropriate preschool, elementary or secondary education" in the state, and be provided in conformity with students' individualized education programs ("IEPs").  20 U.S.C. §§ 1401(9), 1414(d)(2)(A). *See also Bd. of Educ. v. Rowley*, 458 U.S. 176, 203-04 (1982) (holding that the FAPE requirement is satisfied through the provision of "personalized instruction

---

[4] One such qualifying disability is termed an "other health impairment" that is due to chronic or acute health problems such as, *inter alia*, lead poisoning, which adversely affects a child's educational performance.  34 C.F.R. § 300.8(c)(9).

with sufficient support services to permit the child to benefit educationally from that instruction" where such instruction comports with an IEP formulated in accordance with the IDEA's procedures).  Moreover, a FAPE must be provided in the least restrictive environment ("LRE").  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(1).  To the maximum extent appropriate, children with disabilities, including children in public or private settings, "are [to be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should] occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.114(a)(2).

### 1.    Defendants' General Obligations Under the IDEA

Under the IDEA, the MDE, as Michigan's state educational agency ("SEA"), is responsible for the "general supervision" of special education, which includes adopting IDEA-compliant policies, rules, and regulations that conform to the purposes of the IDEA and otherwise ensuring that all of the mandates of the IDEA are met.  *See* 20 U.S.C. §§1407(a-b), 1412(a)(11); 34 C.F.R. § 300.149. Further, "[a] State must not use a funding mechanism by which the State

distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability FAPE according to the unique needs of the child, as described in the child's IEP." 34 C.F.R. § 300.114(b)(1)(ii). FCS and GISD, as LEAs, must provide a FAPE in the first instance. 20 U.S.C. §§ 1414, 1415. Where the MDE, as the state's SEA, is the "provider" of FAPE, it may also provide "direct services" to children with disabilities. 20 U.S.C. § 1412(b). The MDE, GISD, and FCS are required to, *inter alia*, "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. §§ 1415(a); *see also* 34 C.F.R. §300.150. The Supreme Court has held that a student's "educational program must be appropriately ambitious in light of his circumstances." *Endrew F. v. Douglas County School District Re-1,* 137 S. Ct. 988, 1000 (2017).

### 2.     The IEP Process

By the beginning of each school year, Defendants must have an IEP in place for each eligible child that offers a FAPE. *See* 20 U.S.C. §1414(d)(2). An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised" to meet each child's unique needs. §1414(d)(1)(A)(i). The IEP must contain "a statement of the special education and related services and

supplementary aids and services" to be provided to the child and "program modification or supports for school personnel." 20 U.S.C. §1414(d)(1)(A)(i)(IV); *see also* 34 C.F.R. §§ 300.320(a)(4). Each IEP must also contain research-based instructional strategies to the extent practicable, including positive behavioral interventions and supports. *See* 20 U.S.C. §1414(d)(1)(A)(i)(IV), (d)(3)(B)(i); *see also* 34 C.F.R. §§ 300.320(a)(4), 300.324(a)(2)(i), (a)(3)(i). The IEP must be developed by a team based on the results of the initial or most recent comprehensive evaluations of the child, local or state assessments, periodic progress reports, as well as observations and input from teachers, providers and other individuals with knowledge of the child. *See* 20 U.S.C. §§1414(c)(1)(A)(i-iii), (d)(1)(3); 34 C.F.R. §§300.320(a)(1-3); 34 C.F.R. §§300.324(a). Parents also serve as central members of IEP teams. *See* §1414(d)(1)(B)(i).

### 3.    Special Education and Related Services under the IDEA

The IDEA defines the categories of services that must be offered, providing a non-exhaustive list. "Special education" is generally defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability"[5] including "instruction conducted in the classroom, in the home, in

---

[5] "Specially designed instruction" means "adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction" both "(i) [t]o address the unique needs of the child that result from the child's disability; and" "(ii) [t]o ensure access of the child to the general

hospitals and institutions, and in other settings[.]"  20 U.S.C. § 1401(29).  "Related services" are "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education . . ."  20 U.S.C. § 1401(26)(A).[6]

In addition, the IDEA mandates that "transition services" be provided to "facilitate the child's movement from school to post-school activities" including "post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation."  20 U.S.C. § 1401(34)(A); 34 C.F.R. § 300.43(a)(1).  Beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, the IEP must include transition services to assist the child in reaching postsecondary goals.

---

curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children."  34 C.F.R. § 300.39(b)(3).

[6] Related services include, but are not limited to, speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, and orientation and mobility services.  20 U.S.C. § 1401(26)(A). Courts and the U.S. Department of Education do not interpret this as an exhaustive list.  *See J.B. v. Killingly Bd. of Educ.*, 990 F. Supp. 57 (D. Conn. 1997); *see also Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities*; *Comments to the IDEA Regulations*, 71 Fed. Reg. 46540 (Aug. 13, 2006) ("*Comments to the IDEA Regulations.*").

34 C.F.R. § 300.320(b).  The IDEA also requires that children receive extended school year ("ESY") services "[b]eyond the normal school year of the public agency" where necessary to provide FAPE.  34 C.F.R. § 300.106 (noting that public agencies may not "[u]nilaterally limit the type, amount or duration" of ESY services).[7]

Defendants must also ensure that a "continuum of alternative placements" is available to meet the needs of children with disabilities for special education and related services.  34 C.F.R. § 300.115(a).  The continuum must include, *inter alia*, instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions, and must make provision for "supplementary services" such as resource room or itinerant instruction to be provided in conjunction with regular class placement.  34 C.F.R. § 300.115(b).[8]

### 4.    Procedural Safeguards for Children and Parents

Defendants must ensure that children with disabilities are afforded the procedural safeguards required by the IDEA when disciplinary action is

---

[7] *See also Comments to the IDEA Regulations*, 71 Fed. Reg. 46540, 46582 ("Some children with disabilities may not receive FAPE unless they receive necessary services during times when other children, both disabled and nondisabled, normally would not be served.").

[8] "Supplementary aids and services" are "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated [in the LRE] with nondisabled children to the maximum extent appropriate[.]"  20 U.S.C. § 1401(33).

contemplated.   20 U.S.C. §§ 1412(a)(6)(A), 1415(k); 34 C.F.R. §§ 300.150, 300.500, 300.530-300.536.   Under the IDEA, when a child with a disability is removed from his or her original educational placement for more than ten cumulative school days in an academic school year, procedural protections and services must be provided to the student.   20 U.S.C. § 1415(k).   One such procedural protection is a manifestation determination review ("MDR") to determine whether the student's behaviors are a manifestation of his or her disabilities.   20 U.S.C. § 1415(k)(1)(E).   This requirement helps ensure that a school does not impose a long-term suspension, series of suspensions, or expulsion on a special education student on account of a behavior that is merely a "manifestation" of his or her disability.   20 U.S.C. § 1415(k)(1)(E).

The IDEA mandates that if a child's behavior is a manifestation of that student's disability, the child must be permitted to return to, or remain at, his or her current school placement and be provided with all of the behavioral services necessary to support and reinforce the child's positive behavior.   20 U.S.C. § 1415(k)(1)(F).   These behavioral supports include a functional behavioral assessment ("FBA") to determine the function or cause of the child's disability and an accompanying behavioral intervention plan ("BIP") to adequately accommodate the student's educational and behavioral needs.   20 U.S.C. § 1415(k)(1)(F)(i)-(iii).

A manifestation determination review is triggered after ten cumulative days of suspensions or expulsions.  Additionally, the IDEA and its implementing regulations state that a series of removals totaling more than 10 school days can form a "pattern" of behavior (e.g., "because the child's [disciplined] behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals") that also triggers a mandatory MDR.  34 C.F.R. 300.536(a)(2).  Notably, the MDR is not limited to determine whether the behavior at issue is a byproduct of the child's disability, but must additionally inquire into whether it may be the consequence of the district's failure to adequately implement his or her IEP.  20 U.S.C. § 1415(k)(1)(E)(i).

Pursuant to the IDEA, the SEA must examine data to determine if significant discrepancies exist in the rates of long-term suspensions and expulsions of children with disabilities, either between different LEAs or between disabled and nondisabled students within the same LEA.  20 U.S.C. § 1412(a)(22)(A); 34 C.F.R. § 300.170(a).  If such discrepancies exist, the SEA must review and, if appropriate, revise (or require the affected LEA to revise) its policies, procedures and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure compliance with the IDEA.  20 U.S.C. § 1412(a)(22)(B); 34 C.F.R. § 300.170(b).

**B.     Section 504 and Title II**

Section 504 and Title II prohibit public entities from discriminating against individuals with disabilities.  Pursuant to Section 504 and Title II, public schools are prohibited from excluding students with disabilities from participating in or receiving the benefits of a school's services, programs, or activities, and such exclusion constitutes disability discrimination.   29 U.S.C. § 794(a); 42 U.S.C. 12132.  Accordingly, each student with a disability must be provided access to all programs provided to non-disabled students.  29 U.S.C. § 794; 42 U.S.C. § 12132; 34 C.F.R. § 104.21.   Furthermore, Section 504 and Title II require that each disabled student be provided reasonable accommodations and modifications designed to provide meaningful access to educational benefits, or as necessary to avoid discrimination on the basis of disability.  34 C.F.R. § 104.21; 34 C.F.R. § 104.44; 28 C.F.R. § 35.130(b)(7).  Section 504 and Title II define "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9)(A).

Section 504 also mandates that each child with a disability receive a free appropriate public education including the provision of regular or special education and related aides and services to meet the needs of the student.  29 US.C. § 794; 34 C.F.R. § 104.33.

### C.      Michigan State Law

The State of Michigan requires the superintendent of public instruction at the Michigan Department of Education to have each Intermediate School District ("ISD") board submit a plan pursuant to MCLA 380.1711, in accordance with special education rules. M.C.L.A. 380.1701.   Once approved the board of a local school district "shall provide special education programs and services designed to meet the individual needs of each student with a disability in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the Intermediate School District (ISD)  special education plan". MCLA 380.1751(1).   To meet this obligation the local school board can either operate the program or service itself or contract with its ISD, another district, or the MDE.   See MCLA 380.1751(1)(a) and (b). The MCLA 380.1711 requires the Intermediate School Board to "develop, establish, and continually evaluate and modify in cooperation with its constituent districts, a plan for special education that provides for the delivery of special education programs and services designed to meet the individual needs of each student with a disability of whom the intermediate school board is required to maintain a record under subdivision (f)."

The ISD is required to maintain a record of each student with a disability under 26 years of age, who is a resident of 1 of its constituent districts and who has

not graduated from high school, and the special education programs or services in which the student with a disability is participating.  See MCLA 380.1711 (f).  The ISD has the "authority to place in appropriate special education programs or services a student with a disability for whom a constituent district is required to provide special education programs or services under section 1751." Within a Local School District, a staff person must be designated as the one responsible for the implementation of the IEP.  This person must be either the principal of the building where the child is a student or another staff person who is generally accessible to the staff and who will be working with the student.  Mich. Admin. Code R  340.1722.

### III     BACKGROUND AND SYSTEMIC FACTS RELATING TO THE PROPOSED CLASS CLAIMS

#### A.     The Lead Crisis is Both a Public Health and an Educational Crisis

In April 2014, when Flint's water source was changed as a temporary cost-saving measure, lead from the city's deteriorating pipes began leaching into the water supply.  The resulting community-wide contamination persisted for a period of at least 18 months until the fall of 2015.[9]   A study conducted in February 2016

---

[9] "Timeline of Flint water crisis since Gov. Snyder took office," MLIVE (May 3, 2016),                    *available*                    *at* https://www.mlive.com/news/index.ssf/2016/05/timeline_of_the_flint_water_cr.html.

by Dr. Mona Hanna-Attisha found that the incidence of blood levels in Flint doubled, and tripled in some neighborhoods.  (Dkt. 62).

It is well-established that lead, a potent neurotoxin, causes brain damage, inducing a functionally similar type of brain injury as would result from a traumatic car accident or from oxygen deprivation to the brain.  (*Id.*).  The former Superintendent of FCS Schools, Bilal Tawwab, and the FCS Director of Learning Support Services, Melinda Carroll, fully appreciate that exposure to lead can result in cognitive, developmental, and behavioral impairment in children.  Mr. Tawwab testified that he understands "the impact lead can have on the cognitive development of children" and that it can "cause various delays" related to "learning" that "would impact that child's outcomes."  Heck Decl. Ex. 1-A (Tawwab Tr. at 21:18 – 22:12).  He further understands that "it can manifest itself in – in numerous ways in terms of impact on behavior and also impact a child emotionally."  Heck Decl. Ex. 1-A (*Id.* at 22:23 – 23:8).  Melinda Carroll likewise testified that "lead can affect children in a multitude of ways" and can "manifest itself in cognitive impairments[,]" in "acting-out behavior, perhaps more incidents of ADHD."  Heck Decl. Ex 1-C (Carroll Tr. at 55:6-13).  She conveyed that in addition to impacting children's ability to learn and their behavior, it could cause brain damage.  Heck Decl. Ex. 1-C (*Id.* at 55:14-21, 56:24 – 57:5).   Both Mr. Tawwab and Ms. Carroll were emphatic that FCS was operating in emergency

mode – and was placed in the middle of a firestorm – after the lead crisis. Heck Decl. Ex. 1-A, 1-C (Tawwab Tr. at 37:21 – 38:4; Carroll Tr. at 57:21 – 58:6, 99:22 – 93:11). Former Superintendent Tawwab unequivocally underscored that the lead crisis was an educational crisis. Heck Decl. Ex. 1-A (Tawwab Tr. at 37:6-17).

Notwithstanding this testimony from those who are at the frontlines of the crisis unfurling in FCS schools, there has been a failure on the part of the MDE to perceive the lead crisis as both a public health and an educational emergency. The expert retained by the MDE for this case resisted even characterizing the lead crisis as a public health crisis. Instead, he testified that:

> [I]f people have a fear that their children have been poisoned and will have lifelong irreversible effects, I think that's the public health crisis right there, that that fear is going to modify behavior of parents, self-perceptions of children, anxieties among teachers.

Heck Decl. Ex. 1-D (Schretlen Tr. at 132:7-12).

Similarly, the MDE's Director of the Office of Special Education, who has a Bachelor's degree in cognitive impairment and a Master's Degree in Learning Disabilities, and who has worked for thirty years in the field of special education, testified that she understands "the risks posed to people who are exposed to lead" and is "aware that in some cases it may manifest in certain behaviors or potentially cognitive development." Heck Decl. Ex. 1-E (Chapman Tr. at 6:12-15, 7:15-18, 8:11-14, 30:3-7). Yet, when asked whether the lead crisis constituted an emergency, she stated that it "may have been a health emergency" but that she

"didn't consider it an educational emergency." Heck Decl. Ex. 1-E (Chapman Tr. at 41:1-16). She drew a sharp distinction between the two. When further asked whether life had changed for children in FCS schools as a result of the lead crisis, she cavalierly replied:

> A. Well, based on the need to drink bottled water and the change in lifestyle, regarding shower needs and things like that, I would imagine so.
>
> Q. Anything else that would have changed for them?
>
> A. Well, I would imagine that there's a lot of inconvenience in your life when you don't have fresh running water for lots of reasons; cooking, baking, laundry.

Heck Decl. Ex. 1-E (Chapman Tr. at 43:14-24).

Despite her alleged expertise in special education, she entirely ignored and attempted to dismiss the devastating and decades-long impact that lead exposure can have on learning.

Dr. Mona Hanna-Attisha, the pediatrician who sounded the alarm about the crisis, on the other hand, recognizes that prolonged exposure to lead can cause or exacerbate disabilities in children. While identifying such disabilities, which the partial settlement in this case seeks to accomplish, is the gateway to addressing them, Dr. Mona Hanna-Attisha has warned that "[w]e will harm children if we diagnose them with something and we do not get them into the proper treatment." Heck Decl. Ex. 1-T (Detroit Free Press article).

**B.**     **FCS's Chronic Lack of Special Education Staff, Programs and Services**

Flint is a community in severe economic decline, suffering from the deterioration of essential infrastructure and institutions.  Lovette Decl. Ex. I ("Flint again most impoverished city in the nation, new census data shows").  Its population has steadily fallen since 2010 and the poverty rate has remains alarmingly high.[10]  Flint has the highest poverty rate in the nation for a city of its size according to U.S. Census Bureau data from 2017.  (*Id*).  Nearly 39% of the city's residents live in poverty, with an annual income below the poverty line of $12,140 for a single individual.  (*Id*).  The childhood poverty rate is a staggering 60% compared to the national average of 21%.  (*Id*).   As the Data and Policy Advisor for Poverty Solutions at the University of Michigan explained, "the people who remain" in Flint "are facing more difficulties."  %.  (*Id*).   He elaborated: "We know those who stay may be poorer so there are more kids that are poor."  (*Id*).

The conditions in Flint are mirrored in its public school system.   Bilal Tawwab, the former Superintendent of FCS who came to the district in the 2015-16 academic year, testified that he "knew coming" to Flint "that it would sort of be a heavy lift" given the significant challenges the District faced due to "[d]eclining

---

[10] "Flint again most impoverished city in the nation, new census data shows," MLIVE (Sept. 17, 2018), *available at* https://www.mlive.com/news/flint/index.ssf/2018/09/more_than_half_of_flints_child.html.

student enrollment, [a] decline in student outcomes, and decline in public confidence in the District."  Heck Decl. Ex. 1-A (Tawwab Tr. at 10:4-9, 13:5 – 14:1).  He further elaborated:

> A.  You have, you know, flight; you know, the – the citizenry is shrinking in Flint.  You have poverty in the city of Flint.  You have, unfortunately, low performing schools in the city of Flint.  So there are a multitude of challenges the city faces.
>
> Q.  And then on top of that they can't drink their water?
>
> A.  Correct.
>
> (*Id.* at 36:10-17).

Melinda Carroll, the Director of Learning Support Services, likewise testified that, even setting aside the prolonged exposure to lead-contaminated water, children in Flint often come from a high-poverty background and face additional learning challenges.  She stated:

> A.  . . .  [W]e know that our students come to us from the beginning somewhat behind the clock.  Research tells us that children in poverty, children who have been exposed to trauma, children, you now, single-parent families, families who have incarcerated members, usually even just language alone, 20,000 words behind the typical child. . . .
>
> Heck Decl. Ex. 1-A (Carroll Tr., Ex. 1-C, at 108:14-23).

The testimony of both Melinda Carroll and Bilal Tawwab establishes that certain factors in Flint place students at risk of being behind academically or behaviorally, exacerbated by nearly two years of lead exposure.  FCS, which

serves an extremely high-poverty, high-needs population, is hampered by a chronic and severe shortfall of funding and essential resources.

In 2014, when the lead crisis began,[11] FCS was in a state of financial distress.  Melinda Carroll, who joined the district as the Director of Learning Support Services in 2014, testified in another case that when she "arrived at the School District we were under a $21 million deficit and we were battling with the State to submit a deficit elimination plan."  Heck Decl. Ex. 1-C (Carroll Tr. at 13:12-13); Ex. 1-V (Carroll Dep. Ex. 1 at 56:22-25).  Ms. Carroll further clarified that the deficit elimination plan was mandatory and that when "the district found itself with a . . . $21 million" deficit, the MDE "said you cannot continue to operate that way.  You must make extreme cuts."  Heck Decl. Ex. 1-V (Carroll Dep. Ex. 1 at 56:22-25, 57:8-13).  The MDE gave FCS until October 31, 2014 "to make drastic cuts to meet a targeted amount that we would eliminate and put back into our fund equity over the next seven years."  Heck Decl. Ex. 1-V (Carroll Dep. Ex. 1 at 56:22-25,  57:14-21).[12]  In an effort to respond to the MDE's mandate, the administration "made large cuts[,] combining positions . . . . All kinds of things

---

[11] Lovette Decl. Ex. I ("Timeline of Flint water crisis since Gov. Snyder took office," MLIVE (May 3, 2016), *available at* https://www.mlive.com/news/index.ssf/2016/05/timeline_of_the_flint_water_cr.html).

[12] According to Ms. Carroll, the MDE allows most large urban districts five years to eliminate a deficit, but because FCS's deficit was excessive, the MDE allowed for seven years.  Heck Decl. Ex. 1-C (Carroll Dep. Ex. 1, Ex. 1-C, at 57:13-17).

were going on, closing buildings, moving equipment.  It was somewhat chaotic."
Heck Decl. Ex. I-V (Carroll Dep., Ex. 1 at 56:25 – 57:7).

Melinda Carroll testified that some of the budget cuts made during this period included the special education program. Heck Decl. Ex. 1-C (Carroll Tr. at 13:12-13, 21:9-21, 25:19 – 26:9).  Over the prior four years from the 2010-11 to the 2013-14 school year, FCS had already reduced its special education staff dramatically.  It had cut its special education instructional staff by roughly 40% from 121 staff members to 73.  It eliminated nearly all of its special education subject area teachers, cutting 111 out of 113 such positions and leaving the district with only 2.  It cut nearly 50% of its special education teacher consultants, reducing the total number of such consultants from 20 to 9.5.  It similarly decreased the number of special education paraprofessionals and aides by approximately 60% from 56.54 to 33.50, and the number of special education support staff from 33.5 to 26.  The chart set forth below reflects the numbers of FCS special education personnel over this period.

| Year | Special Education Instructional Staff | Special Education Subject Area Teachers | Special Education Teacher Consultants | Special Education Parapros and Aides | Special Education Support Staff | Special Education Other Support Staff |
|------|------|------|------|------|------|------|
| 2010-11 | 121 | 113 | 20 | 56.54 | 33.5 | 3 |

| 2013-14 | 73 | 2 | 9.5 | 33.50 | 26 | 5 |
|---------|----|----|-----|-------|----|---|

Heck Decl. Ex. 1-I (FCS Personnel Summaries).

In 2014, Melinda Carroll also testified that she viewed the budget cuts in 2014 as excessive and indicated that she did not believe that the district was in compliance with the IDEA.  Heck Decl. Ex. 1-C (Carroll Tr., Ex. 1-C, at 32:8-24, 35:10-12, 36:8-37:7, 37:8-25), Ex. I-V (Carroll Dep. Ex. 1 at 65:13 – 66:6).[13] During her deposition in this case in November 2017, she testified that on a scale from one to ten, with a ten representing perfect compliance with the IDEA and a one representing disaster, the district was at a *three* in 2014.  Heck Decl. Ex. 1-C (Carroll Tr. at 41:2-8).

When the lead crisis became public in Fall 2015,[14] FCS still faced a deficit of more than $10 million.  Heck Decl. Ex. 1-A (Tawwab Tr. at 14:2-13, 21:12-17); Ex. 1-B (Tawwab Dep. Ex. 1); Ex. 1-J (Answer No. 8 in Narrative Section). Although the district began implementing staffing cuts prior to the 2015-16 school year in an attempt to balance its budget, the MDE approved FCS's deficit elimination plan in October 2015, just weeks after the State acknowledged the lead

_____

[14] Lovette Decl, Ex. I ("Timeline of Flint water crisis").

crisis in Flint.[15] Heck Decl. Ex. 1-J (Deficit Elimination Plan, Ex. J). Instead of providing debt relief to FCS in the wake of the crisis, the district began implementing the MDE-approved plan to eliminate the budget shortfall. Under this plan, FCS was forced to freeze wages and fringe benefits for employees for the duration of the deficit. Heck Decl. Ex. 1-J (Deficit Elimination Plan, Answer No. 9 in Narrative Section). In addition, the district closed schools and continued to cut personnel. Heck Decl. Ex. 1-A (Tawwab Tr. at 15:23-16:18); Ex. 1-J (Deficit Elimination Plan).

In February 2016, after the lead crisis became public, FCS Superintendent Tawwab testified before Congress about the urgent needs of the district, which, according to him, had been "operating in crisis mode since last September." Heck Decl. Ex. 1-B (Tawwab Tr., Ex 1). In his deposition in this case, he explained his mindset when he went before Congress:

> A. Well, I guess for – I guess for me at the time, you know – oh, ultimately, you know, my goal as a superintendent is to make sure I'm able to meet the needs of all kids. We're now in crisis mode, and so understanding our primary goal is student outcomes, improving student outcomes, making sure they're educated, and so equally in the midst of this crisis I have to make sure our kids are emotionally, socially stable.
>
> Q. Mm-hmm.
>
> A. Understanding that's the work of schools, but now in crisis --
>
> Q. Right.

---

[15] Lovette Decl, Ex. I ("Timeline of Flint water crisis").

A. --  it sort of ups the ante, that there is much more work and focus that's required so that they can have these outcomes educationally that we are hoping for.

Heck Decl. Ex. 1-A (Tawwab Tr. at 37:18 – 38:11).

In the middle of what he characterized as a high-stakes crisis, then-Superintendent Tawwab contemporaneously told Congress that "[t]he Flint Community Schools will need additional support in the form of expanded special education resources."[16]  Heck Decl. Ex. 1-B (Tawwab Tr., Ex 1).  Melinda Carroll agreed with his assessment.  Heck Decl. Ex. 1-C (Carroll Tr. at 95:25 – 96:4).  During this period, she discussed with the FCS Deputy Superintendent the need for special education staff to support students, such as speech pathologists and social workers, as well as positive behavior supports.  Heck Decl Ex. 1-C (Carroll Tr. at 90:7-14, 96:4-7).

In 2014-15, 15% of the students attending FCS schools had been identified with qualifying disabilities and were eligible for special education and related services, as compared to 12.9% statewide.[17]  In 2015-16, the percentage of special education students in FCS increased to 16.7% while the statewide percentage

---

[16] Although he attempted to partially retreat from this position when being deposed in this case, his statement before Congress should be given full credit.

[17] Heck Decl., Ex. S (MI School Data charts reflecting special education counts). In the 2014-15 academic year, 985 out of 6,550 students in FCS qualified for special education and related services.  Michigan Department of Education, Michigan School Data, *available at* https://www.mischooldata.org/SpecialEducationEarlyOn2/DataPortraits/DataPortraitsDisability.aspx#

remained at 12.9%.[18]  By the following school year, the percentage of FCS special education students climbed to 17.4% while the statewide percentage again remained relatively steady at 13% in 2016-17.[19]  In the 2017-18 academic year, the percentage of FCS special education students further ballooned to 19.8%, while the statewide percentage rose only slightly to 13.1%.[20]

As Melinda Carroll testified, FCS has doubled the number of initial evaluations over the two years from 2015-16 to 2016-17 in the wake of the lead crisis.   Heck Decl. Ex. 1-C (Carroll Tr., Ex. C, at 81:16-25).   Overall, the percentage of special education students has increased by approximately 33% – or one-third – over the four-year period from the 2014-15 school year to the 2017-18 school year.  The percentage of special education students will inevitably further

---

[18] Heck Decl., Ex. S (MI School Data charts reflecting special education counts). In the 2015-16 academic year, 907 out of 5,426 students in FCS qualified for special education and related services.    Michigan Department of Education, Michigan           School           Data,           *available           at* https://www.mischooldata.org/SpecialEducationEarlyOn2/DataPortraits/DataPortraitsDisability.aspx

[19] Heck Decl., Ex. S (MI School Data charts reflecting special education counts). In the 2016-17 academic year, 853 out of 4,893 students in FCS qualified for special education and related services.  Michigan Department of Education, Michigan School Data, *available at* https://www.mischooldata.org/SpecialEducationEarlyOn2/DataPortraits/DataPortraitsDisability.aspx.

[20] Heck Decl., Ex. S (MI School Data charts reflecting special education counts). In the 2017-18 academic year, 902 out of 4,565 students in FCS qualified for special education and related services.  Michigan Department of Education, Michigan School Data, *available at* https://www.mischooldata.org/SpecialEducationEarlyOn2/DataPortraits/DataPortraitsDisability.aspx#.

increase once the screening and assessment process established by the partial settlement in this case (Dkt. 116) is put into place.[21]

Despite the substantial increase in the percentage of special education students in FCS schools, and the former Superintendent's admission that educating them costs almost double the amount required to educate their general education counterparts, there has been no corresponding funding increase in the district's budget.[22]   FCS received no additional resources for special education staff, programs and services from the State, MDE, or GISD in the aftermath of the lead crisis.  When asked if additional funding was provided to Flint after the lead crisis,

---

[21] Despite the increasing number of students who qualify for special education and related services, as of November 2017, the district had only 16 Section 504 plans for its 4,565 students and employees, which Melinda Carroll characterized as "on the lower end" based on her past experience.  Heck Decl. Ex. 1-C (Carroll Tr. at 112:11-24).   Former Superintendent Tawwab testified that he believed that Melinda Carroll was ultimately responsible for the implementation of 504 plans, and ensuring that the district was fulfilling its legal obligations under Section 504.  Heck Decl. Ex. 1-A (Tawwab Tr. at 90:1-23).  Melinda Carroll clarified that the principals in FCS schools are responsible for ensuring the district's compliance with Section 504; that does not fall under her remit.  Heck Decl. Ex. 1-C (Carroll Tr. at 26:5-12; 69:14-22; 72:14-21).

[22] In addition, FCS has lost funds over the four-year period from 2013-14 to 2017-18 as a result of declining overall student enrollment even as the population of more-costly to educate students with disabilities has increased.  The overall student population in FCS schools has fallen from 6,550 students in 2014-15 to 4,565 students in 2017-18, Michigan Department of Education, Michigan School Data, *available at*
https://www.mischooldata.org/SpecialEducationEarlyOn2/DataPortraits/DataPortraitsDisability.aspx#.

Teri Chapman, the Director of the Office of Special Education at the MDE, responded:

> A. Through our office?  Through special education?
>
> Q. Yes.
>
> A. No.  There was no additional money.
>
> Heck Decl. Ex. 1-E (Chapman Tr. at 26:4-9).

She further testified with respect to FCS schools:

> Q.  So you remained steady with what you had been doing prior to the lead cris[i]s?
>
> A.  That's correct.
>
> Q.  You did not add any additional resources?
>
> A.  That's correct.
>
> Q.  Or take any specific measures in response to the lead cris[i]s?
>
>      Can you please state your answer?
>
> A.  That's correct.  We did not.

Heck Decl. Ex. 1-E (Chapman Tr. at 35:23 – 36:8).

Thus, since 2014-15, FCS has experienced a sharp rise in the percentage of special education students and no accompanying increase in funding and resources to meet their needs, resulting in a systemic failure to comply with IDEA's FAPE, LRE, and discipline requirements.  As Ms. Carroll testified, FCS had not come into full compliance with the IDEA by November 2017.  Heck Decl. 1-C (Carroll Tr. at

38:24-39:13, 69:14-22, 79:11-17).   As the evidence here demonstrates – and as explained below – the large and constantly growing number of students with disabilities, coupled with chronic budget deficits, has overwhelmed FCS's limited resources and chronic staffing shortages.   As a consequence, FCS is failing to provide special education and related services on a system-wide basis, resulting in students not educated in the least restrictive environment, disciplinary practices without procedural safeguards and behavioral supports, and extremely low student performance and outcomes.

### C.   The Defendants Have Systemically Failed to Provide A Free Appropriate Public Education in the Least Restrictive Environment and Procedural Safeguards in the Administration of Disciplinary Practices

#### 1.   FCS's Chronic and Severe Special Education Staffing Shortages Undermine the Delivery of Special Education and Related Services in Conformance with IEPs and/or 504 Plans

Former Superintendent Tawwab has candidly admitted that as of November 2017, the district needed "to *fill the vacancies*" in teachers and support personnel in FCS schools.   Heck Decl. Ex. 1-A (Tawwab Tr. at 42:22 – 43:13) (emphasis added).   In his Congressional testimony, Mr. Tawwab stated that "[w]e need the resources to attract and retain talented specialists who are trained in special learning needs.   These needs are crucial at [a] time when the district has a looming deficit [of] over ten million dollars."   Heck Decl. Ex. 1-B (Tawwab Dep., Ex. 1). He reiterated in his November 2017 deposition that it was still necessary for the

district to attract and retain such specialists.  Heck Decl. Ex. 1-A (Tawwab Tr. at 64:8-12).  When asked during his deposition if FCS had the resources to do so, he replied:

> A. I would say that's an area – I mean we have a lot of vacancies, so that's an area that we need – that's an opportunity for us to grow in, being able to attract and retain talent.
>
> Q. Okay.  So is the answer, yes, you do need resources to attract and retain talent?
>
> A. To attract, yeah, we may need support there, or hear other strategies on how folks are able to secure that support.  Like I said, we have the positions budgeted for.  We just need to find the talent to fill those roles.

Heck Decl. Ex. 1-A (Tawwab Tr. at 64:13-25).

The FCS's 2018-19 Learning Supports Services staffing list demonstrates the pervasiveness of vacancies in special education vacancies.  Melinda Carroll characterized the district's 2014 budget cuts as excessive when one-sixth of its social workers (2 out of 12) and one-third of the district's psychologists (2 out of 6) were cut.  Heck Decl. Ex. 1-C (Carroll Tr. at 22:8-17).  Currently, nearly one-third of its social worker positions (2 out of 6) and approximately 20% of the district's psychologist positions (3 out of 13.5) are unstaffed.  Lovette Decl. Ex. 3-D (LSS Staffing Charts).  The staffing shortages in these areas today are therefore roughly equivalent to what they were when Melinda Carroll ranked the district at a

three in terms of its IDEA compliance. As a result of the extensive vacancies in the district, the caseloads for special education personnel are overwhelming.

As noted above, the district has four psychologists and two vacancies for psychologist positions (one of the vacancies is denoted as a retirement on the staffing list). All of the psychologists have received new placements this year as compared to last year. Lovette Decl. Ex. 3-D (LSS Staffing Charts). (Note that new hires in 2018-19 are designated in green on the chart and internal moves from placements last year are denoted in blue). The caseloads of the four psychologists in the district range from 27 to 46 students. Lovette Decl. Ex. 3-D (LSS Staffing Charts); Heck Decl. Ex. 1-K (caseload summary).

Social workers are similarly lacking. FCS currently has seven full-time social workers, one part-time social worker, and three vacancies. Two of the social workers are new this year and three have been internally moved from their placements last year. Lovette Decl. Ex. 3-D (LSS Staffing Charts). The caseloads for the full-time social workers in the district range from 25 to 79 students. Lovette Decl. Ex. 3-D (LSS Staffing Charts); Heck Decl. Ex. 1-K (caseload summary).

The chronic staffing shortages in FCS are also reflected in the self-contained classrooms and resource rooms for special education students. The district currently has 27 special education teachers in self-contained classrooms (two are new and five were moved internally) and *eight* vacancies. There are three

vacancies for Cognitive Impairment classrooms at Southwestern Classical Academy High School, one for an Emotional Impairment classroom at Southwestern Middle School, one for a Cognitive Impairment classroom at Scott Middle School, two for Cognitive Impaired classrooms at Durant-Turri-Mott, and one for an Emotional Impairment classroom at Pierce Elementary School. Lovette Decl. Ex. 3-D (LSS Staffing Charts). Stated differently, over 20% of the positions in the district allocated for special education teachers to work in self-contained classrooms – classrooms in which all students are classified as requiring special education – are vacant.

The vacancies in the resource room special education teaching staff are even more dramatic. Nineteen resource room positions are filled, while seven full-time resource room positions and two half-time resource room positions remain vacant. In short, nearly one-third of the allocated resource room positions are open. Lovette Decl. Ex. 3-D (LSS Staffing Charts). As a result, the resource room caseloads for the nineteen resource room teachers (three of whom are new and three of whom were moved internally) are elevated. For example, seven have caseloads of 21 students, one has a caseload of 22 students, one has a caseload of 20 students, one has a caseload of 18 students, and one has a caseload of 17 students. Lovette Decl. Ex. 3-D (LSS Staffing Charts); Heck Decl. Ex. 1-K (caseload summary).

Melinda Carroll testified that the resource room caseloads tend to be high in FCS schools.  Heck Decl. Ex. 1-C (Carroll Tr. at 115:24 – 116:2).  When the district gets close to the maximum permitted caseloads, she explains to the Superintendent that the district has a compliance issue and asks for positions to be added.  Heck Decl. Ex. 1-C (Carroll Tr. at 116:3-7).  If positions are allocated but not filled, as here, the compliance issues are not resolved.

The caseloads for speech therapists in FCS are also exceedingly high.  Five of the thirteen speech therapists in FCS schools are new this year, and ten out of the thirteen have caseloads of over 40 students.  Six speech therapists have caseloads of over 50 students, and one has a caseload with 64 students.  Heck Decl. Ex. 1-K (caseload summary).

In addition, the district currently does not have a secondary supervisor for Learning Support Services for Grades 7-12, a position which is critical.  The secondary supervisor is vested with responsibility for ensuring the effective and efficient provision of special education programs and services for these grades.  Lovette Decl. Ex. 3-D (LSS Staffing Charts); Therrein Decl. Ex. 2 ¶ 16.  The district also currently has only one nurse for approximately 4,600 students.

Lovette Decl. Ex. 3-D (LSS Staffing Charts).  It previously had three nurses when the lead crisis first came to light.[23]  Heck Decl. Ex. 1-C (Carroll Tr. at 47:8-25).

In sum, FCS has and continues to experience systemic deficits in essential special education teachers and support staff.  The district – in which nearly 20% of students currently qualify for special education – lacks 25% of the existing special education teaching force, let alone the additional staff that may be needed to serve the growing numbers of students with disabilities.  Lovette Decl. Ex. 3-D (LSS Staffing Charts) (self-contained classrooms are resource rooms columns); Therrein Decl. Ex. 2 ¶ 12.  Using an estimate of one special education teacher for 15 to 20 students, between 240 and 320 currently enrolled students are lacking appropriate teaching staff, let alone necessary support staff. Stated differently, in a district with 902 special education students as of the 2017-18 school year, between one-fourth and one-third of these students have been left with no special education teacher. Therrein Decl. Ex. 2 ¶ 12.  One school, Neithercut Elementary, has no certified special education teachers on staff, five weeks into the new school year.  Lovette Decl. Ex. 3 ¶ 18.

---

[23] Districtwide leadership is also a revolving door.  Former Superintendent Tawwab left in 2017.  Since his departure, FCS has had two acting Superintendents and seven different assistant superintendents over the past five years.  (Lovette Decl. Ex. 3 ¶ 32).

The chronic teacher shortage is a consequence of FCS budget deficits. As noted above, under the MDE deficit elimination plan, FCS had to freeze wages and fringe benefits for employees for the duration of the deficit. Heck Decl. Ex. 1-J, (Deficit Elimination Plan) (Answer No. 9 in Narrative Section). The starting salaries for teachers in FCS schools are consequently the lowest of any school district falling within the GISD's purview. On average, the annual starting salaries in FCS schools are approximately $5,000 below the other districts in the intermediate school district. In some cases, they are approximately $8,000-$10,000 below the salaries offered by the surrounding districts. As a result, new teachers in Flint make approximately 13% less than their counterparts in the other districts in Genesee County, and 12% less than the average starting salary for a teacher in the state of Michigan.[24] Heck Decl., Ex. 1-U (transparency reports). Then-Superintendent Tawwab was quoted in a February 2018 news article stating that, "Our greatest challenge right now is the number of teacher vacancies." He added that FCS "struggles not only [to] attract them but to keep them here. Our salaries are not competitive."[25]

The record also shows that GISD has not stepped in to fill the resource gap caused by MDE. Teri Chapman testified that the federal IDEA funding is

---

[24] Lovette Decl., Ex. 3-I (*Is Flint's Water Crisis Leading to Lower Test Scores?*)
[25] Lovette Decl., Ex. 3-I (*Is Flint's Water Crisis Leading to Lower Test Scores?*)

transferred to the GISD to fund the special education programs in FCS and other Genesee County school districts. The GISD, in turn, may choose to provide resources to the school districts it oversees through direct funding or through the provision of services. She explained the process in the following detail:

> A. Well, we fund the intermediate school districts through a formula grant from the IDEA that the State is in receipt of and the ISD through their intermediate school district relationship with the districts in their jurisdiction develop the process for how they're going to utilize those funds.
>
> There's many different models, I think about six different models across the State, for how ISDs choose to use those resources. *Some pass the funding out to the district directly. Some provide services in support of all their districts and then there are a lot of them that have varying degrees of both of those things.*

> Q. So is it fair to say that the money that's funneled from you to the district passes through the ISD?

> A. Actually, the money from the Federal Government passes through our office, the Department of Education, to the Intermediate School District.

> Q. And then in terms of you said that they had various models for utilizing those funds. Is that at their discretion to choose which model they will use?

> A. It's a distribution model that's determined by each ISD in relationship to the way in which they wish to support their local districts.

> Q. So the MDE does not mandate how they distribute those funds?

> A. That's correct.

Heck Decl. Ex. 1-E (Chapman Tr. at 27:14 – 28:18) (emphasis added).

As the 2018-19 Learning Support Services Staffing List establishes, FCS is not receiving sufficient IDEA funding directly from the MDE and GISD to fill its special education and related services positions.  FCS also is receiving almost no special education and related services from the GISD.  Appendix B to the GISD's Special Education Mandatory Plan reveals that FCS is responsible for providing districtwide psychological services; school social workers; orientation and mobility specialists; teacher consultants for learning disabilities, as well as teacher consultants for visually impaired, hearing impaired, and physically or otherwise health impaired students; occupational therapy; physical therapy; speech therapy; and homebound services.  The GISD only shares responsibility with FCS for providing teacher consultants for emotionally impaired students within the district.  (Dkt. 79-2, Pg. ID 3334).  The GISD provides every other school district under its auspices with at least five of the aforementioned services, and in most districts, it provides six or more of these services and shares responsibility for others.  (*Id.*).  FCS is the glaring anomaly, as the excerpt from Appendix B displayed below demonstrates:

**Special Education Diagnostic/Related Services**

Appendix B

| District Name | Psychological Services | School Social Worker | Orientation & Mobility | Teacher Consultant – VI | Teacher Consultant – LD | Teacher Consultant – HI | Teacher Consultant – EI | Teacher Consultant – POHI | Occupational Therapy | Physical Therapy | Homebound | Speech Therapy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atherton | C | D | I | I | I | I | D/I | I | I | I | D/I | D |
| Beecher | D | D | I | I | D | I | I | I | I | I | D/I | D |

Key:
D - Local District/PSA Provides Services

I - ISD Provides Services

C – Contracted Services

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bendle | C | D | I | I | D | I | D/I | I | I | I | D/I | D |
| Bentley | C | D | I | I | D | I | D/I | I | I | I | D/I | D |
| Carman Ainsworth | D/C | D | I | I | D | I | I | I | I | I | D/I | D |
| Clio | D/C | I | I | I | D | I | D/I | I | I | I | D/I | D |
| Davison | D | D/I | I | I | D | I | D/I | I | I | I | D/I | D |
| Fenton | D/C | D | I | I | D | I | D/I | I | I | I | D/I | D |
| Flint | D | D | D | D | D | D | D/I | D | D | D | D | D |
| Flushing | D | D | I | I | D | I | I | I | I | I | D/I | D |
| Genesee | C | I | I | I | D | I | I | I | I | I | D/I | D |
| Goodrich | C | I | I | I | D | I | D/I | I | I | I | D/I | D |
| Grand Blanc | D | D | I | I | D | I | D/I | I | I | I | D/I | D |
| Kearsley | D | D | I | I | D | I | D/I | I | I | I | D/I | D |
| Lake Fenton | C | C | I | I | D | I | C/I | I | I | I | D/I | D |
| LakeVllle | D | I | C | I | D | I | D/I | I | I | I | D/I | D |
| Linden | C | D | I | I | D | I | I | I | I | I | D/I | D |
| Montrose | C | I | I | I | D | I | D/I | I | I | I | D/I | D |
| Mt. Morris | D/C | I | I | I | D | I | I | I | I | I | D/I | D |
| Swartz Creek | D | I | I | I | D | I | D/I | I | I | I | D/I | D |
| Westwood Heights | C | I | I | I | D | I | I | I | I | I | D/I | D |
| Academy of Flint | D/C | C | I | I | D/C | I | D/C/I | I | I | I | D/I | D |
| Burton Glen Academy | D | D | I | I | D/C | I | D/C/I | I | D | I | D/I | D |
| Center Academy | D/C | C | I | I | D/C | I | D/C/I | I | I | I | D/I | D |
| Grand Blanc Academy | C | D | I | I | D/C | I | D/C/I | I | I | I | D/I | D |

(Dkt. 79-2, Pg. ID 3334).

## 2. Defendants' Systemic Failure to Provide A Free Appropriate Public Education In The Least Restrictive Environment

The FCS is also not systemically providing students with special needs with a free appropriate public education in the least restrictive environment as required by law.  Over the last five years for which data is available, approximately 26% to 29% of students with IEPs aged 6-21 in FCS schools have received their education inside the regular classroom environment *less than* 40% of the day.  This is approximately 2.5 to 3 times more than the state average, as shown below:

**Indicator #5B Educational Environment – Percentage of students with IEPs aged 6-21 that receive their education inside the regular class less than 40% of the day**[26]

| Year | Target | Flint Community Schools | Met? | Statewide[27] |
|---|---|---|---|---|
| **2012-13 Data** | ≤11.90% | 25.90% | Not Met | 11.40% |
| **2013-14 Data** | ≤11.90% | 28.39% | Not Met | 11.24% |
| **2014-15 Data** | ≤11.80% | 29.07% | Not Met | 11.08% |
| **2015-16 Data** | ≤11.70% | 28.35% | Not Met | 10.86% |
| **2016-17 Data** | ≤11.60% | 28.95% | Not Met | 10.90% |

During and after the lead crisis, the percentage of students with IEPs falling into this category increased by nearly 12% from 25.90% to 28.95%. These data indicate that FCS is systemically failing to educate students with special needs in the least restrictive environment.

3.      **Defendants' Systemic Failure to Provide Procedural Safeguards in the Student Discipline**

In addition to failing to provide special education students with a free appropriate public education in the least restrictive environment, FCS systemically fails to provide procedural safeguards to students with disabilities to prevent them from being removed from the educational setting as a result of their disabilities.

---

[26] *See* Heck Decl. Ex. 1-R.

[27] *See* Heck Decl. Ex. 1-R.

This systemic failure is demonstrated by self-reported statistics on the number of special education students suspended or expelled for more than cumulative ten days per school year from 2012-13 to 2015-16.  These statistics, set forth in the chart below, indicate that the percentage of students with IEPs subject to such disciplinary practices increased by a whopping 282% from the 2012-13 to the 2013-14 school year.  For the following two years, there was a similarly egregious discrepancy in the rate of suspensions and expulsions for students with disabilities.  In 2013-14, the percentage of these suspended or expelled for more than 10 days in FCS was more than five times the state average.  In 2014-15, it was more than ten times the state average, and in 2015-16, it was more than four times the state average.

**Indicator #4A Suspension/Expulsion[28] (significant discrepancy in the rate of suspensions and expulsions of greater than 10 days in a school year for children with IEPs)**

|  | Target | Flint Community Schools | Met? | Significant Discrepancy?[29] | Statewide |
|---|---|---|---|---|---|
| **2012-13 School Year Data** | ≤ 4.50% | 3.56% | Met | NO | 0.82% |
| **2013-14 School Year Data** | ≤ 4.30% | 13.59% | Not Met | YES | 2.48% |

---

[28] *See* Heck Decl. Ex. 1-Q.

[29] The Michigan Department of Education identifies districts "as having a *significant discrepancy* in rates of suspensions and expulsions *if more than five percent of its students with an IEP received out-of-school suspensions/expulsions for greater than ten cumulative days*." *See* 2015-16 School Year Data, Indicator Report: 4A, Suspension/Expulsion, http://bit.ly/2QG8vyY (emphasis added).

| | | | | | |
|---|---|---|---|---|---|
| **2014-15 School Year Data** | ≤ 4.10% | 14.12% | Not Met | YES | 1.34% |
| **2015-16 School Year Data** | ≤ 3.90% | 6.02% | Not Met | YES | 1.48% |

The above data are consistent with reports from FCS teachers that behavioral issues have significantly increased in FCS schools since the onset of the lead crisis. (Therrein Decl. Ex. 2 ¶¶ 17, 32; Lovette Decl Ex. 3 ¶ 14).   Despite this, the behavioral specialists contracted by the district are not required to have even minimal qualifications.   Most notably, it is not a prerequisite for behavioral specialists to have expertise in Applied Behavior Analysis ("BCBA") to assist teachers in developing meaningful and positive behavior programs for children with disabilities.  (Therrein Decl. Ex. 2 ¶¶ 17; Lovette Decl Ex. 3 ¶¶ 26-27).  FCS pays behavioral specialists roughly $14/hour without benefits, which significantly limits the pool of applicants and impedes retaining qualified individuals.  (Lovette Decl. Ex. 3 ¶ 28, 29).   The behavioral specialists employed by the private contractor receive no formal training from either FCS or GISD in positive behavior intervention strategies or the development of behavior intervention plans.  (Lovette Decl. Ex. 3 ¶¶ 25).  Teachers report that private behavioral specialists are largely ineffective and that behavior plans are not developed for students with disabilities that manifest in behavioral issues.  Even where behavior plans are developed, they

are not properly implemented.  (Therrein Decl. Ex. 2 ¶¶ 23, 37; Lovette Decl. Ex. 3 ¶ 29).

These policies, practices, and procedures constitute a clear systemic violation of the provision of procedural safeguards in the administration of disciplinary practices under federal and state law.

### 4. Special Education Students Have Poor Achievement Outcomes In FCS Schools

FCS's failure to provide necessary special education and related services in compliance with students' IEPs and 504 plans in the least restrictive environment, coupled with disciplinary measures that are administered without procedural safeguards, has resulted in exceedingly poor outcomes for special education students.  Both prior to, and following, the lead crisis, dropout rates for special education students in FCS have consistently been nearly 1.5 to 2 times higher than the statewide average, and substantially above the state's established targets.

**Indicator 2: Dropout[30] (high school dropout rates for students with IEPs)**

|  | Target | Flint Community Schools | Met? | Statewide |
|---|---|---|---|---|
| **2012-13 School Year Data** | ≤ 9.50% | 15.52% | Not Met | 8.63% |
| **2013-14 School Year Data** | ≤ 9.25% | 13.11% | Not Met | 7.86% |
| **2014-15 School Year Data** | ≤ 9.00% | 11.76% | Not Met | 7.35% |

---

[30] *See* Heck Decl. Ex. 1-P.

| | | | | |
|---|---|---|---|---|
| **2015-16 School Year Data** | ≤ 8.75% | 9.69% | Not Met | 7.06% |

FCS students with disabilities who are not forced to drop out and who are not involuntary pushed out through the district's pervasive disciplinary practices are graduating from high school with a regular diploma at extremely low rates. As the chart below demonstrates, from 2012-13 to 2014-15, only half of the FCS students with IEPs on average (46% to 56%) graduated with a regular diploma as part of a four-year cohort. In 2015-16, 69.81% of special education students graduated as part of a six-year cohort. Overall, the graduation rates are well below the MDE benchmark; only about one out of every two students in FCS with disabilities is graduating from high school in four years.

**Indicator 1: Graduation[31] (percentage of students with IEPs graduating from high school with a regular diploma)**

| | Target | Flint Community Schools | Met? | Statewide |
|---|---|---|---|---|
| **2012-13 Four-year Cohort Data** | ≥ 80.00% | 46.38% | Not Met | 53.63% |
| **2013-14 Four-year Cohort Data** | ≥ 80.00% | 56.67% | Not Met | 55.07% |
| **2014-15 Four-year Cohort Data** | ≥ 80.00% | 52.50% | Not met | 57.12% |

---

[31] *See* Heck Decl. Ex. 1-O.

| 2015-16 Six-year Cohort Data | ≥ 80.00% | 69.81% | Not met | 64.15% |
|---|---|---|---|---|

Finally, student achievement for all FCS students, including students with disabilities, is nothing short of abysmal. As of the end of the 2017-18 school year, only 4.2% of students in 3rd through 8th grade were proficient in Math and English Language Arts, 10.8% of third grade students were proficient in English Language Arts, and 0.9% of 11th graders were proficient on the M-STEP in all subjects. (Therrein Decl. Ex. 2 ¶ 30 & Ex. 8; Lovette Decl. Ex. 3 ¶ 41 & Ex. I). Teachers report that student achievement is lower since the lead crisis, and that there has been an increase in the number of kindergarten students who are non-verbal. (Therrein Decl. Ex. 2 ¶ 30; Christian Decl. Ex. 6). Three current FCS teachers, all in different elementary schools, commented separately that the current cohort of first grade students were unable to even recognize letters – a basic skill that should be mastered in kindergarten. (Lovette Decl. Ex. 3 ¶ 14).

The exceedingly poor outcomes for special education students in FCS schools are indicia of, and directly attributable to, the district's systemic lack of resources and its resulting systemic violations of the free appropriate public education, least restrictive environment, and disciplinary procedural safeguards requirements of federal and state law.

**D.    Defendants MDE and GISD Have Systemically Failed to Discharge Their Monitoring and Enforcement Responsibilities**

In the face of systemic violations of FAPE, LRE, and due process in discipline, the MDE and GISD have failed to discharge their monitoring and enforcement responsibilities under federal and state law. Teri Chapman testified that an internal 2013 office of auditor review of MDE found that the agency was in violation of its IDEA monitoring responsibilities. Heck Decl. Ex. 1-E (Chapman Tr. at 55:22 – 56:16). According to Ms. Chapman, "one of the findings that came from that audit was that some of our processes for verifying corrective action [by school districts] were actually being inconsistently done." Heck Decl. Ex. 1-E (Chapman Decl. at 56:1-4). She further explained that another finding was that at the time verification of mandated corrective action was being conducted by the intermediate school districts without independent verification by the MDE. Heck Decl. Ex. 1-E (Chapman Decl. at 56:5-57:3).

When Ms. Chapman assumed the role of Director of the Office of Special Education in 2014, she recalled that "[t]he office had been faced with a number of challenges to whether or not our systems were adequately addressing the obligations we had[.]" Heck Decl. Ex. 1-E (Chapman Tr. at 8:11-14, 61:1-7). As a result, she hired an outside consultant, Pingora Consulting, LLC, to "come to Michigan and take a look at our internal practice on how we conduct State complaint investigations and other obligations so that we could get some

recommendations on how we can improve those processes." Heck Decl. Ex. 1-E (Chapman Tr. at 61:8-20). In the fall of 2015, during the same period that the public became aware of the lead crisis in Flint, Pingora Consulting, LLC began working with the MDE. Heck Decl. Ex. 1-E (Chapman Tr. at 61:20-21).

In February 2016, the very month that Bilal Tawwab went before Congress seeking additional resources for FCS in the midst of the lead crisis, the MDE Office of Special Education was found non-compliant in its monitoring of FCS schools; monitoring activities that it undertook in conjunction with the GISD. Heck Decl. Ex. 1-E (Chapman Dep. Ex. 3); Ex. 1-C (Carroll Tr. at 56:24 – 57:3). A complaint brought against the MDE, FCS, and GISD by Michigan Protection & Advocacy Services, Inc. ("MPAS") was sent to an outside consultant to investigate. In its final decision, the investigator found that the MDE was non-compliant on all issues arising under both federal and state law. Heck Decl. Ex. 1-F (Chapman Dep. Ex. 3). Teri Chapman testified that the MDE had failed to monitor FCS consistently in conformance with its legal requirements and that "in failing to do so it lead [sic] to repeated non-compliance in the District." Heck Decl. Ex. 1-E (Chapman Tr. at 57:4-25). The MDE's Office of Special Education represented in a letter to MPAS regarding implementation of the final decision that the MDE's Office of Special Education secured a contract with an outside

consultant, Pingora Consulting, to assist in the redesign of the entire state complaint process. Heck Decl. Ex. 1-F (Chapman Dep. Ex. 3).

In February 2016, Pingora consultants issued their final report and recommendations. Heck Decl. Ex. 1-N (Pingora Final Report). Teri Chapman testified that implementation of Pingora's recommendations was critical because "a report in and of itself isn't very helpful if you don't take steps to put them into action." Heck Decl. Ex. 1-E (Chapman Tr. at 69:12-14). The review of the policies, practices, and procedures of the MDE's Office of Special Education undertaken by Pingora Consulting Group unearthed evidence of systemic violations of the MDE's and GISD's legal obligations. Specifically and notably, Teri Chapman testified that:

> We had also been operating in the absence of [a] clear understanding that anything in IDEA can be investigated through the State Complaint System. We were unaware apparently in our system at the time that there had been clear guidance issued from the federal office that issues pertaining to more substantive challenges such as eligibility and placement identification didn't have to only be resolved through due process hearing[s], but could in fact be investigated by the State and so we made changes to our process that was a much more complex investigation.
>
> So there was some additional learning that Pingora provided in terms of professional development for our staff to help them think about substantive issues that would be part of the State Complaint Investigation System.

> Heck Decl. Ex. 1-E (Chapman Tr. at 65:23 – 66:13).

The MDE and GISD's lack of awareness of their obligations to investigate substantive violations of the IDEA, and to issue corrective action plans related to these types of violations, placed them in systemic dereliction of their legal monitoring responsibilities.  Ms. Chapman elaborated about the training that was allegedly provided to MDE staff with respect to investigating, and issuing corrective action plans related to, substantive violations the IDEA as part of the state complaint process.  She claimed that the training that occurred after Pingora issued its report in February 2016 focused on substantive areas of compliance such as the following:

> A. . . . [W]e did not understand that where the local districts [sic] IEP team is responsible for determining eligibility, if through the course of an investigation we believe that based on the information the District had that they should have made a different decision, *we can order them to go back to redetermine, go back through that process to determine eligibility.*
>
> We can do that either because we feel they were inappropriately identified or not identified at all when they maybe should have been. Prior to this understanding we always felt that those were decisions IEP teams made and *who are we to question. . . . .*
>
> Maybe they've looked at a manifestation determination and said that the child should be expelled.  We may think that was an inappropriate decision.  *We can order them back to find that the child's behavior was a manifestation.*
>
> So there are more complex issues *that we are required to investigate we did not know.*  And because of that we've had a need for the support of Pingora to help us through that process.
>
> Q. And that process is still on-going?  It's not completed?

A.  Correct.

Heck Decl. Ex. 1-E (Chapman Tr. at 76:6 – 77:17) (emphasis).

Although Ms. Chapman testified that these professional development activities were in the process of being carried out in order to begin implementation of Pingora's recommendations, this was not corroborated by the other MDE witness who has been deposed to date.  Harmonee Costello works under Teri Chapman as a special education consultant employed by the MDE's Office of Special Education.  Heck Decl. Ex. 1-G (Costello Tr. at 6:17 – 7:4).  Her primary responsibility is to verify the correction of non-compliance after a state complaint has been filed.  However, she also is responsible for investigating complaints on occasion and is familiar with this process.  Heck Decl. Ex. 1-G (Costello Tr. at 7:5-9, 11:6-19).  When asked during her November 2017 deposition if she had received any training in 2016 or 2017 with respect to ensuring local districts' compliance with their legal obligations, she responded:

A. No.

Q. There's been no new training from the 2016 to 2017 year?

A.  You know what, I misspoke.

Q.  Okay.

A.  I believe there was one training.

Q.  And when was that?

A.  I couldn't tell you the date for sure.

Q.  And what did that training cover?

A.  It covered the State complaint process and how – the State complaint process and it was a case law update, current issues and trends and state complaints and also due process hearings was a part of that as well.  I think that was within the last year.

Q.  Were any changes made to the State complaint process during that time?

A.  *I don't recall.*

Heck Decl. Ex. 1- G (Costello Tr. at 92:16 – 93:10) (emphasis added).

The Pingora report also focused upon on the role of the intermediate school districts such as GISD in the state complaint process.  The stakeholder feedback that Pingora Consulting received during its review revealed a widespread perception that the intermediate school district investigators are poorly trained and lack objectivity.  Heck Decl. Ex. 1-N (Pingora Final Report, p. 8).  Stakeholders also criticized the intermediate school districts because their role as a gate keeper in the state complaint process creates conflict.  Heck Decl. Ex. 1-N (*Id.*).  In light of this feedback, one of the findings of the report was that:

> OSE requires the complaint to be filed with the SEA, but conducts a joint investigation with ISD staff.  Concerns were noted regarding the impartiality of this process, as the ISD serves as a "gate keeper," which may result in discouraging use of the state complaint process.

Heck Decl. Ex. 1-N (*Id.*)

The evidence demonstrates that MDE has not fully implemented recommended changes to the role of the intermediate school districts in the state complaint investigation process. Ambiguity remains regarding the delineation of responsibilities between the MDE and GISD. Teri Chapman testified that there was a "pause" on activities related to the "removal of the intermediate school district monitor from the investigation process" but claimed that by November 2017 the intermediate school districts had been phased out of this process and "do not conduct the investigation activities any longer." Heck Decl. Ex. 1-E (Chapman Tr. at 78:18 – 80:6).

Yet, Harmonee Costello gave contradictory testimony in November 2017, characterizing the GISD's role in the investigation process as the MDE's "co-investigators[,]" the same role it occupied when Pingora made its findings. Heck Decl. Ex. 1-G (Costello Tr. at 94:15-20). She elaborated that the GISD participates in interviews that are conducted via both conference calls and on-site visits and that the GISD may discuss what legal issues are going to be investigated. Heck Decl. Ex. 1-G (*Id.* at 94:21 – 95:10). She asserted that in sum, the MDE works closely with the intermediate school districts. Heck Decl. Ex. 1-G (*Id.* at 95:11-12). Harmonee Costello's understanding of the investigation process is consistent with the MDE's "State Complaint Investigation Process" manual, dated July 2017. Heck Decl. Ex. 1-M (*See* Steps 3 and 5).

Further, Cherie Wager, the Assistant Superintendent for Special Education
Services at the GISD, likewise characterized the GISD as "an extension of the
State education agency . . . in terms of monitoring and compliance" that
"enforce[s] what the requirements are from the – the Michigan Department of
Education."     Heck Decl. Ex. 1-H (Wager Tr. at 14:6-9, 35:15-20).
Notwithstanding this assertion, she disavowed responsibility for independently
monitoring or verifying FCS's compliance with the IDEA.  She stated that as long
as the MDE determines that FCS is performing at a 1 (meets requirements) or 2
(needs assistance) on the scale of 1-4 that the MDE uses to rate districts, "that, to
[her], means they [FCS] meet compliance of IDEA."  Heck Decl. Ex. 1-H (Wager
Tr. at 41:18-21).  When asked to rank FCS's IDEA compliance on a scale from one
to ten where ten represents perfect compliance and one represents a disaster, she
opined that if the district receives a score of a 1 or 2 from the MDE, "that would be
translated to a 10."  Heck Decl. Ex. 1-H (Wager Tr. at 41:21-22).

Ms. Chapman conversely testified that if a district receives a 2 (needs
assistance) on MDE's scale for two years in a row, as FCS had from 2014-15 to
2015-16, then the MDE will follow up with the district to determine what
resources they have "accessed and what they've been using to try to address the
issue." Heck Decl. Ex. 1-E (Chapman Tr. at 21:17 – 23:6).

The 2018 Strand Report issued to FCS from the MDE reveals that follow-up with districts is limited.  This report provided the district with a snapshot of how it performed on the indicators that the MDE tracks.  As outlined above, FCS fell well below the state targets on nearly all of these indicators.  Yet, the Strand Report that it received from the MDE, excerpted below, indicated in the "Next Steps" column that "No Action [was] Required."

| # | Indicator/Type | Data Year | District Calculation | Target | District Data | Target Met? | Release Date | Next Step |
|---|---|---|---|---|---|---|---|---|
| 1 | Graduation *(Results)* | SY 14-15 4-Year Cohort | (21 ÷ 40) X 100 | $\geq$ 80.00% | 52.50% | No | N/A | No Action Required |
| 2 | Dropout *(Results)* | SY 14-15 | (24 ÷ 204) X 100 | $\leq$ 9.00% | 11.76% | No | N/A | No Action Required |
| 4 A | Suspension/Expulsion *(Results)* | SY 14-15 | (180 ÷ 1275) X 100 | < 5.00% | 14.12% | No | N/A | No Action Required |
| 5 | Educational Environments *(Results)* | | | | | | | |
| 5 A | 80% or More | SY 15-16 | (521 ÷ 829) X 100 | $\geq$ 63.50% | 62.85% | No | N/A | No Action Required |
| 5B | 40% or Less | SY 15-16 | (235 ÷ 829) X 100 | $\leq$ 11.70% | 28.35% | No | | |
| 5C | Separate Facilities | SY 15-16 | (1 ÷ 829) X 100 | $\leq$ 5.32% | 0.12% | Yes | | |

Heck Decl. Ex. 1-L.

According to Ms. Chapman, the MDE still had not come into full compliance with the IDEA by the time she was deposed in this case in November 2017. She stated that:

> Well, I don't think when you work with people in such complex things as this law is that you're probably ever going to be a ten but I have a lot of confidence in our systems today. I think that the staff has made significant progress so I would feel more like eight, nine, eight. I would say pretty strong. There's always room for improvement in everything that we do.

Heck Decl. Ex. 1-E (Chapman Tr. at 78:9-17).

The systemic failures of MDE to provide supervision and support to MDE has recently been underscored by the US Department of Education's ("USDOE") evaluation of MDE performance of its IDEA oversight obligations. Earlier this year, USDOE determined Michigan was the only state in the country to receive a "Needs Intervention" rating for failing to meet federal education requirements under the IDEA after two consecutive years of a "Needs Assistance" rating. (Lovette Decl. Ex. 3 ¶ 40, Ex. J). The U.S. Department of Education's rating, which reflects on both the MDE and GISD's compliance with their IDEA obligations, is wildly at odds with Ms. Chapman's rating of her department at an eight or a nine in terms of IDEA compliance.

# IV    ARGUMENT

To address the systemic problems identified above, Plaintiffs seek certification of a class consisting of all present and future children, ages 3 through age 26, who attend or who will attend FCS schools and who are eligible or who will be eligible for special education and related services pursuant to the IDEA and its federal implementing regulations, and/or 504 services pursuant to Section 504, as well as analogous provisions of Michigan state law (the "Proposed Class").

# V    THE PROPOSED CLASS SATISFIES RULE 23(A) REQUIREMENTS

A class must satisfy each of the four prerequisites of Fed. R. Civ. P. 23(a) in order to be certified. *Calloway v. Caraco Pharm. Labs., Ltd.*, 287 F.R.D. 402, 406 (E.D. Mich. 2012). The four requirements are: 1) the class must be so numerous that joinder of all members is impracticable (numerosity); 2) there must be questions of law or fact common to the class (commonality); 3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality); and 4) the representative parties must fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

Plaintiffs' proposed class here easily meets each of Rule 23(a)'s four requirements. Where, as here, Plaintiffs' claims relate to system-wide, wholesale violations of federal and state education laws, and Plaintiffs seek to vindicate the

rights of disabled students who, without class certification, will be unable to protect their own rights, class certification is necessary. *See, e.g., R.A.G. v. Buffalo City School Dist. Bd. of Educ.*, 569 Fed. App'x 41 (2d Cir. 2014) (affirming the district court's grant of class certification and finding that commonality was satisfied where "Plaintiff's entire case is predicated on a policy that is applied uniformly to all students. . . ."); *J.G. v. Board of Education of Rochester City School District*, 830 F.2d 444, 447 (2d Cir. 1987) (holding "there can be little dispute that claims of generalized violations such as these lend themselves well to class treatment."). Further, because Plaintiffs seek declaratory and injunctive relief that will offer redress for the class a whole, a class action is the most efficient and appropriate way to vindicate the rights to which Plaintiffs are entitled and class certification should be granted.

Plaintiffs will first establish that the Proposed Class satisfies the requirements of Rule 23(a). Next, Plaintiffs will establish that the Proposed Class is appropriate pursuant to the standards set forth in Rule 23(b).

## A. The Proposed Class Satisfies the Numerosity Requirement of Rule 23(a)(1)

The Proposed Class satisfies the numerosity requirement of Rule 23(a)(1). This Rule requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The threshold to satisfy the numerosity requirement is not high in the Sixth Circuit and "is usually satisfied by the numbers

alone." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  Classes of only 35 members have been upheld by the Sixth Circuit and courts in this district have stated that "[t]he modern trend for meeting the numerosity factor is to require only between 21 and 40 class members." *Davidson v. Henkel Corp.*, 302 F.R.D. 427, 436 (E.D. Mich. 2014) (holding that 49 proposed class members satisfied Rule 23(a)'s numerosity requirement and granting motion for class certification) (internal quotation omitted); *In re Am. Med. Sys.*, 75 F.3d at 1076 (noting that "[t]he United States Court of Appeals for the Sixth Circuit has previously held that a class of 35 was sufficient to meet the numerosity requirement.") (citing *Afro Am. Patrolmens League v. Duck*, 503 F.2d 294 (6th Cir. 1974)).  Courts certifying classes where the named plaintiffs are students with disabilities bringing suit on behalf of all students eligible to receive special education services under IDEA have reiterated these principles regarding numerosity.  *See R.P.-K. v. Dep't of Educ.*, 272 F.R.D. 541, 547 (D. Haw. 2011) (noting that "a class that is likely to exceed forty members satisfies numerosity" and certifying class of individuals entitled to receive special education and related services under the IDEA).[32]

---

[32] *See also, e.g.*, *P.V. v. Sch. Dist. of Phila.*, 289 F.R.D. 227, 233 (E.D. Pa. 2013) (stating that, "[i]n general . . . if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met" and certifying class of K-8 students requiring autism support); *R. A-G v. Buffalo City Sch. Dist. Bd. of Educ.*, No. 12-CV-960S, 2013 U.S. Dist. LEXIS 93924, at *33 (W.D.N.Y. June 30, 2013) (noting that "[a] reasonably estimated class of forty or more members raises a presumption of numerosity" and certifying class of children

Here, the class numbers in the multiple hundreds if not thousands and thus clearly satisfies the numerosity standard under Rule 23(a)(1).

The most recent data reveal that in the 2017-18 academic year, 902 students in FCS qualified for special education and related services, representing nearly 20% of the FCS student population.  This number reflects only those students who have currently been identified as having a disability.  This number will inevitably increase once the screening and assessment process established by the partial settlement in this case (Dkt. 116) is put into place.[33]

---

between the ages of 5 and 21 receiving services due to their classification as disabled under IDEA); *J.S. v. Attica Cent. Sch.*, No. 00-CV-513S, 2006 U.S. Dist. LEXIS 12827, at *12-13 (W.D.N.Y. Mar. 7, 2006) (holding that "[w]hile a potential class of forty members is generally presumed sufficiently numerous, there is 'no magic minimum number that breathes life into a class'" and certifying class of children aged 3 to 21 who should be classified as disabled under the definition in IDEA) (citations omitted).

[33] That Plaintiffs cannot provide an exact number of class members is no bar to certification.  *See R.P.-K.*, 272 F.R.D. at 547 (holding, in action brought under IDEA, that "courts need not determine the exact size of a class in order to find numerosity satisfied" and that "[w]hen the exact number of class members cannot be ascertained, the court may make common sense assumptions to support a finding of numerosity"); *R. A-G*, 2013 U.S. Dist. LEXIS 93924, at *33 (noting that numerosity does not require "evidence of the exact class size" and certifying class in action brought under IDEA); *LV v. N.Y.C. Dep't of Educ.*, 2005 U.S. Dist. LEXIS 20672, at *10 (S.D.N.Y. SepT. 15, 2005) (holding, in action brought under IDEA, that where "the precise number of persons affected is within defendants' control, plaintiffs may reasonably rely on the 'reasonable inferences drawn from the available facts' in establishing the impracticability of joining hundreds of potential claims of class members."); *Ray M. by Juana D. v. Bd. Of Educ. Of City Sch. Dist. Of City of N.Y.*, 884 F. Supp. 696, 699 (E.D.N.Y. 1995) (holding that "plaintiffs are not obligated to show an exact number of class members" and

Numerosity is satisfied here not only by class size, but also by a variety of other factors courts consider in the numerosity analysis, including judicial economy, the financial resources of class members, the nature of the claims asserted and the relief requested, and the ability of class members to institute individual suits on their own. *Calloway,* 287 F.R.D. at 406. Courts also consider the transitory nature of a proposed class as an additional reason to certify a class. *See R.P.-K.*, 272 F.R.D. at 548 (holding that where "it is impossible to know who or how many students precisely would be qualified for a FAPE . . . now or in the future," joinder was rendered impracticable and the numerosity requirement was satisfied). Each of these factors is present here.

First, Flint has a staggering childhood poverty rate of 60%. (*See supra*, Section III). Many students within Flint come from low-income families and cannot afford their own individual representation. Second, the relief Plaintiffs request – declaratory and injunctive relief (Compl. ¶ 395) – makes this action particularly appropriate to maintain on a class-wide basis, as resolution of the case will not require individualized relief. Rather, the institutional and policy changes Plaintiffs seek will affect all members of the class equally, obviating a need to scrutinize any one plaintiff. Third, judicial economy is best served by the maintenance of this suit, rather than inviting a situation where dozens or even

certifying class of all disabled preschool students living in New York City aged three to five).

hundreds of individual plaintiffs bring suits seeking remedies that can be obtained in this class action. Finally, the transitory nature of the proposed class – which is comprised of school children who may age out of the class or move from the district and of unknown numbers of children who may develop qualifying disabilities in the future – counsels in favor of maintaining this suit as a class action. *See, e.g.*, *Ray M. v. Bd. of Educ.*, 884 F. Supp. 696, 706 (E.D.N.Y. 1995) (holding that where "class membership is revolving rendering joinder impracticable," the numerosity requirement was satisfied and adding additional students to previously certified class of preschool students who had not received special education services); *Andre H. v. Ambach*, 104 F.R.D. 606, 612 (S.D.N.Y. 1985) (stating that "[t]he fact that the population is constantly revolving establishes sufficient numerosity" and certifying class of juvenile center residents in need of special education and related services).

Accordingly, the Proposed Class satisfies the numerosity requirement of Rule 23(a)(1).

## B.    The Proposed Class Satisfies the Commonality Requirement of Rule 23(a)(2)

Commonality is easily satisfied for the Proposed Class because Plaintiffs seek injunctive and equitable relief from Defendants' injurious systemic conduct, discussed *supra*.   The commonality requirement is satisfied by a showing of common questions of law and fact, the resolution of which will affect all or a

significant proportion of the proposed class. *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998) (citations omitted); Fed. R. Civ. P. 23(a)(2) (Rule 23(a)(2)'s commonality requirement is met when "there are questions of law or fact common to the class.").  In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court made clear that "[w]hat matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 85 N.Y.U. L. Rev. 97, 132 (April 2009)) (emphasis in original).

Courts in this district routinely note that the test for commonality is "not demanding."  *Reese v. CNH America LLC*, 227 F.R.D. 483, 487 (E.D. Mich. 2005).  Building upon the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, the Sixth Circuit has observed that "all *Dukes* requires" is the identification of "a common question [that] will yield a common answer for the entire class that goes to the heart" of the defendants' liability.  *Rikos v. Procter & Gamble*, 799 F.3d 497, 508-09 (6th Cir. 2015).  Questions unique to an individual plaintiff or group of plaintiffs will not defeat a finding of commonality. *Reese*, 227 F.R.D. at 488 (E.D. Mich. 2005) ("factual and legal variations . . . do not render the proposed Class unworkable; nor do they demonstrate a lack of commonality and/or typicality.").  Indeed, "there need be only one common question to certify a class."

*Glazer v. Whirlpool Corp.*, 722 F.3d 838, 853 (6th Cir. 2013); *see also Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998) (noting that it is enough if "there is at least one issue whose resolution will affect all or a significant number of the putative class members.") (citations omitted).

As an initial matter, commonality is readily satisfied here because of the systemic injunctive relief Plaintiffs seek. Courts have noted that "because the [commonality] requirement may be satisfied by a single common issue, it is easily met" in cases seeking systemic injunctive relief because such actions "by their very nature often present common questions satisfying Rule 23(a)(2)." *CG v. Commonwealth Dep't of Educ.*, Civil Action No. 1:06-CV-1523, 2009 U.S. Dist. LEXIS 90028, at *14 (M.D. Pa. Sep. 29, 2009). Here, Plaintiffs seek to enjoin Defendants from continuing to engage in system-wide policies and practices that violate their federal and state rights to receive a free and appropriate public education in the least restrictive environment and to be afforded procedural safeguards in the administration of disciplinary activities, free from discrimination based on their disabilities. Thus, the injunctive relief Plaintiffs seek presents a common question that easily satisfies this prong of the class certification test. *See id.* (certifying class where plaintiffs sought to enjoin the Pennsylvania Secretary of Education from using the current funding formula and finding there was a common question of whether Pennsylvania's funding regime impeded special-needs

65

students' educations in violation of IDEA, the ADA, the Rehabilitation Act, and the Fourteenth Amendment).

The injunctive nature of this proceeding is not the only reason that commonality is readily found here. The Plaintiffs have established the systemic nature of Defendants' violation in this case, demonstrating that commonality has been satisfied. As described *supra*, Plaintiffs have pointed to systemic policies, practices, and procedures – including with respect to resources for special education and 504 services – that give rise to plaintiffs' claims. Courts have found that challenges to systemic policies, practices, and procedures satisfy commonality. *See In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 217 (E.D. Mich. 2002); *Fox*, 172 F.R.D. at 661. Indeed, where a proposed class action "effectively challenges a school district's failure to . . . accommodate disabled students on a system-wide basis, courts routinely find that commonality it satisfied." *J.S. v. Attica Cent. School District*, 2006 U.S. Dist. LEXIS 12827 (W.D.N.Y. 2006) (citing cases); *see also C.G. v. Commonwealth of Pa. Dep't of Educ.*, 2009 U.S. Dist. LEXIS 90028, at *16-17 (M.D. Pa. Sept. 29, 2009) (holding "that the commonality requirement was met because the main thrust of the plaintiffs' claims was allegation of a systemic failure," namely, the "systemic failure of the special-education funding formula to provide FAPE to special-needs

students at low-income schools with high special-needs populations within the state.").

Commonality is satisfied here because each member of the Proposed Class has suffered the same injury resulting from the same conduct by the Defendants – deprivation of a free appropriate education in the least restrictive environment and a lack of procedural safeguards in the administration of disciplinary practices. Regardless of each representative plaintiffs' individual needs, Defendants' systemic policies, practices, and procedures, including those leading to a chronic lack of resources in FCS schools, have resulted in the: (1) failure to provide children with qualifying disabilities under the IDEA or Section 504 with special education programs and services, thereby depriving them of FAPE and placement in the LRE; and (2) failure to provide such qualifying students with procedural due process in the administration of disciplinary activities or positive behavioral supports.

The overarching common questions of fact are evident, as they pertain to, *inter alia*: (a) the existence, extent, and application of the Defendants' policies, practices, and procedures; and (b) the resources, programs, and services available to members of the Proposed Class. The common questions of law relate to whether these system-wide policies, practices, and procedures comport with the IDEA, Section 504, Title II and state law, to the extent that they, *inter alia*: (a)

deprive children with qualifying disabilities of the programs and services that they are entitled under federal and state law; (b) fail to provide children with qualifying disabilities with a free appropriate education in the least restrictive environment; and (c) subject the members of the Proposed Class to the administration of discipline without required procedural safeguards and to discrimination based upon their disabilities. These are matters that can be resolved only through class-wide litigation.

As demonstrated above, FCS has an ongoing pattern and practice of systematically failing to provide special education and related services compliant with students' IEPs and 504 plans in the least restrictive environment, and of failing to provide procedural safeguards in the administration of disciplinary practices. The systemic and recurring nature of Defendants' violations are evidenced by: (1) cuts to staff and pervasive vacancies, which have eroded the provision of essential special education and related services; (2) high percentages of special education students being educated inside the regular classroom less than 40% of the day; (3) severe discrepancies in the rates of students with disabilities being suspended or expelled for more than ten cumulative days in a school year; (4) exceedingly poor outcomes for special education students in FCS schools; and (5) the expert opinions of Dr. William Therrein and Dr. Gail Lovette, attached hereto as Exhibits 2 and 3.

Each of the systemic violations described above represents a "course of conduct that affects a group of persons and gives rise to a cause of action," which is all that is required in the Sixth Circuit to satisfy commonality. *See In re Northwest Airlines*, 208 F.R.D. at 217. Moreover, these systemic violations evidence policies of Defendants, which bear upon the issues at the center of this litigation, thus providing further support for commonality. *See Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 661 (E.D. Mich. 1995) (commonality is satisfied "as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation"). Defendants' systemic violations under the IDEA, Section 504, Title II, and Michigan state law are more than adequate to satisfy the commonality requirement. *See, e.g.*, *P.V. v. Sch. Dist. of Phila.*, 289 F.R.D. 227, 233-34 (E.D. Pa. 2013) (holding that where plaintiffs alleged a "systemic failure" of defendant's policy of upper-leveling autistic students in violation of the IDEA, commonality was satisfied); *J.S. v. Attica Cent. Sch.*, No. 00-CV-513S, 2006 U.S. Dist. LEXIS 12827, at *15-16 (W.D.N.Y. Mar. 7, 2006) ("Where, as here, a proposed class action effectively challenges a school district's failure to evaluate and accommodate disabled students on a system-wide basis, courts routinely find that commonality is satisfied").

A class-wide proceeding here would generate common *answers* apt to drive the resolution of the litigation. *Wal-Mart Stores, Inc.*, 564 U.S. 338, 350. Such quintessential common answers would touch upon the impact of increased funding, higher levels of filled staffing positions, modified policies regarding the provision of special education and related services in the least restrictive environment and the application of disciplinary practices, and better quality control and supervision by the MDE and GISD. All of these are common answers insofar as they naturally benefit the class as a whole, and not just the individual students.

## C. The Claims of the Class Representatives are Typical of the Claims of the Proposed Class under Rule 23(a)(3)

The third requirement for class certification under Rule 23(a)(3) is that the claims or defenses of the representative parties are typical of the claims or defenses of the entire class. The Supreme Court has stated that the commonality and typicality requirements "tend to merge" because both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members were be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 at n.13 (1982); *Dukes*, 564 U.S. at 349-50 n.5. Similar to the test for commonality, the test for typicality is "not demanding" and does not require identical facts for each class member. *See Reese*, 227 F.R.D. at 487-88; *Johnson v.*

*District of Columbia*, 248 F.R.D. 46, 53 (D.D.C) ("demonstrating typicality does not mean showing that there are no factual variations between the claims of the plaintiffs"); *McBride v. Mich. Dep't of Corr.*, 2017 U.S. Dist. LEXIS 113144, *16 (E.D. Mich., July 30, 2017) (granting class certification and noting that the mere fact that each potential class member may have an impairment somewhat different than other members does not "negate the focus of the litigation"). "A representative's claims are 'typical' within the meaning of Rule 23(a)(3) if the defendant's conduct that gave rise to the representative's claims also gave rise to the class members' claims, and if the representative and class members seek to establish the defendant's liability 'based on the same legal theory.'" *Hillson v. Kelly Servs.*, 2017 U.S. Dist. LEXIS 8699 (E.D. Mich. 2017), quoting *Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 438 (6th Cir. 2009); R.A.G. v. Buffalo City Sch. Dist. Bd. Of Educ., No. 12-CV-960S, 2013 U.S. Dist. LEXIS 93924, at *32 (W.D.N.Y. June 30, 2013) (stating that typicality is met where it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented).

Here, each of the named Plaintiffs' claims are typical because they have suffered identical injuries as members of the Proposed Class as a result of the alleged districtwide policies, practices, and procedures. All of the named Plaintiffs have been subjected to the same systemic discriminatory and retrogressive policies

of the Defendants as the rest of the class, which has resulted in the denial of a free and appropriate public education in the least restrictive environment and the denial of procedural safeguards in the administration of disciplinary practices for the named plaintiffs, just as it has for the rest of the class.  Defendant FCS consistently and repeatedly engaged in practices and procedures which are unlawful under the IDEA, Section 504, Title II, and Michigan state law including:  failure to provide special education and/or 504 services in accordance with IEPs and/or 504 plans; failure to provide these services in the least restrictive environment; administration of excessive disciplinary measures against students with disabilities, including suspensions and expulsions; failure to provide procedural safeguards and resorting to removal and seclusion techniques. Defendants MDE and GISD have also enacted and pursued policies that have impacted plaintiffs on a class-wide basis. MDE and GISD have failed to provide adequate resources, including those required to attract and retain necessary special education staff; and have failed to effectively monitor FCS in the carrying out of its required duties under the IDEA, its implementing regulations, and analogous provisions of state law.

The very same conduct by Defendants that gave rise to the named Plaintiffs' claims also gave rise to the class members' claims, and the named Plaintiffs and class members seek to establish Defendants' liability based on the same legal theories.  *See Hillson.*  The named Plaintiffs' claims—whether they relate to their

IEPs and/or 504 plans, education in the least restrictive environment, due process in disciplinary procedures, or discrimination on the basis of disability—all arise from the systemic violations described in Section III, *supra*. The claims of the named Plaintiffs go hand-in-hand with the statistics that show that, as a group, students with disabilities in Flint are (1) segregated from the general education environment at rates far higher than the statewide average; and (2) suspended or expelled at rates that are more than four times the statewide average.

Taken together, the claims of the named Plaintiffs undoubtedly reflect and represent the claims of the entire Proposed Class. The injuries of the named Plaintiffs resulted from the same policies, practices, and procedures that impact the Proposed Class at large, and their causes of action are identical to those of the Proposed Class. As a result, the claims or defenses of the representative parties are typical of the claims or defenses of the class.

## D.   Plaintiffs and Plaintiffs' Counsel Will Fairly and Adequately Protect the Interests of the Proposed Class under Rule 23(a)(4)

Under Rule 23(a)(4), the adequacy requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The test for adequacy in the Sixth Circuit examines two factors: "1) [T]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Pelzer v. Vassalle*,

655 F. App'x 352 (6th Cir 2016) (citation omitted). Both of these factors are readily satisfied here.

As described above, each of the named Plaintiffs has causes and claims that are identical to the claims any unnamed class member might bring against the Defendants. All Plaintiffs, whether named or unnamed, have the same interest in compelling the Defendants to abide by their obligations under the IDEA, Section 504, Title II, and Michigan state law. The declaratory and injunctive relief sought will vindicate that shared interest. There is nothing in the record nor have there been any credible allegations by Defendants' counsel that the named Plaintiffs in this case are compromised or biased in any manner. Nor could there be. Each of the named Plaintiffs and their families has committed significant time and dedication to this lawsuit. The named Plaintiffs seek only what they are entitled to under the law and their interests are wholly in line with those of the Proposed Class.

Lastly, as set forth in the Complaint and in Part III below, Plaintiffs' counsel are experienced in class action litigation and specifically in educational class actions under the IDEA and Section 504. Plaintiffs' counsel has pursued this action vigorously and will continue to do so.

## VI    PLAINTIFFS SEEK CERTIFICATION OF THEIR CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER RULE 23(B)(2)

Class certification under Rule 23(b)(2) is appropriate where, as here, Plaintiffs seek injunctive relief from conduct that applies "generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   Fed. R. Civ. P. 23(b)(2).   Plaintiffs seek certification under Rule 23(b)(2) because the Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Courts in the Sixth Circuit have held that the requirements of Rule 23(b)(2) "should be liberally construed in civil rights actions. . . especially where. . . only declaratory and injunctive relief is sought." *Glover v. Johnson*, 85 F.R.D. 1, 3 (E.D. Mich. 1977).   Similarly, the Supreme Court has recognized that civil rights cases, such as the suit at hand, are "prime examples of what [Rule 23(b)(2) class actions are] meant to capture." *Wal-Mart*, 131 S. Ct. at 361 (citation and internal quotation marks omitted).

Courts routinely certify 23(b)(2) classes in the education context, and the same result is warranted here.[34]   *See, e.g.*, *R. A-G v. Buffalo City Sch. Dist. Bd. of*

---

[34] Additionally, there is no definiteness or ascertainability requirement in the Sixth Circuit for a 23(b)(2) class. *See Cole v. City of Memphis*, 839 F.3d. 530, 542 ("The precise identity of each class member need not be ascertained here, particularly given that notice is not required as it would be in a (b)(3) class.   The decisions of

*Educ.*, No. 12-CV-960S, 2013 U.S. Dist. LEXIS 93924, at \*37 (W.D.N.Y. June 30, 2013); *R.P.-K. v. Dep't of Educ.*, 272 F.R.D. 541, 551 (D. Haw. 2011); *J.S. v. Attica Cent. School District*, 2006 U.S. Dist. LEXIS 12827, at \*20 (W.D.N.Y. 2006); *LV v. N.Y.C. Dep't of Educ.*, 2005 U.S. Dist. LEXIS 20672, at \*21 (S.D.N.Y. Sep. 15, 2005).

## VII   THE COURT SHOULD DESIGNATE PLAINTIFFS' COUNSEL AS CLASS COUNSEL

Rule 23(g)(1)(A) sets forth four criteria for the court to consider in appointing class counsel: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Plaintiffs' counsel satisfy each of these requirements. Counsel for the plaintiffs, which consists of attorneys from the American Civil Liberties Union Fund of Michigan, Education Law Center, and White & Case LLP, are experienced in civil rights litigation, disability law, education law, and class actions. Counsel have devoted thousands of hours to this case and have obtained significant results

---

other federal courts and the purpose of Rule 23(b)(2) persuade us that ascertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.")

for the plaintiffs, including the Partial Settlement Agreement, which guarantees universal screening and assessment. The American Civil Liberties Union Fund of Michigan has extensive experience litigating civil rights cases, including class actions, as well as cases related to the Flint water crisis. (Ex. 8). Similarly, the Education Law Center is the nation's preeminent education rights law firm and litigates cases nationwide on behalf of students similar to the plaintiff class here (Ex. 9). White & Case LLP is an international law firm with over a dozen lawyers who have committed significant time and resources to this case. White & Case has experience litigating class actions and educational law cases. (Ex. 7). This court should designate plaintiffs' counsel as class counsel under Rule 23(g)(1) so that counsel can continue litigating this landmark case to vindicate the rights of the plaintiff class and safeguard each of their futures.

DATED: October 15, 2018

By: /s/ Lindsay M. Heck

Gregory M. Starner

Kristin L. Totten (P72942)               Lindsay M. Heck
Daniel S. Korobkin (P72842)              Walter A. Ciacci
Michael J. Steinberg (P43085)            Dominique N. Forrest
ACLU Fund of Michigan                    Laura A. Grai
2966 Woodward Ave.                       Michael Jaoude
Detroit, MI 48201                        Celine Aka
(313) 578-6800                           Maria A. Brusco

ktotten@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumnic.or


David G. Sciarra
Gregory G. Little
Jessica A. Levin
Education Law Center
60 Park Place
Suite 300
Newark, NJ 07102
(973) 624-1815
dsciarra@edlawcenter.org
glittle@edlawcenter.org
jlevin@edlawcenter.org

Lindsey B. Cherner
Andrew Gershenfeld
Lauren A. Kuehn
Andres Ivan Navedo
Kareem Ramadan
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
gstarner@whitecase.com
lindsay.heck@whitecase.com
walter.ciacci@whitecase.com
dominique.forrest@whitecase.com
laura.grai@whitecase.com


*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 15th day of October, 2018 the undersigned filed through CM/ECF with the Clerk of the Court the foregoing Plaintiffs' Motion for Class Certification, and I hereby request that a copy of this document be served by the Clerk's office via the Court's CM/ECF system upon all counsel of record in this case who are participants in the CM/ECF system.

BY:  <u>/s/ Lindsay M. Heck</u>

Lindsay M. Heck
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212)-819-8200
lindsay.heck@whitecase.com